FILED

2024 Sep-12  PM 07:19
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ALABAMA
# EASTERN DIVISION

|  |  |
|---|---|
| DON BUTLER, *et al.*, |  |
| *Plaintiffs*, |  |
| v. | Case No. 1:24-cv-00975-CLM |
| MERRICK GARLAND, in his official capacity as Attorney General of the United States, *et al.*, |  |
| *Defendants*. |  |

## DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................. 1

BACKGROUND .................................................................................................. 2

I.     Statutory and Regulatory Background ............................................................ 2

     A.    The Gun Control Act of 1968 .............................................................. 2

     B.    The Bipartisan Safer Communities Act of 2022 ....................................... 6

     C.    The Final Rule ......................................................................................... 8

     D.    Legal Challenges to the Rule ................................................................. 13

II.    Procedural History ....................................................................................... 14

LEGAL STANDARD .......................................................................................... 15

ARGUMENT ...................................................................................................... 16

I.     Plaintiffs Lack Standing to Challenge the Rule ............................................ 16

     A.    The Individual Plaintiffs Lack Standing to Bring a Pre-
           Enforcement Challenge Against the Rule .............................................. 17

     B.    The NRA Lacks Associational Standing ................................................ 23

II.    Plaintiffs Fail to Clearly Show They Will Suffer Irreparable Harm ............. 24

     A.    Plaintiffs' Multi-Month Delay in Seeking Preliminary Relief
           Precludes a Finding of Irreparable Harm ............................................... 24

     B.    Plaintiffs' Alleged Injuries Do Not Amount to Irreparable Harm ........ 29

III.   Plaintiffs Are Not Substantially Likely to Succeed on the Merits ................ 32

     A.    The Rule Is Consistent with the GCA and ATF's Authority ................ 32

B. The Rule Is Not Arbitrary and Capricious .................................................. 50

C. The Rule is Not Unconstitutionally Vague ................................................ 54

D. The Rule Comports with the Second Amendment ................................. 58

E. Plaintiffs' Separation-of-Powers Claim Lacks Merit ............................ 65

IV. The Balance of the Equities and Public Interest Disfavor Injunctive Relief .................................................................................................................... 66

V. Any Relief Should Be Limited ..................................................................... 68

CONCLUSION ..................................................................................................... 70

# TABLE OF AUTHORITIES

## CASES

*Abramski v. United States*,
573 U.S. 169 (2014) ............................................................... 1, 3, 43, 67

*Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.*,
594 U.S. 758 (2021) ............................................................49

*Alabama v. U.S. Dep't of Com.*,
546 F. Supp. 3d 1057 (M.D. Ala. 2021)........................................ 25, 27

*Benisek v. Lamone*,
585 U.S. 155 (2018) ............................................................25

*Biden v. Nebraska*,
143 S. Ct. 2355 (2023)............................................................49

*Boroski v. Dyncorp Int'l*,
700 F.3d 446 (11th Cir. 2012) ..............................................37

*Bryan v. United States*,
524 U.S. 184 (1998) ............................................................5

*Case v. Ivey*,
No. 2:20-cv-777, 2020 WL 13747177 (N.D. Ala. Oct. 6, 2020) ........................27

*City of N. Miami v. FAA*,
47 F.4th 1257 (11th Cir. 2022)..............................................50

*City of S. Miami v. Governor*,
65 F.4th 631 (11th Cir. 2023)..............................................30

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013) ............................................................. 17, 21, 23

*Club Madonna, Inc. v. City of Miami Beach*,
924 F.3d 1370 (11th Cir. 2019)..............................................21

*Cole v. U.S. Dep't of Agric.*,
    33 F.3d 1263 (11th Cir. 1994) ...............................................................46

*Common Cause/Ga. v. Billups*,
    554 F.3d 1340 (11th Cir. 2009) ..............................................................17

*Corbett v. Trans. Sec. Admin.*,
    930 F.3d 1225 (11th Cir. 2019) ..............................................................21

*Dela. State Sportsmen's Ass'n, Inc. v. Dela. Dep't of Safety & Homeland Sec.*,
    108 F.4th 194 (3d Cir. 2024) .................................................................31

*District of Columbia v. Heller*,
    554 U.S. 570 (2008) ...................................................................... 58, 60

*Dream Defs. v. Governor of the State of Fla.*,
    57 F.4th 879 (11th Cir. 2023) ........................................................ 18, 22

*Durr v. Shinseki*,
    638 F.3d 1342 (11th Cir. 2011) ..............................................................33

*Ezell v. City of Chicago*,
    651 F.3d 684 (7th Cir. 2011) .................................................................61

*FCC v. Fox Television Stations, Inc.*,
    556 U.S. 502 (2009) ...........................................................................51

*FCC v. Prometheus Radio Project*,
    592 U.S. 414 (2021) ...................................................................... 51, 52

*FDA v. All. for Hippocratic,*
    *Med.*, 602 U.S. 367 (2024) ........................................................... 16, 17

*Florida v. U.S. Dep't of Health & Hum. Servs.*,
    19 F.4th 1271 (11th Cir. 2021) ...................................................... 30, 66

*Francis v. Franklin*,
    471 U.S. 307 (1985) ...........................................................................45

*Georgia v. President of the U.S.*,
   46 F.4th 1283 (11th Cir. 2022) .......................................................... 15, 66, 69, 70

*Gill v. Whitford*,
   585 U.S. 48 (2018) ......................................................................................68

*Greater Birmingham Ministries v. Alabama*,
   161 F. Supp. 3d 1104 (N.D. Ala. 2016) ...............................................31

*Greater Birmingham Ministries v. Sec'y of State for State of Ala.*,
   992 F.3d 1299 (11th Cir. 2021) ...........................................................23

*Huddleston v. United States*,
   415 U.S. 814 (1974) .............................................................................3

*Jacobson v. Fla. Sec'y of State*,
   974 F.3d 1236 (11th Cir. 2020) ...........................................................24

*Kansas v. Garland*,
   No. 2:24-cv-88, 2024 WL 2384611 (E.D. Ark. May 23, 2024)..........................13

*Kansas v. Garland*,
   No. 6:24-cv-1086-TC-TJJ, 2024 WL 3360533 (D. Kan. July 10, 2024),
   *appeal filed*, No. 24-3101 (10th Cir. July 22, 2024) ............................... 13, 66, 67

*Klayman v. President of U.S.*,
   689 F. App'x 921 (11th Cir. 2017).......................................................19

*LaCroix v. Lee Cnty.*,
   819 F. App'x 839 (11th Cir. 2020)......................................................20

*League of Women Voters of Fla. Inc. v. Fla. Sec'y of State*,
   66 F.4th 905 (11th Cir. 2023)..............................................................56

*Licon v. Ledezma*,
   638 F.3d 1303 (10th Cir. 2011) ...........................................................52

*Lujan v. Defs. of Wildlife*,
   504 U.S. 555 (1992) .............................................................................22

*Mack v. USAA Ca. Ins. Co.*,
   994 F.3d 1353 (11th Cir. 2021) ............................................................16

*Madsen v. Women's Health Ctr., Inc.*,
   512 U.S. 753 (1994) ................................................................... 68, 70

*Maryland v. King*,
   567 U.S. 1301 (2012) ........................................................................67

*McRorey v. Garland*,
   99 F.4th 831 (5th Cir. 2024) .................................................... 58, 59, 61

*Md. Shall Issue, Inc. v. Moore*,
   -- F.4th --, 2024 WL 3908548 (4th Cir. Aug. 23, 2024) .....................62

*Menudo Int'l, LLC v. In Miami Prod., LLC*,
   No. 17-cv-21559, 2017 WL 4919222 (S.D. Fla. Oct. 31, 2017).................. 28, 29

*Miccosukee Tribe of Indians of Fla. v. United States*,
   566 F.3d 1257 (2009) ........................................................................51

*Millennium Funding, Inc. v. 1701 Mgmt. LLC*,
   No. 21-cv-20862, 2021 WL 3618227 (S.D. Fla. Aug. 16, 2021) ........................26

*Muransky v. Godiva Chocolatier, Inc.*,
   979 F.3d 917 (11th Cir. 2020).............................................................16

*Murthy v. Missouri*,
   144 S. Ct. 1972 (2024)................................................................. 16, 17

*Nat'l Mining Ass'n v. United Steel Workers*,
   985 F.3d 1309 (11th Cir. 2021) ...........................................................50

*N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*,
   597 U.S. 1 (2022) ..................................................................... 58, 64

*Norwegian Cruise Line Holdings Ltd. v. State Surgeon Gen., Fla. Dep't of Health*,
   50 F.4th 1126 (11th Cir. 2022).............................................................15

*Nw. Austin Mun. Util. Dist. No. One v. Holder*,
  557 U.S. 193 (2009) ............................................................66

*Pugin v. Garland*,
  599 U.S. 600 (2023) ...........................................................42

*Republic Aviation Corp. v. NLRB*,
  324 U.S. 793 (1945) ...........................................................46

*Sampson v. Murray*,
  415 U.S. 61 (1974) .............................................................32

*Siegel v. LePore*,
  234 F.3d 1163 (11th Cir. 2000) .............................................. *passim*

*SisterSong Women of Color Reprod. Just. Collective v. Governor of Ga.*,
  40 F.4th 1320 (11th Cir. 2022)...................................... 54, 56

*Snider Tire, Inc. v. Chapman*,
  No. 2:20-cv-1775, 2021 WL 2497942 (N.D. Ala. Apr. 27, 2021)............... 25, 27

*Summers v. Earth Island*,
  *Ins.*, 555 U.S. 488 (2009) ....................................................24

*Susan B. Anthony List v. Driehaus*,
  573 U.S. 149 (2014) ....................................... 16, 18, 20, 22

*Tech Traders, LLC v. Insuladd Env't, Ltd.*,
  No. 6:18-cv-754, 2018 WL 5830568 (M.D. Fla. Nov. 7, 2018) .........................28

*Teixeira v. Cnty of Alameda*,
  873 F.3d 670 (9th Cir. 2017) ...................................... 61, 63

*Texas v. ATF*,
  -- F. Supp. 3d --, 2024 WL 2967340 (N.D. Tex. June 11, 2024),
  *appeal filed*, No. 24-10612 (5th Cir. July 9, 2024) ..............................14

*TransUnion LLC v. Ramirez*,
  594 U.S. 413 (2021) ....................................... 16, 69

*U.S. Steel Corp. v. Astrue*,
   495 F.3d 1272 (11th Cir. 2007) ............................................................46

*United States v. Bailey*,
   123 F.3d 1381 (11th Cir. 1997) ...................................................... 35, 57

*United States v. Baptiste*,
   607 F. App'x 950 (11th Cir. 2015)................................................... 35, 36

*United States v. Biswell*,
   406 U.S. 311 (1972) ..........................................................................67

*United States v. Carter*,
   801 F.2d 78 (2d Cir. 1986) ................................................................34

*United States v. Dubois*,
   94 F.4th 1284 (11th Cir. 2024)....................................................... 59, 60

*United States v. Duncan*,
   Case No. 7:20-cr-00167-M-3, 2023 WL 7346042 (E.D.N.C. Nov. 7, 2023) ......61

*United States v. Flores*,
   652 F. Supp. 3d 796 (S.D. Tex. 2023)..................................................61

*United States v. Focia*,
   869 F.3d 1269 (11th Cir. 2017) ................................................ 21, 37, 59

*United States v. Gray*,
   470 F. App'x 468 (6th Cir. 2012).......................................................35

*United States v. Hester*,
   No. 23-11938, 2024 WL 4100901 (11th Cir. Sept. 6, 2024) ............................60

*United States v. King*,
   646 F. Supp. 3d 603 (E.D. Pa. 2022)...................................................61

*United States v. King*,
   735 F.3d 1098 (9th Cir. 2013) ............................................................34

*United States v. McNulty*,
   ---F Supp.3d.---, 2023 WL 4826950 (D. Mass. July 27, 2023) ..........................61

*United States v. Myers*,
   972 F.2d 1566 (11th Cir. 1992) ..................................................................45

*United States v. Nadirashvili*,
   655 F.3d 114 (2d Cir. 2011) ......................................................................34

*United States v. Palmieri*,
   21 F.3d 1265 (3d Cir. 1994),
   *vacated on other grounds*, 513 U.S. 957 (1994) ...................................34

*United States v. Rahimi*,
   144 S. Ct. 1889 (2024)................................................... 58, 62, 64, 65

*United States v. Rozier*,
   598 F.3d 768 (11th Cir. 2010) ..................................................................60

*United States v. Shipley*,
   546 F. App'x 450 (5th Cir. 2013) ..............................................................36

*United States v. Smith*,
   No. 23-10172, 2023 WL 4929961 (11th Cir. Aug. 2, 2023)................................34

*United States v. Tilotta*,
   Case No. 3:19-cr-04768-GPC, 2022 WL 3924282 (S.D. Cal. Aug. 30, 2022)....61

*United States v. Valdes*,
   681 F. App'x 874 (11th Cir. 2017)................................................. 34, 36

*United States v. Williams*,
   553 U.S. 285 (2008) .................................................................................56

*United States v. Wilmoth*,
   636 F.2d 123 (5th Cir. Unit A 1982) ........................................................36

*United States v. Woods*,
   684 F.3d 1045 (11th Cir. 2012) ................................................. 54, 57

*Vital Pharms., Inc. v. Alfieri*,
    23 F.4th 1282 (11th Cir. 2022) ...................................................... 15, 66

*Wall v. Ctrs. for Disease Control & Prevention*,
    588 F. Supp. 3d 1301 (M.D. Fla. 2022) ............................................30

*West Virginia v. EPA*,
    597 U.S. 697 (2022) ................................................................ 49, 50

*Winter v. Nat. Res. Def. Council*,
    555 U.S. 7 (2008) ............................................................................17

*Wreal, LLC v. Amazon.com, Inc.*,
    840 F.3d 1244 (11th Cir. 2016) .......................................... 15, 25, 27

## STATUTES

5 U.S.C. § 706(2) ............................................................... 50, 66

18 U.S.C. § 921 .....................................................................2, 6

18 U.S.C. § 921(a)(3) ..............................................................40

18 U.S.C. § 921(a)(5) ..............................................................59

18 U.S.C. § 921(a)(11)(a) ........................................................47

18 U.S.C. § 921(a)(11)(c) ..........................................................8

18 U.S.C. § 921(a)(13) ....................................................... 39, 40

18 U.S.C. § 921(a)(21)(C) ................................................ *passim*

18 U.S.C. § 921(a)(21)(D) ..........................................................7

18 U.S.C. § 921(a)(22) ...................................................... *passim*

18 U.S.C. § 922(a)(1)(A) .................................................. 3, 5, 41, 59

18 U.S.C. § 922(b)5 ...............................................................3, 4

18 U.S.C. § 922(c) ................................................................3

18 U.S.C. § 922(d) ................................................................5

18 U.S.C. § 922(g) ................................................................3

18 U.S.C. § 922(g)(8)............................................................65

18 U.S.C. § 922(t)(1) ..........................................................3, 4

18 U.S.C. § 924(a)(1)(D) .......................................................5

18 U.S.C. § 926(a) ........................................... 8, 47, 50, 65

Act of May 22, 1794, 1 Stat. 369, ch. 33, § 1, .......................62

Bipartisan Safer Communities Act,
    Pub. L. No. 117-159, 136 Stat. 1313 (2022) ....................6, 7

Brady Handgun Violence Prevention Act,
    Pub. L. No. 103-159, 107 Stat. 1536 (1993) .......................4

Firearms Owners' Protection Act,
    Pub. L. No. 99-308, 100 Stat. 449 (1986) .......................5, 6

Pub. L. No. 99-360, 100 Stat. 766 (1986)...............................6

**REGULATIONS**

27 C.F.R. § 478.11 ........................................................ *passim*

27 C.F.R. § 478.13 ........................................................ 10, 19

27 C.F.R. § 478.13(a)..................................................... *passim*

27 C.F.R. § 478.13(b) ......................................... 10, 33, 34, 35

27 C.F.R. § 478.13(c)....................................................... 11, 44

27 C.F.R. § 478.13(c)(2)(ii)(A) ...............................................................................11

27 C.F.R. § 478.13(c)(3)(i) ......................................................................................44

27 C.F.R. § 478.13(d)(1)............................................................................ 11, 36, 43

27 C.F.R. § 478.13(d)(2)...................................................................... 11, 12, 44, 45

27 C.F.R. § 478.13(e).............................................................................. 12, 45, 56

27 C.F.R. § 478.13(f) .................................................................................. 12, 45

27 C.F.R. § 478.13(g) ................................................................................ 12, 56

27 C.F.R. § 478.13(h) ................................................................................ 12, 45

27 C.F.R. § 478.57 ...................................................................................................12

27 C.F.R. § 478.78 ...................................................................................................12

27 C.F.R. §§ 478.121-478.134................................................................................4

Executive Order No. 14092,
    88 Fed. Reg. 16527 (Mar. 14, 2023). .....................................................8

Final Rule, Definition of "Engaged in the Business" as a Dealer in Firearms,
    89 Fed. Reg. 28,968 (Apr. 19, 2024) ........................................... *passim*

Notice of Proposed Rulemaking, Definition of "Engaged in the Business" as a
    Dealer in Firearms, 88 Fed. Reg. 61,993 (Sept. 8, 2023)......................8

**STATE STATUTES**

1 Laws of the State of Maine 546 (1830) ....................................................63

2 General Laws of Mass. from the Adoption of the Constitution to Feb. 1822
    (1823)........................................................................................................63

3 Laws of the Commonwealth of Massachusetts, from November 28, 1780,
    to February 28, 1807, (1807).....................................................................63

15 The Public Records of the Colony of Connecticut, from May, 1775, to June, 1776, Inclusive 191, An Act for Encouraging the Manufactures of Salt Petre and Gun Powder (1890) ...............................................................................63

Acts of the General Assembly of the State of New-Jersey, at a Session Begun at Princeton on the 27th Day of August 1776, and Continued by Adjournments 6, ch. 6, An Act for the Inspection of Gun-Powder, § 1 (1877) ......................................63

An Act Providing for the Appointment of Inspectors, and Regulating the Manufactory of Gun- Powder, secs. 1, 8 (1823).....................................................63

Colonial Laws of Mass. Reprint. from the Ed. of 1672 (1890)................................63

Laws of the State of New Hampshire; With the Constitutions of the United States and of the State Prefixed 276-78, An Act to Provide for the Appointment of Inspectors and Regulating the Manufactory of Gunpowder, secs. 1, 8 (1830) .....63

## OTHER AUTHORITIES

ATF Form 4473, Firearms Transaction Record, https://www.atf.gov/firearms/docs/4473-part-1-firearms-transaction-record-over-counter-atf-form-53009/download .........................................................................3

ATF, National Tracing Center, https://www.atf.gov/firearms/national-tracing-center...........................................4

FBI, National Instant Criminal Background Check System 2022 Operational Report, https://www.fbi.gov/file-repository/nics-2022-operations-report.pdf/view...........4

Perry Stein, *ATF traced Trump rally shooter's gun using records opposed by some in GOP*, Washington Post (July 21, 2024), http:// https://www.washingtonpost.com/national-security/2024/07/21/tracing-trump-rally-gun-atf-closed-business-records/ ........................................................4

William J. Krouse, Cong. Rsch. Serv., IF12197, *Firearms Dealers ''Engaged in the Business''* (2022), https://crsreports.congress.gov/product/pdf/IF/IF12197/2....................................7

## INTRODUCTION

When selling a firearm to a stranger, a person may have no obvious way to distinguish a law-abiding purchaser from a potentially dangerous one.  In the Gun Control Act of 1968 ("GCA"), Congress accordingly required those "engaged in the business" of dealing in firearms to obtain a federal firearms license and to comply with a series of verification, background-check, and recordkeeping obligations when transferring firearms.  These requirements serve the "twin goals" of "keep[ing] guns out of the hands of criminals and others who should not have them, and . . . assist[ing] law enforcement authorities in investigating serious crimes."  *Abramski v. United States*, 573 U.S. 169, 180 (2014).  Recognizing the harm to public safety caused by unlicensed firearms dealing, Congress recently amended the GCA via the Bipartisan Safer Communities Act of 2022 ("BSCA") to expand the category of conduct that constitutes being "engaged in the business" of firearms dealing and thus requires a federal license.  And in the Rule at issue in this case,[1] the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") exercised its statutory authority to promulgate regulations necessary to carry out the GCA by further clarifying what it means to be "engaged in the business" of dealing and setting forth conduct that presumptively does, or does not, so qualify.

---

[1] Final Rule, Definition of "Engaged in the Business" as a Dealer in Firearms, 89 Fed. Reg. 28,968 (Apr. 19, 2024) ("Rule").

The plaintiffs in this case—two individual gunowners and a national gun-rights organization—challenge the Rule under the Administrative Procedure Act ("APA") and on constitutional grounds, and they now seek a preliminary injunction. The Court should deny such extraordinary relief for several reasons. None of the Plaintiffs, for one, has standing to challenge the Rule in the first instance. Plaintiffs also fail to show that the Rule is causing them irreparable harm—as they must—a deficiency that is underscored by their several-month delay in seeking preliminary relief. And even if the Court were to address the merits, the Final Rule is consistent with the GCA and BSCA, is not unconstitutionally vague, and comports with the Second Amendment. Plaintiffs are therefore not substantially likely to succeed on the merits of any of their claims, and the balance of the equities also weighs strongly against enjoining a Rule that promotes public safety. Plaintiffs' Motion for Preliminary Injunction should accordingly be denied.

## BACKGROUND

### I.    Statutory and Regulatory Background

### A.    The Gun Control Act of 1968

Congress enacted the Gun Control Act, 18 U.S.C. § 921 *et seq.*, in 1968 to promote public safety and to curb the crime and violence caused by the misuse of firearms. "The twin goals of [the GCA's] comprehensive scheme are to keep guns out of the hands of criminals and others who should not have them, and to assist law

enforcement authorities in investigating serious crimes." *Abramski*, 573 U.S. at 180. The GCA prohibits various groups of people, including felons, fugitives from justice, and individuals subject to domestic violence restraining orders, from receiving or possessing firearms with a nexus to interstate commerce. *See* 18 U.S.C. § 922(g). In restricting the access of criminals and other dangerous individuals to firearms, "the focus of the federal scheme is the federally licensed firearms dealer." *Huddleston v. United States*, 415 U.S. 814, 825 (1974).

Under the GCA, anyone "engage[d] in the business of . . . dealing in firearms" must obtain a federal license, 18 U.S.C. § 922(a)(1)(A), and federal firearms licensees ("FFLs") must fulfill various obligations imposed by federal law that are designed, among other things, "to enable" licensed dealers "to verify, at the point of sale, whether a potential buyer may lawfully own a gun." *Abramski*, 573 U.S. at 172. In most cases, a person wishing to purchase a firearm must "appear in person at the licensee's business premises." 18 U.S.C. § 922(c). The licensed dealer must obtain the transferee's "name, age, and place of residence" and "verif[y] the identity of the transferee by examining a valid identification document," *id.* §§ 922(b)(5), (t)(1)(D). Transferees must fill out a form certifying that they are not prohibited by federal law from receiving or possessing firearms.[2] The dealer must then submit

---

[2] *See* ATF Form 4473, Firearms Transaction Record, https://www.atf.gov/firearms/docs/4473-part-1-firearms-transaction-record-over-counter-atf-form-53009/download.

information about the transferee to the FBI's National Instant Criminal Background Check System ("NICS"), which will conduct a background check and will deny the transaction if the check reveals that the transferee is prohibited by law from receiving or possessing the firearm.  18 U.S.C. § 922(t)(1).[3]

FFLs also maintain records of acquisitions and dispositions of firearms, which enable the tracing of firearms recovered from crime scenes.  18 U.S.C. §§ 922(b)(5), 923(g)(1)(A); 27 C.F.R. §§ 478.121-478.134.  When a firearm is recovered from a crime scene, law enforcement (often state or local) can submit a request to ATF's National Tracing Center,[4] and ATF will query the records maintained by FFLs in order to trace the firearm to its first retail purchaser.  Such tracing, which is made possible by the records maintained by FFLs, helps all levels of law enforcement solve crimes involving firearms.  *See* 89 Fed. Reg. at 28,988.[5]

---

[3] The NICS was established pursuant to the Brady Handgun Violence Prevention Act, Pub. L. No. 103-159, 107 Stat. 1536 (1993).  Since it became operational in 1998, NICS has conducted more than 443 million background checks, and more than 2.1 million firearms transactions have been denied based on such checks.  *See* FBI, *National Instant Criminal Background Check System 2022 Operational Report* 14-15, https://www.fbi.gov/file-repository/nics-2022-operations-report.pdf/view.

[4] *See* ATF, National Tracing Center, https://www.atf.gov/firearms/national-tracing-center.

[5] For instance, law enforcement officials were able to identify the man who attempted to assassinate former president Donald Trump in July 2024 within 30 minutes of relaying the serial number on the shooter's firearm to ATF's National Tracing Center.  *See* Perry Stein, *ATF traced Trump rally shooter's gun using records opposed by some in GOP*, Washington Post (July 21, 2024), http:// https://www.washingtonpost.com/national-security/2024/07/21/tracing-trump-rally-gun-atf-closed-business-records/.

Each of the requirements described above applies only to firearms transfers made by FFLs.[6]  In contrast, a person who is not "engaged in the business" of dealing in firearms does not need a federal license to transfer a firearm and may make such transfers without conducting a background check, keeping transaction records, or complying with any of the other obligations required of FFLs by the GCA.[7]  The GCA's standard for when a person or business must obtain a federal firearms license thus has vital public safety implications.

When Congress first enacted the GCA, it did not further define what it means to be "engaged in the business" of dealing firearms.  In 1986, as part of the Firearms Owners' Protection Act, Pub. L. No. 99-308, 100 Stat. 449 (1986) ("FOPA"), Congress added a statutory definition of engaged in the business for the first time.  As applied to a dealer in firearms other than a gunsmith or pawnbroker, FOPA defined "engaged in the business" as follows:

> a person who devotes time, attention, and labor to dealing in firearms as a regular course of trade or business with the principal objective of livelihood and profit through the repetitive purchase and resale of firearms, but such term shall not include a person who makes occasional sales, exchanges, or purchases of firearms for the

---

[6] An individual can face criminal liability under the GCA for engaging in firearms dealing without a license, but only if he or she does so "willfully."  18 U.S.C. §§ 922(a)(1)(A), 924(a)(1)(D).  That is, the GCA imposes criminal liability only on individuals who (1) engage in the business of firearms dealing without a license and (2) "act[] with knowledge that [their] conduct [is] unlawful." *Bryan v. United States*, 524 U.S. 184, 191-92 (1998); *see id.* at 191 (explaining that the term "willfully" differentiates between "deliberate and unwitting conduct").

[7] Certain requirements apply even to firearms transfers by unlicensed individuals.  For example, no person may transfer a firearm if that person knows or has reasonable cause to believe that the transferee is legally prohibited from receiving or possessing that firearm.  *See* 18 U.S.C. § 922(d).

enhancement of a personal collection or for a hobby, or who sells all or part of his personal collection of firearms.

*Id.* § 101 (amending 18 U.S.C. § 921). Congress further defined the term "with the principal objective of livelihood and profit" to "mean[] that the intent underlying the sale or disposition of firearms is predominantly one of obtaining livelihood and pecuniary gain, as opposed to other intents, such as improving or liquidating a personal firearms collection." *Id.* Congress amended that definition several months later to clarify that "proof of profit shall not be required as to a person who engages in the regular and repetitive purchase and disposition of firearms for criminal purposes or terrorism." Pub. L. No. 99-360, § 1(b), 100 Stat. 766, 766 (1986).

## B.  The Bipartisan Safer Communities Act of 2022

In 2022, Congress amended the GCA by enacting the Bipartisan Safer Communities Act, Pub. L. No. 117-159, 136 Stat. 1313 (2022). Congress enacted the BSCA in the wake of a series of tragic mass shootings. In one of those shootings, which occurred between Midland and Odessa, Texas, an FFL refused to transfer a firearm to the perpetrator based on mental illness, but the perpetrator then unlawfully obtained the firearm used in the shooting from an unlicensed dealer who did not conduct a background check. That dealer later pleaded guilty to unlawful unlicensed firearms dealing. *See* 89 Fed. Reg. at 28,971-72 & nn.26-29.

As relevant here, the BSCA expanded the GCA's definition of being "engaged in the business" of dealing in firearms. The BSCA replaced the phrase "with the

principal objective of livelihood and profit" with the phrase "to predominantly earn a profit," and defined the latter in a separate subsection to mean that "the intent underlying the sale or disposition of firearms is predominantly one of obtaining pecuniary gain." 136 Stat. at 1324-25, § 12002. The BSCA's sponsors intended to address potential confusion about the GCA's application to individuals who deal in firearms with the intent to earn profit, but possibly not as a principal source of livelihood, to "clarify who should be licensed, eliminating a 'gray' area in the law, ensuring that one aspect of firearms commerce is more adequately regulated."[8]

As amended by the BSCA, the GCA thus currently defines "engaged in the business" as applied to a dealer in firearms as:

> a person who devotes time, attention, and labor to dealing in firearms as a regular course of trade or business to predominantly earn a profit through the repetitive purchase and resale of firearms, but such term shall not include a person who makes occasional sales, exchanges, or purchases of firearms for the enhancement of a personal collection or for a hobby, or who sells all or part of his personal collection of firearms.

18 U.S.C. § 921(a)(21)(C).[9] The GCA further defines the term "to predominantly earn a profit" to

---

[8] 89 Fed. Reg. at 28,972 (quoting William J. Krouse, Cong. Rsch. Serv., IF12197, *Firearms Dealers* ''*Engaged in the Business*'' 2 (2022), https://crsreports.congress.gov/product/pdf/IF/IF12197/2); *see also id.* at 28,972 n.31 (collecting statements of the BSCA's sponsors).

[9] A separate statutory provision defines "engaged in the business" as applied to a dealer in firearms as a gunsmith. 18 U.S.C. § 921(a)(21)(D). Another provision defines "dealer" to include any pawnbroker who receives any firearm as security for payment or repayment of money. *Id.*

mean[] that the intent underlying the sale or disposition of firearms is predominantly one of obtaining pecuniary gain, as opposed to other intents, such as improving or liquidating a personal firearms collection: *Provided*, That proof of profit shall not be required as to a person who engages in the regular and repetitive purchase and disposition of firearms for criminal purposes or terrorism.

*Id.* § 921(a)(22).[10]

## C.    The Final Rule

ATF is a bureau within the Department of Justice responsible for implementing and enforcing federal firearms laws, including the GCA.  Congress has vested in the Attorney General the authority to prescribe regulations "necessary to carry out the provisions of" the GCA, *id*. § 926(a), and Congress and the Attorney General have delegated that authority to ATF.

On September 8, 2023, ATF issued a Notice of Proposed Rulemaking for a proposed rule addressing when a person is "engaged in the business" of dealing firearms.  Notice of Proposed Rulemaking, Definition of "Engaged in the Business" as a Dealer in Firearms, 88 Fed. Reg. 61,993 (Sept. 8, 2023) ("NPRM").[11]  ATF

---

§ 921(a)(11)(C).  These provisions were not addressed in the Final Rule and are not at issue in this litigation.

[10] This provision further contains a detailed definition of "terrorism," *see* 18 U.S.C. § 921(a)(22), which is also not in dispute in this litigation.

[11] On March 14, 2023, President Biden issued an Executive Order directing the Attorney General to "develop and implement a plan to . . . clarify the definition of who is engaged in the business of dealing in firearms, and thus required to become Federal firearms licensees (FFLs), in order to increase compliance with the Federal background check requirement for firearm sales, including by considering a rulemaking, as appropriate and consistent with applicable law."  Executive Order No. 14092, § 3, 88 Fed. Reg. 16527, 16527-28 (Mar. 14, 2023).

received nearly 388,000 comments, including nearly 258,000 comments in support of the proposed rule and nearly 99,000 in opposition to it.  89 Fed. Reg. at 28,984.

After considering these comments, ATF published the Final Rule on April 19, 2024.  ATF explained that the Rule "implement[s]" the BSCA's "statutory change" to the definition of "engaged in the business," and thereby furthers Congress's design "to improve public safety by helping to prevent persons who are prohibited from possessing firearms under Federal law from acquiring firearms and allowing law enforcement officers to trace firearms involved in crime."  *Id.* at 28,968, 28,987.[12]   The Rule also "provide[s] clarity to persons who remain unsure of whether" they are engaged in the business of dealing in firearms.  *Id.* at 28,968.

The Rule defines various subsidiary terms in the GCA's definition of "engaged in the business," consistent with statutory text and ordinary usage.  For example, the term "Dealer" includes "[a]ny person engaged in the business of selling firearms at wholesale or retail . . . wherever, or through whatever medium, they are conducted," including at "a gun show," a "flea market," "by mail order," "over the internet," or "through the use of other electronic means."  27 C.F.R. § 478.11.  ATF explained that this definition reflects the statutory text, because "there is no statutory

---

[12] *See also* 89 Fed. Reg. at 28,993-95 (explaining that the Rule will promote compliance with the GCA, which will in turn effectuate the GCA's purpose of enhancing public safety by increasing the number of background checks performed, enabling more traces of firearms, and improving crime gun intelligence).

exemption under the GCA for unlicensed persons to engage in the business of dealing in firearms at a gun show, or at any other venue." 89 Fed. Reg. at 28,989. The list of venues at which firearms dealing could occur is also consistent with decades of case law and ATF practice. *See id.* at 28,973-74 & nn.35-46.

The Rule introduces a standalone section, 27 C.F.R. § 478.13, to define "engaged in the business as a dealer in firearms other than a gunsmith or a pawnbroker." Subsection (a) sets forth a definition of "engaged in the business" that is substantively identical to the statutory definition contained in 18 U.S.C. § 921(a)(21)(C), while also clarifying that being "engaged in the business" covers consignment-type auctions but not estate-type auctions. 27 C.F.R. § 478.13(a). Subsection (b) states that whether someone is "engaged in the business" of dealing "is a fact-specific inquiry," and that while "[s]elling large numbers of firearms . . . may be highly indicative of business activity, . . . there is no minimum threshold number of firearms purchased or sold that triggers the licensing requirement." *Id.* § 478.13(b). This subsection reflects ATF's sensible conclusion that defining "engaged in the business" through a bright-line threshold of number of transactions would be inconsistent with the GCA's text and would necessarily be both underinclusive and overinclusive. *See* 89 Fed. Reg. at 29,086.

To clarify the GCA's application, subsection (c) sets forth a number of fact patterns that give rise to rebuttable presumptions "[i]n civil and administrative

proceedings" (but not in criminal proceedings) that "a person shall be presumed to be engaged in the business of dealing in firearms."  27 C.F.R. § 478.13(c).  For example, a person is presumed to be engaged in the business of dealing firearms when the person repetitively purchases for the purpose of resale stolen firearms, or resells or offers for resale stolen firearms.  *Id.* § 478.13(c)(2)(ii)(A).  These presumptions "are supported by the Department's investigative, regulatory, and enforcement experience, as well as conduct that the courts have found to require a license even before the BSCA expanded the definition of 'engaged in the business.'"  89 Fed. Reg. at 28,977; *see also id.* at 28,977-79 nn.72-73, 74-77, 79-83 (citing case law and examples of federal prosecutions supporting these presumptions).

Subsection (d) clarifies the application of the statutory term "predominantly earn a profit."  It provides that the phrase means that "[t]he intent underlying the sale or disposition of firearms is predominantly one of obtaining pecuniary gain," which is identical to the statutory definition found at 18 U.S.C. § 921(a)(22), and further states that "a person may have the intent to profit even if the person does not actually obtain the intended pecuniary gain from the sale or disposition of firearms."  27 C.F.R. § 478.13(d)(1).  Subsection (d) then sets forth fact patterns giving rise to rebuttable presumptions in civil and administrative proceedings (but not in criminal proceedings) that a person has "the intent to predominantly earn a profit."  *Id.* § 478.13(d)(2).  For example, a person is presumed to have intent to predominantly

11

earn a profit if the person repetitively or continuously purchases or rents physical space to display firearms offered for resale. *Id.* § 478.13(d)(2)(ii). The "predominantly earn a profit" presumptions are likewise supported by decades of case law arising before the BSCA's expansion of the statutory language, as well as enforcement experience. *See* 89 Fed. Reg. at 28,981-82 & nn.97-104.

The Rule also lists categories of conduct that are not to be presumed as amounting to being "engaged in the business" of firearms dealing and can be used to rebut the Rule's presumptions, such as reselling or transferring firearms "[o]ccasionally to a licensee or to a family member for lawful purposes." 27 C.F.R. § 478.13(e), (f). Subsection (g) specifies that the activities set forth in the Rule's presumptions and its list of rebuttal evidence "are not exhaustive of the conduct or evidence that may be considered in determining whether a person is engaged in the business of dealing in firearms, or has the intent to predominantly earn a profit through the repetitive purchase and resale of firearms." *Id.* § 478.13(g). Subsection (h) expressly provides that the presumptions "shall not apply to any criminal case, although they may be useful to courts in criminal cases, for example, when instructing juries regarding permissible inferences." *Id.* § 478.13(h).[13]

---

[13] Other provisions of the Rule address the procedures that former licensees must follow when they liquidate business inventory upon license revocation or other termination of their license. *See* 27 C.F.R. §§ 478.57, 478.78. Because Plaintiffs allege, however, that they have "never held a federal firearms license," Declaration of Don Butler ("Butler Decl.") ¶ 12, ECF No. 8-1; *see* Declaration of David Glidewell ("Glidewell Decl.") ¶ 12, ECF No. 8-2, these other provisions are not at issue here.

The Rule took effect on May 20, 2024.  89 Fed. Reg. at 28,968.

### D.    Legal Challenges to the Rule

The Rule has been challenged in three other lawsuits.  In *Kansas v. Garland*, No. 6:24-cv-1086 (D. Kan.), twenty-one states, three individuals, and an organization brought suit in the Eastern District of Arkansas and sought emergency relief before the Rule went into effect.  Compl., *Kansas v. Garland*, No. 2:24-cv-88-JM (E.D. Ark. May 1, 2024), ECF No. 1.  The Arkansas district court dismissed the State of Arkansas as a plaintiff for lack of standing and transferred the case to the District of Kansas for lack of venue.  *See Kansas v. Garland*, No. 2:24-cv-88, 2024 WL 2384611, at *2-*3 (E.D. Ark. May 23, 2024).  Following the transfer, the plaintiffs renewed their motion for a preliminary injunction, which the Kansas district court denied after concluding that the plaintiffs (1) failed to demonstrate standing "to the degree necessary for injunctive relief" and (2) likewise failed to show that they were "'substantially likely' to succeed on the merits."  *Kansas v. Garland*, No. 6:24-cv-1086, 2024 WL 2260533, at *4, *6 (D. Kan. July 10, 2024), *appeal filed*, No. 24-3101 (10th Cir. July 22, 2024).  The *Kansas* court's order denying a preliminary injunction is on appeal, and Defendants have since filed a motion to dismiss for lack of subject-matter jurisdiction, which remains pending.

In another case, four states, four gun-rights organizations, and an individual plaintiff filed suit in the Northern District of Texas on May 1, 2024—nearly three

weeks before the Rule went into effect. *See* Compl., *Texas v. ATF*, No. 2:24-cv-89-Z (N.D. Tex. May 1, 2024), ECF No. 1. There, the Texas district court granted a preliminary injunction enjoining ATF from enforcing the Rule "against all Plaintiffs pending the resolution of th[e] lawsuit." *Texas v. ATF*, -- F. Supp. 3d --, 2024 WL 2967340, at *10 (N.D. Tex. June 11, 2024), *appeal filed*, No. 24-10612 (5th Cir. July 9, 2024).

In the third case, the State of Florida brought suit in the Middle District of Florida on May 1, 2024—also before the Rule went into effect—challenging the Rule solely under the APA. Compl., *Florida v. ATF*, No. 8:24-cv-1041 (M.D. Fla. May 1, 2024), ECF No. 1. Florida did not move for preliminary relief, and Defendants have filed a motion to dismiss for lack of subject-matter jurisdiction, which remains pending.

## II.   Procedural History

In this case, two individuals—Don Butler and David Glidewell—and the National Rifle Association of America ("the NRA"), brought suit on July 19, 2024. *See* Compl., ECF No. 1. In their Complaint, Plaintiffs challenge the Rule under the APA, arguing that it exceeds ATF's statutory authority (Count I) and is arbitrary and capricious (Count II). *Id.* ¶¶ 85-104. Plaintiffs also allege that the Rule is unconstitutionally vague (Count III), violates the Second Amendment (Count IV), and violates the separation of powers (Count V). *Id.* ¶¶ 105-127. Plaintiffs filed a

Motion for Preliminary Injunction on August 24, 2024, ECF No. 7; *see* Br. in Support of Pls.' Mot. for Prelim. Inj. ("Pls.' Br."), ECF No. 8, in which they ask the Court to enjoin Defendants from enforcing the Rule against Butler and Glidewell as well as the NRA's members, *see* Pls.' Br. at 64.

## LEGAL STANDARD

A preliminary injunction is "an extraordinary and drastic remedy" that should not be granted "unless the movant clearly establishes the burden of persuasion as to . . . four requisites." *Vital Pharms., Inc. v. Alfieri*, 23 F.4th 1282, 1290-91 (11th Cir. 2022) (citation omitted). To obtain such relief, a party "must prove" that (1) "it has a substantial likelihood of success on the merits"; (2) "it will suffer irreparable injury unless the injunction issues"; (3) "the injury that threatens it 'outweighs whatever damage the proposed injunction may cause the opposing party'"; and (4) "'the injunction would not be adverse to the public interest' if issued." *Norwegian Cruise Line Holdings Ltd. v. State Surgeon Gen., Fla. Dep't of Health*, 50 F.4th 1126, 1135 (11th Cir. 2022) (citations omitted). "[T]he third and fourth factors merge" when the government is the opposing party. *Georgia v. President of the U.S.*, 46 F.4th 1283, 1292 (11th Cir. 2022). And a plaintiff's "failure to meet even one" of the factors "dooms" its request for preliminary relief. *Wreal, LLC v. Amazon.com, Inc.*, 840 F.3d 1244, 1248 (11th Cir. 2016).

## ARGUMENT

## I.   Plaintiffs Lack Standing to Challenge the Rule

Plaintiffs' demand for a preliminary injunction should be denied at the threshold because they fail to "establish[] standing to seek" such relief.  *Murthy v. Missouri*, 144 S. Ct. 1972, 1985 (2024).  "Article III of the Constitution confines the jurisdiction of federal courts to 'Cases' and 'Controversies.'"  *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 378 (2024).  "For there to be a case or controversy . . . , the plaintiff must have a 'personal stake' in the case—in other words, standing."  *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021).

To have Article III standing, a plaintiff must show that he has "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision."  *Muransky v. Godiva Chocolatier, Inc.*, 979 F.3d 917, 924 (11th Cir. 2020) (en banc).  An alleged injury confers standing only if it is "concrete and particularized," and "actual or imminent, not conjectural or hypothetical."  *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (cleaned up).  And a party seeking prospective relief—as Plaintiffs do here—must establish a "substantial likelihood that [it] will suffer injury in the future."  *Mack v. USAA Ca. Ins. Co.*, 994 F.3d 1353, 1356 (11th Cir. 2021) (citation omitted).  That is, "threatened injury must be *certainly impending* to constitute injury in fact," and "'[a]llegations of *possible* future injury' are not

16

sufficient." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (citation omitted); *see All. for Hippocratic Med.*, 602 U.S. at 381 ("[T]he injury must have already occurred or be likely to occur soon.").

The plaintiff, as "[t]he party invoking federal jurisdiction," always bears the burden of establishing standing. *Common Cause/Ga. v. Billups*, 554 F.3d 1340, 1349 (11th Cir. 2009). Because a preliminary injunction "may only be awarded upon a clear showing that the plaintiff is entitled to such relief," *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 22 (2008), a plaintiff seeking one must accordingly "make a 'clear showing' that she is 'likely' to establish each element of standing," *Murthy*, 144 S. Ct. at 1986. Absent that clear showing, a federal court "lack[s] jurisdiction to reach the merits of" the plaintiff's claims. *Id.* at 1985.

Plaintiffs Butler and Glidewell lack standing to bring a pre-enforcement challenge against the Rule because the firearms-related conduct they describe in their declarations does not amount to being "engaged in the business" of dealing in firearms under the Rule's plain terms, and their subjective fear of the Rule is too speculative to qualify as an injury in fact. And the NRA fails to establish that it has associational standing to bring suit on behalf of its members.

### A.   The Individual Plaintiffs Lack Standing to Bring a Pre-Enforcement Challenge Against the Rule

Plaintiffs Butler and Glidewell principally base their standing to sue on their subjective belief that their firearms-related conduct "is proscribed" by the Rule and

their attendant fear that they will consequently "fac[e] enforcement proceedings under [it]." Pls.' Br. at 32-33; *see* Butler Decl. ¶¶ 14, 17; Glidewell Decl. ¶¶ 14, 17. The Rule "has not yet been enforced" against either plaintiff, meaning that—as Plaintiffs themselves acknowledge—their standing to challenge it hinges on a purported "threat of future injury." *Dream Defs. v. Governor of the State of Fla.*, 57 F.4th 879, 887 (11th Cir. 2023); *see* Pls.' Br. at 33 (asserting "an imminent prospective injury through anticipated enforcement" of the Rule). To have standing to bring such a pre-enforcement challenge, however, Butler and Glidewell must establish that they (1) intend "to engage in a course of conduct" that is "arguably . . . proscribed" by the Rule and (2) face "a credible threat of prosecution" as a result. *Dream Defs.*, 57 F.4th at 887 (quoting *Susan B. Anthony List*, 573 U.S. at 159). Both plaintiffs fall well short of satisfying this standard.

Butler and Glidewell would potentially be subject to the Rule only if they intend to engage in conduct that amounts to being "engaged in the business" of dealing in firearms. But their respective declarations—which are materially identical—make plain that their firearms-related conduct does not so qualify. Both plaintiffs state that they "occasionally" sell firearms they own but "no longer want" through "unlicensed private sales" in order to "free up funds to purchase newer or more technologically advanced models as finances permit." Butler Decl. ¶ 8; Glidewell Decl. ¶ 7. They further state that they have "bought, and then

subsequently traded or sold, several firearms" through such "private transactions over [their] decades of gun ownership" and that "[o]ne of [their] principal motivations for buying, selling, and trading firearms is . . . personal protection." Butler Decl. ¶¶ 9-10; Glidewell Decl. ¶¶ 8-9.  But noticeably absent from Butler's and Glidewell's declarations is any assertion indicating that either plaintiff sells firearms with the predominant intent "to earn a profit"—an essential element to being "engaged in the business" of firearms dealing.  27 C.F.R. § 478.13(a); *see, e.g.*, Butler Decl. ¶ 15 (stating that Butler "intend[s] to continue occasionally buying, selling, and trading [his] firearms for the purpose of enhancing [his] personal collection").  Nor does either individual plaintiff state that, outside of his occasional unlicensed private sales, he otherwise "devotes time, attention, and labor to dealing in firearms as a regular course of trade or business."  27 C.F.R. § 478.13; *see* Butler Decl. ¶¶ 8, 12 (stating that Butler "ha[s] never sold firearms as part of a business" and only does so "occasionally" to "afford a newer or different firearm").  In short, Butler and Glidewell fail to demonstrate that they have or will "engage[] in conduct that could reasonably require a federal firearms license."  *Klayman v. President of U.S.*, 689 F. App'x 921, 924 (11th Cir. 2017) (per curiam) (finding no standing where a plaintiff challenging ATF guidance concerning the definition of "dealer" "never alleged he would repetitively buy and sell firearms for the principal motive of making a profit").  Both plaintiffs thus fail to establish that their conduct is even

"arguably . . . proscribed" by the Rule, rendering the threat of future enforcement proceedings they allegedly fear "wholly conjectural," *Susan B. Anthony List*, 573 U.S. at 162-63 (citation omitted); *see LaCroix v. Lee Cnty.*, 819 F. App'x 839, 843-44 (11th Cir. 2020) (per curiam) (concluding that a plaintiff lacked standing because he "ha[d] not shown that he [was] 'subject to' or 'imminently will be subject to'" the ordinance he was challenging).

Butler and Glidewell nonetheless suggest that they have standing because they construe the Rule to "prohibit[]" "occasional sales" of firearms used for "personal protection," Pls.' Br. at 32, and subjectively "believe" that the Rule "prevents [them] from engaging in private transactions involving firearms," Butler Decl. ¶ 14. Yet the Rule does not *prohibit* firearms sales to any extent; it merely defines—consistent with the GCA—the conduct that amounts to being "engaged in the business" of firearms dealing and thus requires a federal license. Moreover, irrespective of the individual plaintiffs' insistence that they buy and sell firearms principally for "personal protection," Butler Decl. ¶ 10; Glidewell Decl. ¶ 9, the firearms-related conduct they describe in their declarations falls comfortably outside of the Rule's ambit because it does not otherwise satisfy the express elements of being "engaged in the business," including that a person sell firearms "to predominantly earn a

profit." 27 C.F.R. § 478.13(a).[14]  *Cf. United States v. Focia*, 869 F.3d 1269, 1281 (11th Cir. 2017) (noting that the "plain import" of the GCA's language "reveals congressional intent not to criminalize" someone who "merely seeks . . . to infrequently sell an odd gun here or there").  Accordingly, the individual plaintiffs' "subjective fear" of the Rule, absent any "real and immediate" threat of future injury from it, is simply "not sufficient to create standing."  *Corbett v. Trans. Sec. Admin.*, 930 F.3d 1225, 1238-39 (11th Cir. 2019); *see Club Madonna, Inc. v. City of Miami Beach*, 924 F.3d 1370, 1382 (11th Cir. 2019) (noting that the "mere fear of unconstitutional action alone . . . is too speculative an injury to confer standing"). Nor can they "manufacture standing merely by inflicting harm on themselves"— say, by voluntarily choosing not to make additional firearms sales for the time being—"based on their fears of hypothetical future" enforcement proceedings that are not at all "certainly impending."  *Clapper*, 568 U.S. at 416.

That Butler and Glidewell lack standing here is reinforced by their inability to point to any evidence suggesting that the threat of the Rule being enforced against

---

[14] Put another way, Plaintiffs' theory of injury hinges on their assertion that "occasional sales, exchanges, or purchases of firearms for the enhancement of a personal [firearms] collection" that is "maintained for personal protection *triggers liability* under [the Rule]."  Pls.' Br. at 32 (quoting 27 C.F.R. § 478.13(a)) (emphasis added).  Under both the Rule and the GCA, however, "occasional" firearms sales, as a general matter, do not constitute being "engaged in the business" absent evidence demonstrating that the seller (1) "devotes time, attention, and labor to dealing firearms as a regular course of trade or business" and (2) does so "to predominantly earn a profit." 27 C.F.R. § 478.13(a).  And that remains true even if the firearms being sold do not fall under the "personal collection" exemption to being "engaged in the business. *Id.*; *see id.* § 478.11 (defining "personal collection" as used in the definition of being "engaged in the business").

them specifically is even remotely credible.  *See Dream Defs.*, 57 F.4th at 887.  The Rule has already been in effect for nearly four months, yet Plaintiffs provide no examples of the Rule being applied to gunowners who, like them, only occasionally sell firearms for the purpose of enhancing their private collections.  *Cf. Susan B. Anthony List*, 573 U.S. at 164 (finding a credible threat of enforcement where there was "a history of past enforcement," including against the plaintiff, and that such enforcement was "not a rare occurrence").[15]

Finally, the individual plaintiffs separately argue that the "'lost time' and money associated with trying to obtain a federal firearms license" qualifies as an injury in fact for purposes of standing.  Pls.' Br. at 34.  But nowhere in their declarations do Butler and Glidewell assert that they have, in fact, spent money or time trying to obtain a license, or that they intend to do so soon.  *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 564 (1992) ("Such 'some day' intentions—without any description of concrete plans, or indeed even any specification of *when* the some day will be—do not support a finding of the 'actual or imminent' injury that our cases

---

[15] Plaintiffs contend that "the federal government *has* enforced" the Rule "against a citizen who surrendered his federal firearms license, transferred his business inventory to his personal collection, and then sold his firearms to others to liquidate his collection and recoup his investment."  Pls.' Br. at 33.  What bearing an enforcement proceeding against a former FFL who tried to liquidate his former inventory has on Butler and Glidewell—neither of whom has ever held a firearms license or "sold firearms as part of a business," Butler Decl. ¶ 12—is far from clear.  In any event, the example Plaintiffs point to involved an enforcement proceeding that was initiated in 2014, a decade before ATF promulgated the Rule and eight years before Congress amended the GSCA via the BSCA.

require.").  Nor, again, can they "manufacture standing" by "inflicting harm on themselves"—here, by attempting to obtain a license that, per their declarations, they are not required to have.  *Clapper*, 568 U.S. at 398.  Plaintiffs' "compliance costs" theory of standing, Pls.' Br. at 34, can thus be rejected outright.

### B.     The NRA Lacks Associational Standing

The NRA separately asserts that it has associational standing to challenge the Rule on behalf of its members, Pls.' Br. at 35-36, and, in a similar vein, asks the Court to preliminarily enjoin Defendants from enforcing the Rule "against . . . the NRA's members pending resolution of this lawsuit," ECF No. 7.  But the NRA fails to satisfy the basic requirement of identifying members who "otherwise have standing to sue in their own right."  *Greater Birmingham Ministries v. Sec'y of State for State of Ala.*, 992 F.3d 1299, 1316 (11th Cir. 2021) (citation omitted) (listing the requirements for associational standing).  The NRA attempts to tie its standing to Butler and Glidewell, both of whom claim to be members of the organization.  *See* Pls.' Br. at 35.  As explained above, however, those two plaintiffs lack standing themselves, and the NRA fails to specifically identify any other member with a claim to standing that is distinguishable from the individual plaintiffs' claims.  *See, e.g.*, Compl. ¶ 28 (alleging only that certain unnamed members "will be impacted by [the Rule] in substantially the same way as" Butler and Glidewell).  The NRA asserts that "many other . . . members face credible threats of enforcement under the Final

Rule." Pls.' Br. at 36 (citing Compl. ¶¶ 26-30). Yet the Supreme Court has unequivocally explained that this sort of vague assertion that some unidentified members somewhere in the United States might engage in certain firearms-related conduct and, as a result of the Rule, face enforcement at some point in the future is wholly inadequate to establish associational standing. *See Summers v. Earth Island Ins.*, 555 U.S. 488, 498 (2009) (noting that such a "novel approach to the law of [associational] standing would make a mockery of [the Court's] prior cases"); *see Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1249 (11th Cir. 2020) (finding no associational standing where an organization "failed to identify any of its members, much less one who will be injured by" the statute being challenged).

## II.    Plaintiffs Fail to Clearly Show They Will Suffer Irreparable Harm

Even if the Court were to find that Plaintiffs have Article III standing, their request for a preliminary injunction—which was made nearly three months after the Rule went into effect—should be denied because Plaintiffs have failed to diligently and clearly make the requisite showing of irreparable harm.

### A.    Plaintiffs' Multi-Month Delay in Seeking Preliminary Relief Precludes a Finding of Irreparable Harm

"A showing of irreparable injury is the *sine qua non* of injunctive relief." *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (citation omitted). "[T]he absence of a substantial likelihood of irreparable injury" thus, by extension, "make[s] preliminary injunctive relief improper." *Id.* An asserted irreparable injury

"must be neither remote nor speculative, but actual and imminent." *Id.* (citation omitted). And this requirement of "*imminent* harm . . . places an onus on a plaintiff to demonstrate some sense of 'urgency or necessity'" in pursuing preliminary relief. *Alabama v. U.S. Dep't of Com.*, 546 F. Supp. 3d 1057, 1073 (M.D. Ala. 2021). "Indeed, the very idea of a *preliminary* injunction is premised on the need for speedy and urgent action to protect a plaintiff's rights before a case can be resolved on the merits." *Wreal, LLC*, 840 F.3d at 1248. Accordingly, "[a] delay in seeking a preliminary injunction of even only a few months—though not necessarily fatal— militates against a finding of irreparable harm." *Id.*; *see Benisek v. Lamone*, 585 U.S. 155, 159 (2018) ("[A] party requesting a preliminary injunction must generally show reasonable diligence."); *see also Snider Tire, Inc. v. Chapman*, No. 2:20-cv-1775, 2021 WL 2497942, at *4 (N.D. Ala. Apr. 27, 2021) ("[W]hen a plaintiff waits too long to move for a preliminary injunction after the defendant commences the conduct sought to be enjoined, [it] fails to demonstrate . . . irreparable harm").

Plaintiffs moved for a preliminary injunction on August 15, 2024—nearly four months after the Rule was promulgated, three months after the Rule took effect, and one month after Plaintiffs filed their Complaint. This "unexplained [multi]-month delay in seeking a preliminary injunction, by itself, fatally undermine[s] any showing of irreparable injury" here. *Wreal, LLC*, 840 F.3d at 1248. And Plaintiffs' delay goes unexplained likely because it is inexplicable. In their Complaint,

Plaintiffs challenged the lawfulness of various provisions of the Rule, arguing that they "exceed[] . . . statutory authority"; "conflict[] with" the GCA's "unambiguous" text; are "unconstitutionally vague"; and violate the Second Amendment on their face. Compl. ¶¶ 89, 107, 117-19. Such claims raise legal questions that depend solely on the construction of the Rule's terms, and Plaintiffs learned of those terms by April 19, 2024, at the latest—the date on which the Rule was promulgated.[16] Yet Plaintiffs did not file their Complaint until three months later, and then waited to seek a preliminary injunction for another full month. *See Millennium Funding, Inc. v. 1701 Mgmt. LLC*, No. 21-cv-20862, 2021 WL 3618227, at \*9 (S.D. Fla. Aug. 16, 2021) (noting that both the "delay in filing a complaint after discovering" the harm giving rise to a legal claim and the time between the filing of the complaint and a motion for preliminary injunction are "relevant in determining whether a plaintiff acts promptly in seeking judicial relief"). Relatedly, given that the irreparable injuries Plaintiffs allege here depend entirely on their subjective interpretation of the Rule's meaning and scope—*e.g.*, Plaintiffs claim that they "cannot buy, sell, or trade firearms in private transactions," Pls.' Br. at 60, because they "*believe*" the Rule prohibits such transactions, Butler Decl. ¶ 14 (emphasis added), not because Defendants or any other authority has declared (or even suggested) as much—the

---

[16] Plaintiffs learned of the Rule's key provisions even earlier, when the NPRM was issued in September 2023.

prospect of those injuries ostensibly became apparent shortly after Plaintiffs learned of the Rule's provisions as well. Yet Plaintiffs nonetheless waited until the Rule went into effect, and then several months more, before making any effort to prevent their alleged injuries via a preliminary injunction. *Cf. Wreal, LLC*, 840 F.3d at 1248-49 (finding no justification for a plaintiff's delay in seeking preliminary relief because "the preliminary-injunction motion relied exclusively on evidence that was available to [the plaintiff] at the time it filed its complaint").

Courts in this district have concluded that similar multi-month delays in seeking preliminary relief have foreclosed a finding of irreparable harm. *See Snider Tire, Inc.*, 2021 WL 2497942, at *5 (denying a preliminary injunction where the plaintiff "prosecuted its request for a preliminary injunction in such a way that" its alleged harm had been ongoing "for nearly four months before the request was ripe for the court's decision"); *Case v. Ivey*, No. 2:20-cv-777, 2020 WL 13747177, at *2 (N.D. Ala. Oct. 6, 2020) ("So, at least, Plaintiffs delayed more than two months in filing their motion; at most, they delayed more than five months. Either way, Plaintiffs waited an impermissible amount of time to seek the 'extraordinary and drastic remedy' of a temporary restraining order."); *see also Alabama*, 546 F. Supp. 3d at 1073 ("[B]y sitting on his or her rights for even a few months, a plaintiff has squandered any corresponding entitlement to injunctive relief."). This Court should reach the same conclusion here.

27

Plaintiffs' multi-month delay is especially inexcusable given that other individual plaintiffs who allegedly engage in firearms-related conduct similar to Butler's and Glidewell's sought preliminary relief from the Rule several months ago. In the *Texas* case, for instance, such a plaintiff filed a lawsuit challenging the Rule on May 1, 2024, and sought preliminary relief roughly a week later—that is, over two weeks before the Rule's May 20, 2024 effective date, and over two and a half months before Plaintiffs filed their Complaint in this case.  And in the *Kansas* case, three individual plaintiffs who challenged the Rule's alleged impact on occasional sales of firearms made by unlicensed gunowners filed their lawsuit on May 1, 2024, and moved for preliminary relief five days later—again, several months before Plaintiffs did here.  Plaintiffs offer no explanation for why their lawsuit—which alleges near-identical firearms-related conduct, brings near-identical legal claims against the Rule, and asserts near-identical bases for irreparable harm—was filed so much later than these other cases.  *See Menudo Int'l, LLC v. In Miami Prod., LLC*, No. 17-cv-21559, 2017 WL 4919222, at *6 (S.D. Fla. Oct. 31, 2017) ("If Plaintiff was concerned about a harm truly believed to be irreparable, Plaintiff would have acted swiftly to protect itself . . . ." (cleaned up)).[17]

---

[17] Plaintiffs' brief does not even acknowledge, let alone explain, their multi-month delay in seeking a preliminary injunction.  In light of the near-identical lawsuits that were brought well before Plaintiffs', that delay cannot be explained by the nature of Plaintiffs' legal claims.  And to the extent Plaintiffs might suggest in reply that their delay can be explained by "financial or practical difficult[ies]" (*e.g.*, obtaining counsel)—which are nowhere mentioned in their brief—any such hurdles would still "not [be] an adequate excuse for the[ir] delay." *Tech Traders, LLC v. Insuladd*

### B.     Plaintiffs' Alleged Injuries Do Not Amount to Irreparable Harm

Even assuming Plaintiffs' unexplained delay is not justification enough for denying their preliminary injunction motion, none of their alleged injuries is sufficiently imminent and irreparable to warrant such relief in any event.  *See Siegel*, 234 F.3d at 1176.  Plaintiffs first claim that the Rule "threaten[s]" them with a potential "loss of liberty" that amounts to an irreparable injury.  Pls.' Br. at 59.  But because the Rule, as explained above, simply does not encompass the firearms-related conduct that Butler and Glidewell describe in their declarations, any "threat[]" of the Rule being enforced against them, *id.*, is virtually nonexistent at this stage.  And even assuming otherwise for the sake of argument, the "loss of liberty" that Plaintiffs purport to fear depends on a "highly attenuated chain of possibilities"—*i.e.*, that Defendants (1) devote their limited resources to investigating Plaintiffs' occasional sales of firearms made for the purpose of "enhanc[ing]" their "personal [firearms] collection," Butler Decl. ¶ 8; (2) determine that such occasional sales constitute being "engaged in the business" of dealing; (3) further determine that Plaintiffs' conduct amounts to a willful violation of the GCA's prohibition against unlicensed dealing; and (4) then decide to subject Plaintiffs to potential criminal sanctions—that is far too "improbable" and

*Env't., Ltd.*, No. 6:18-cv-754, 2018 WL 5830568, at *3 (M.D. Fla. Nov. 7, 2018); *see also Menudo*, 2017 WL 4919222, at *6.

speculative to establish irreparable harm. *City of S. Miami v. Governor*, 65 F.4th 631, 637 (11th Cir. 2023) (concluding that such "speculative" and "attenuated" injuries fail to even establish an injury in fact for standing purposes); *see Florida v. U.S. Dep't of Health & Hum. Servs.*, 19 F.4th 1271, 1291 (11th Cir. 2021) ("Importantly, *the possibility* of an irreparable injury is not enough." (emphasis added)).

Plaintiffs next contend that the Rule irreparably deprives them of their "statutory and constitutional rights" by preventing them from "buy[ing], sell[ing], or trad[ing] firearms in private transactions." Pls.' Br. at 59-60 (citing the Second Amendment). Yet the Rule does not preclude Plaintiffs (or anyone else) from keeping, bearing, or purchasing firearms. Nor does it prohibit selling firearms to any extent; the Rule instead simply defines when sales-related activity rises to the level of being "engaged in the business" of dealing under the GCA and thus requires a license. The restrictions on their firearms-related conduct that Plaintiffs allege are therefore not even actual, let alone irreparable. *See Siegel*, 234 F.3d at 1176. To the extent Plaintiffs nonetheless elect to stop buying, selling, and trading firearms, that "voluntary choice" cannot qualify as irreparable harm. *Wall v. Ctrs. for Disease Control & Prevention*, 588 F. Supp. 3d 1301, 1304 (M.D. Fla. 2022); *see Florida*, 19 F.4th at 1292 n.5 (suggesting that a "self-inflicted" injury fails to establish irreparable harm). And even accepting for the sake of argument Plaintiffs' claim

that the Rule (1) prohibits them from engaging in certain firearms-related conduct and (2) thus "depriv[es] them" of certain "statutory and constitutional rights," Pls.' Br. at 59, Plaintiffs still fail to demonstrate how such an outcome would constitute the sort of irreparable harm necessary to justify the extraordinary relief they seek. *See Siegel*, 234 F.3d at 1177 (noting that the Eleventh Circuit's case law "has not gone . . . [so] far" as to conclude that, outside of the "right to privacy and certain First Amendment claims," a "violation of constitutional rights always constitutes irreparable harm"); *see Greater Birmingham Ministries v. Alabama*, 161 F. Supp. 3d 1104, 1117 (N.D. Ala. 2016) (acknowledging that "a constitutional violation does not always constitute irreparable harm"); *cf. Dela. State Sportsmen's Ass'n, Inc. v. Dela. Dep't of Safety & Homeland Sec.*, 108 F.4th 194, 203-04 (3d Cir. 2024) (rejecting the proposition that "all constitutional harms," including alleged Second Amendment harms, are presumed irreparable for purposes of preliminary relief).

Finally, Plaintiffs assert that the Rule "threatens" them with "unrecoverable compliance costs"—specifically, the "costs and burdens associated with obtaining a federal firearms license" and "lost business opportunities" stemming from the Rule's alleged impact on Plaintiffs' ability to sell their firearms.  Pls.' Br. at 61.  But regarding the first alleged cost, the Rule does not require Plaintiffs to obtain a license because, again, their firearms-related conduct does not amount to being "engaged in the business" of dealing, meaning that any license-related costs Plaintiffs incur

would be entirely self-inflicted.  As for the second alleged cost, even if Plaintiffs decide not to consummate sales with certain customers because of the Rule, that alleged harm would only be temporary; if the Rule were later held invalid, Plaintiffs would be able to complete any foregone sales, just "at a later date" following the "ordinary course of litigation"—which is the opposite of irreparable.  *Sampson v. Murray*, 415 U.S. 61, 90 (1974).

## III.   Plaintiffs Are Not Substantially Likely to Succeed on the Merits

Plaintiffs' failure to clearly show "a substantial likelihood" of irreparable harm, "standing alone," is sufficient grounds for denying their request for a preliminary injunction.  *Siegel*, 234 F.3d at 1176.  Yet they are also not substantially likely to succeed on the merits of any of their claims.

### A.   The Rule Is Consistent with the GCA and ATF's Authority

Plaintiffs contend that they are "likely to prevail on their claim that the [Rule] exceeds ATF's statutory authority" because, they argue, the Rule "contradicts unambiguous statutory text in six distinct ways."  Pls.' Br. at 36-37; *see* Compl. ¶¶ 85-94.  All six of these alleged "contradictions" lack merit.

**1.**   Plaintiffs first argue that the Rule "conflicts" with the GCA because the former purportedly "provid[es] that a single [firearms] sale, *or no sale at all*, triggers licensing requirements," while the latter defines "engaged in the business" to require "repeated and habitual purchasing and reselling."  Pls.' Br. at 38.  Plaintiffs, for one,

misconstrue the Rule, which provides that "a single firearm transaction or offer to engage in a transaction, *when combined with other evidence* (*e.g.*, where a person represents to others a willingness and ability to purchase more firearms for resale), *may* require a license." 27 C.F.R. § 478.13(b) (emphasis added). The Rule then expressly states—contrary to Plaintiffs' bald assertion here—that "a single isolated firearm transaction without such evidence would not require a license." *Id.*

More fundamentally, Plaintiffs misread the GCA as well. They home in on the statute's reference to "the repetitive purchase and resale of firearms" to argue that being "engaged in the business" requires "repeated and habitual" firearms sales. Pls.' Br. at 38 (quoting 18 U.S.C. § 921(a)(21)(C)). But Plaintiffs read that statutory phrase out of context. *See Durr v. Shinseki*, 638 F.3d 1342, 1349 (11th Cir. 2011) ("[I]n construing a statute, we do not look at one word or term in isolation, but instead we look to the entire statutory context." (cleaned up)). Under the GCA, a person is "engaged in the business" of dealing if he (1) "devotes time, attention, and labor to dealing in firearms as a regular course of trade or business" and (2) does so "to predominantly earn a profit through the repetitive purchase and resale of firearms." 18 U.S.C. § 921(a)(21)(C). And the statute further makes clear that "to predominantly earn a profit" refers to the "intent underlying the sale or disposition of firearms," namely, "one of obtaining pecuniary gain, as opposed to other intents." *Id.* § 921(a)(22). The "repetitive purchase and resale" language Plaintiffs highlight

is thus part of the *intent* element of the "engaged in the business" definition; that is, repetitively purchasing and reselling firearms must be the method "through*"* which a person *intends* to obtain pecuniary gain, *id.* § 922(a)(21)(C).  *See United States v. Palmieri*, 21 F.3d 1265, 1268 (3d Cir. 1994), *vacated on other grounds*, 513 U.S. 957 (1994) ("Although the definition explicitly refers to economic interests as the principal purpose, and repetitiveness as the *modus operandi*, it does not establish a specific quantity or frequency requirement.").   Courts have accordingly recognized—for years prior to the Rule—that someone can be "engaged in the business" of dealing firearms without necessarily consummating multiple sales, or even a single sale.[18]

The Rule's language about there being "no minimum threshold number of firearms purchased or sold that triggers the licensing requirement," 27 C.F.R. § 478.13(b), is thus entirely consistent with the GCA because the statute itself "does

---

[18] *See United States v. Nadirashvili*, 655 F.3d 114, 120-21 (2d Cir. 2011) (explaining that being "engaged in the business" does not require "actually engag[ing] in multiple transactions," but rather "h[olding]" oneself "out as a source of firearms" and a readiness to "procure them for . . . customers"); *United States v. Carter*, 801 F.2d 78, 81-82 (2d Cir. 1986) ("[T]he government need only prove that the defendant has guns on hand or is ready and able to procure them for the purpose of selling them from [time] to time to such persons as might be accepted as customers."); *United States v. King*, 735 F.3d 1098, 1107 & n.8 (9th Cir. 2013) (upholding a conviction for unlicensed firearms dealing where the defendant attempted to sell one firearm and offered to provide another and noting that such a conviction "does not require the actual sale of firearms"); *see also United States v. Valdes*, 681 F. App'x 874, 877 (11th Cir. 2017) ("It is enough to prove that the accused has guns on hand or is ready and able to procure them for the purpose of selling them from time to time for customers (citation omitted)); *cf. United States v. Smith*, No. 23-10172, 2023 WL 4929961, at *2 (11th Cir. Aug. 2, 2023) ("But the statute does not require the government to prove that the defendant engaged in a high-volume firearm business . . . .").

not establish" such "a minimum threshold." *United States v. Gray*, 470 F. App'x 468, 473 (6th Cir. 2012). The same is true of the Rule's language about there being "no minimum number of transactions that determines whether a person is 'engaged in the business.'" 27 C.F.R. § 478.13(b); *see United States v. Baptiste*, 607 F. App'x 950, 952-53 (11th Cir. 2015) (noting that 18 U.S.C. § 921(a)(21)(C) "does not require a threshold number of sales"). Courts have instead made clear that whether someone is "engaged in the business" is a fact-specific inquiry, *see, e.g.*, *United States v. Bailey*, 123 F.3d 1381, 1392 (11th Cir. 1997) ("[T]he finder of fact must examine the intent of the actor and all circumstances surrounding the acts alleged to constitute engaging in the business." (citation omitted)), which the Rule reflects, *see* 27 C.F.R. § 478.13(b). Indeed, depending on the circumstances, a "single . . . transaction" involving five firearms "combined with . . . evidence" that the seller has the "willingness and ability" to purchase five more for resale, *id.*, can just as naturally qualify as being "engaged in the business" of dealing firearms as ten separate transactions involving one firearm each. At bottom, then, it is Plaintiffs' "repeated and habitual" sales theory, Pls.' Br. at 38, rather than the Rule, that cannot be squared with the GCA's text and relevant case law.

**2.**    Plaintiffs next argue that the Rule unlawfully "nullifies the government's statutory burden to prove 'actual profit.'" Pls.' Br. at 38. But this alleged "burden" appears nowhere in the actual statute. Per the GCA's plain text, if

a person "devotes time, attention, and labor to dealing in firearms as a regular course of trade or business," then that person need only have the predominant "*intent*" to earn a profit or "obtain[] pecuniary gain" in order to be "engaged in the business." 18 U.S.C. § 921(a)(21)(C), (22) (emphasis added).  In other words, it is the *intent* to profit that matters, not whether a person "necessarily made a profit from dealing." *Valdes*, 681 F. App'x at 877 (quoting *United States v. Wilmoth*, 636 F.2d 123, 125 (5th Cir. Unit A 1982)); *see Baptiste*, 607 F. App'x at 952-953 (noting that the GCA "does not require . . . profit . . . before a person has engaged in the business"); *United States v. Shipley*, 546 F. App'x 450, 454 (5th Cir. 2013) ("[A] conviction requires that the defendant had the 'principal objective' of making a profit, but it does not require that he succeeded in that endeavor.").  The Rule simply states a natural inference that can be drawn from the GCA's language—namely, that "[a] person may have the intent to profit even if the person does not actually obtain the intended pecuniary gain from the sale or disposition of firearms."  *See* 27 C.F.R. 478.13(d)(1).[19]

Plaintiffs nonetheless assert that, because the GCA provides that "proof of profit shall not be required as to a person who engages in the regular and repetitive

---

[19] The absence of a profit requirement also aligns with the public safety objectives the GCA sought to advance.  It would make little sense, for instance, to suggest that an unlicensed dealer should be able to routinely sell firearms without restriction or consequence simply because his poor salesmanship or lack of business acumen prevents him from turning a profit.  *See* 89 Fed. Reg. at 29,043-44.

purchase and disposition of firearms for criminal purposes or terrorism," 18 U.S.C. § 921(a)(22), the negative implication of that language is that "proof of profit is required" in "all other contexts." Pls.' Br. at 39. As a textual matter, however, Plaintiffs' reading would contradict the clear language in the same provision stating that "to predominantly earn a profit" refers to the "intent underlying" a firearms sale, 18 U.S.C. § 921(a)(22). *See Boroski v. Dyncorp Int'l*, 700 F.3d 446, 452 (11th Cir. 2012) (underscoring the "black letter rule of statutory construction" that a court should "fit, if possible, all parts" of a statute "into an harmonious whole" (citation omitted)). The provision Plaintiffs focus on, moreover, has been part of the GCA for decades, *see* 89 Fed. Reg. at 28,970, yet courts have consistently held that it is the intent to profit, rather than the existence of a profit, that determines whether someone is "engaged in the business" of firearms dealing. *See Focia*, 869 F.3d at 1282 ("[W]e have recognized that the statute focuses on the defendant's *motivation* in engaging in the [firearms] sales." (emphasis added)).

To the extent Plaintiffs suggest that the BSCA added a proof-of-profit requirement, such an assertion cannot be squared with that statute's principal objective, which was to *expand* the definition of "engaged in the business" by replacing the intent element (*i.e.*, having the "principal objective of livelihood and profit") with a *broader* one requiring only that a person have the predominant intent to earn a profit. *See* 89 Fed. Reg. at 28,971-72 (discussing the BSCA's legislative

37

history).  Plaintiffs' preferred reading of the BSCA would instead *narrow* the

"engaged in the business" definition by introducing a new requirement of showing

actual profit.  That reading conflicts with clear legislative intent, as well as the Rule's

text and case law interpreting the GCA.

      **3.**    Plaintiffs separately challenge the Rule's definition of "personal

collection" as incompatible with the GCA.  Pls.' Br. at 40-42.  But that definition

aligns with the ordinary meaning of "collection" and best comports with a common-

sense understanding of the GCA's and BSCA's objective of promoting public safety

via federal licensing requirements for firearms dealers.

      The GCA provides that the term "engaged in the business" does not include

"a person who makes occasional sales, exchanges, or purchases of firearms for the

enhancement of a personal collection or for a hobby, or who sells all or part of his

personal collection of firearms."  18 U.S.C. § 921(a)(21)(C).  The Rule reproduces

this language in its definition of "engaged in the business."  *See* 27 C.F.R.

§ 478.13(a).  It then defines "personal collection" to mean:

> Personal firearms that a person accumulates for study, comparison,
> exhibition (*e.g.*, collecting curios or relics, or collecting unique firearms
> to exhibit at gun club events), or for a hobby (*e.g.*, noncommercial,
> recreational activities for personal enjoyment, such as hunting, skeet,
> target, or competition shooting, historical re-enactment, or
> noncommercial firearms safety instruction).  The term shall not include
> any firearm purchased for the purpose of resale with the predominant
> intent to earn a profit (*e.g.*, primarily for a commercial purpose or
> financial gain, as distinguished from personal firearms a person
> accumulates for study, comparison, exhibition, or for a hobby, but

which the person may also intend to increase in value).  In addition, the
term shall not include firearms accumulated primarily for personal
protection: *Provided*, that nothing in this definition shall be construed
as precluding a person from lawfully acquiring firearms for self-
protection or other lawful personal use.

*Id.* § 478.11.

Plaintiffs claim that this definition is an impermissible interpretation of the
statute because it "arbitrarily excludes 'firearms accumulated . . . for personal
protection'"; "eradicates" what they call the "personal collection" "safe-harbor
provision" found in 18 U.S.C. § 921(a)(21)(C); and bars Plaintiffs from "sell[ing] or
trad[ing] firearms for the purpose of enhancing a personal collection maintained for
personal protection."  Pls.' Br. at 40-42.  None of these contentions have merit.

Start with the fact that the Rule's definition of "personal collection" is
consistent with the ordinary meaning of "collection."  As explained by ATF, the
definition is drawn "from standard dictionary definitions" of "collection," which
means "an accumulation of objects gathered for study, comparison, or exhibition or
as a hobby."  89 Fed. Reg. at 29,038 (quoting Merriam-Webster Online Dictionary);
*see id.* at n.216 (quoting a similar definition of "collection" from another dictionary);
*see also id.* at 28,980 n.88 (quoting definitions of "personal," "collection", and
"hobby" from Webster's Third New International Dictionary (1971)).  The Rule's
definition is also "consistent with how the GCA views a 'collection,'" 89 Fed. Reg.
at 29,038, as the statute defines "collector" as "any person who acquires, holds, or

disposes of firearms as curios or relics," 18 U.S.C. § 921(a)(13), and ATF regulations (at the direction of Congress)[20] have long further defined "curios or relics" as "[f]irearms which are of special interest to collectors by reason of some quality other than is associated with firearms intended for sporting use or as offensive or defensive weapons," 27 C.F.R. § 478.11.

In light of these dictionary and statutory definitions, it is not surprising then— let alone "arbitrar[y]," Pls.' Br. at 40—that the Rule's definition of "personal collection" does not include "firearms accumulated primarily for personal protection."  Such firearms, by definition, are not "curios or relics" that would qualify their possessor as a "collector" under the GCA.  *See* 27 C.F.R. § 478.11 (stating that firearms "intended . . . as offensive or defensive weapons" are not "curios or relics").  And as a matter of common language, a person who acquires multiple firearms for their utility as self-defense weapons, rather than for some other feature unrelated to that core function of a firearm[21] (*e.g.*, its novelty, its historical value, *etc.*), has no more of a firearms "collection" than a person with a full closet has a clothes "collection" or a large family with multiple vehicles has a car "collection."

---

[20] The GCA provides that the Attorney General "shall by regulation define" the statutory terms "curios or relics."  18 U.S.C. § 921(a)(13).

[21] *See* 18 U.S.C. § 921(a)(3) (defining "firearm" in relevant part as "any weapon . . . which will or is designed to or may readily be converted to expel a projectile by the action of an explosive").

Plaintiffs also cite to a dictionary definition to argue that "personal collection" as used in the GCA "naturally encompasses firearms accumulated for protection and defense." Pls.' Br. at 41. But Plaintiffs' preferred reading of "personal collection"— *i.e.*, any firearms a person amasses for any non-commercial purpose, including personal protection—is incompatible with a statutory scheme under which "dealers in firearms," as a default rule, "must be licensed." 89 Fed. Reg. at 29,039; *see* 18 U.S.C. § 922(a)(1)(A). Indeed, all firearms, including ones that someone purchases in order to resell for profit, are inherently weapons that can be used for personal protection. Accordingly, under Plaintiffs' preferred definition of "personal collection," any person who sells (i.e., deals) firearms (which inherently can be used for personal protection and thus, according to Plaintiffs, were part of the seller's "personal collection") in order to obtain money (i.e., pecuniary gain) to be used to acquire newer, better, or simply more firearms (which too can be used for personal protection and thus become part of the seller's now-enhanced "personal collection") would be shielded from the GCA's licensing requirements by an expansive statutory exclusion encompassing "sales, exchanges, or purchases" made for the enhancement of a "personal collection," 18 U.S.C. § 921(a)(21)(C). Put another way, because "one could nearly always claim that a firearm was . . . sold to improve or liquidate the firearms one keeps for self-defense," Plaintiffs' preferred definition of "personal collection" would "allow the limited definitional exclusions for enhancing and

41

liquidating a personal collection to swallow the rule that dealers in firearms must be licensed." 89 Fed. Reg. at 29,039. Given that a cardinal purpose of the GCA and the BSCA is to regulate firearms sales, it should not be "lightly" assumed that Congress intended to enact such a "self-defeating" exclusion to federal licensing requirements. *Pugin v. Garland*, 599 U.S. 600, 607 (2023) (citation omitted).

The Rule, in contrast, advances that statutory purpose. The Rule's "engaged in the business" definition still excludes "occasional sales, exchanges, or purchases of firearms," 27 C.F.R. § 478.13(a), that are "accumulate[d] for study, comparison, exhibition . . . , or for a hobby," *id.* § 478.11(defining "personal collection").[22] But as to sales of firearms that are acquired for other purposes—including for use as self-defense weapons—the Rule focuses the relevant inquiry onto whether such sales satisfy the elements of being "engaged in the business" of dealing under the GCA and thus require a license (*e.g.*, because they were made with the predominant intent

---

[22] That sales involving firearms acquired for "study, comparison, [or] exhibition" or "for a hobby" may be treated differently under the GCA than sales of other firearms is reasonable for at least a few reasons. For one, common experience confirms that firearms in the former categories—for instance, a historically unique firearm that will be exhibited at a gun club event or a rifle used for skeet shooting—are less desirable to criminals and, relatedly, pose less of a public safety risk than firearms that are used principally as weapons (*e.g.*, a concealable handgun). Additionally, a "collector" of firearms that qualify as "curios or relics"—*e.g.*, firearms "which derive a substantial part of their monetary value from the fact that they are novel, rare, bizarre, or because of their association with some historical figure, period, or event," 27 C.F.R. § 478.11—may, like collectors of other items, intend for their "personal collection" of firearms "to increase in value" over time, 89 Fed. Reg. at 29,038. Subsequent sales from such a collection will thus oftentimes be motivated, at least in part, by monetary considerations. Yet under the Rule, such sales would comfortably fall within the ambit of the "personal collection" exclusion to the GCA's licensing requirements.

to earn a profit), rather than on whether the firearms in question may or may not be part of a "personal collection." That focus is entirely consistent with the GCA, which was enacted to improve public safety by imposing licensing requirements on firearms sales, *see Abramski*, 573 U.S. at 180, as well as the BSCA, which was enacted to improve compliance with and expand the scope of those same requirements.

A fair reading of the Rule confirms that Plaintiffs' other objections to the "personal collection" definition can be readily dismissed. They assert that under the Rule, "Plaintiffs and the NRA's members cannot sell or trade firearms for the purpose of enhancing a personal collection maintained for personal protection." Pls.' Br. at 41-42. But again, the Rule does not prohibit firearms sales to any extent; it merely defines (consistent with the GCA) the type of sales-related activity that requires a federal license. Moreover, while firearms acquired primarily for personal protection do not fall within the "personal collection" exclusion to the GCA's definition of "engaged in the business," *see* 27 C.F.R. § 478.11, that does not mean, as Plaintiffs baldly assert, that a person is necessarily engaged in the business of dealing whenever they sell any such firearms. *See* Pls.' Br. at 40 (claiming that "[a]n individual" who makes such sales "is acting unlawfully"). Under the Rule, being "engaged in the business" still requires that a person "devote[] time, attention, and labor to dealing in firearms as a regular course of trade or business" with the

predominant intent "of obtaining pecuniary gain." *Id.* § 478.13(a), (d)(1); *see* 18 U.S.C. § 921(a)(21)(C). Accordingly, because the firearms-related conduct Plaintiffs allegedly engage in, *see* Butler Decl. ¶ 8, does not satisfy the requisite elements of being "engaged in the business," they are not subject to the GCA's licensing requirements, irrespective of whether they acquire firearms for personal protection, and irrespective of their desire to have their conduct be encompassed by the GCA's "personal collection" exclusion.

4. Plaintiffs claim that the Rule "violates" the GCA by "creating three sets of presumptions," Pls.' Br. at 42, but their arguments as to how, exactly, those presumptions are purportedly unlawful miss the mark. The Rule identifies certain firearms-related activities that give rise to a rebuttable presumption, applicable only "[i]n civil and administrative proceedings," that an individual is "engaged in the business" of dealing firearms, as defined by the GCA. 27 C.F.R. § 478.13(c); *see, e.g.*, *id.* § 478.13(c)(3)(i) (providing that a person is "presumed" to be engaged in the business, "absent reliable evidence to the contrary," if he "[r]epetitively resells or offers for resale firearms . . . [w]ithin 30 days" of purchasing them). The Rule likewise identities certain activities that give rise to a rebuttable presumption—again, applicable only "[i]n civil and administrative proceedings"—that an individual "ha[s] the intent to predominantly earn a profit through the repetitive purchase and resale of firearms." *Id.* § 478.13(d)(2); *see, e.g.*, *id.* § 478.13(d)(2)(i)

(providing that a person is "presumed to have the intent to predominantly earn a profit," "absent reliable evidence to the contrary," if he "[r]epetitively or continuously advertises, markets, or otherwise promotes a firearms business"). And the Rule also identifies categories of firearms sales and transfers that do not support a presumption that a person is "engaged in the business," such as a transfer amounting to a "[b]ona fide gift," or sales made "[o]ccasionally to obtain more valuable, desirable, or useful firearms for the person's personal collection." *Id.* §478.13(e); *see id.* § 478.13(f) (providing that "[r]eliable evidence of" such sales or transfers "may be used to rebut" any of the presumptions set forth in the Rule).

Plaintiffs suggest that the "engaged in the business" and "predominantly earn a profit" presumptions "violate[] . . . 'the presumption of innocence'" afforded to criminal defendants. Pls.' Br. at 42. But the Rule could not be clearer about the fact that its rebuttable presumptions "shall not apply to any criminal case." 27 C.F.R. § 478.13(h). And while the Rule notes that its presumptions "may be useful to courts in criminal cases, for example, when instructing juries regarding permissible inferences," *id.*, that observation is neither improper nor remarkable. *See, e.g.*, *Francis v. Franklin*, 471 U.S. 307, 314 (1985) (noting that a "permissive inference" in jury instructions "suggests to the jury a possible conclusion to be drawn if the State proves predicate facts, but does not require the jury to draw that conclusion"); *United States v. Myers*, 972 F.2d 1566, 1573 (11th Cir. 1992) (explaining that "[a]

permissive inference is not burden shifting and, therefore, does not violate the due process clause"); *see also* 89 Fed. Reg. at 28,976 n.66 (collecting cases explaining that courts may use permissive inferences in criminal jury instructions).

To the extent Plaintiffs mean to imply that the Rule's presumptions are impermissible even in a non-criminal context, courts have long made clear that federal agencies, including ATF, may lawfully promulgate regulations that include factual presumptions "as long as there is a rational nexus between the proven facts and the presumed facts." *U.S. Steel Corp. v. Astrue*, 495 F.3d 1272, 1284 (11th Cir. 2007); *see Republic Aviation Corp. v. NLRB*, 324 U.S. 793, 804-05 (1945) (finding "no error" in the NLRB's adoption of a presumption and noting that the "validity" of a regulatory presumption "depends upon the rationality between what is proved and what is inferred"); *see also Cole v. U.S. Dep't of Agric.*, 33 F.3d 1263, 1267 (11th Cir. 1994) ("The law is well established that presumptions may be established by administrative agencies . . . ."). Plaintiffs do not even attempt to challenge the Rule's presumptions under this standard.

Instead, Plaintiffs simply assert that the presumptions "contradict the [GCA's] text" by "trigger[ing] presumptive liability based on lawful conduct." Pls.' Br. at 42. Yet whether the Rule's presumptions impermissibly encompass "lawful conduct" hinges entirely on Plaintiffs' assertions that the GCA requires multiple firearms transactions and proof of profit in order for someone to be "engaged in the

business." *See id.* at 42-43.  That is, Plaintiffs' arguments concerning the Rule's presumptions are largely indistinguishable from their arguments concerning the number of transactions or the amount of profit (or lack thereof) that does or does not rise to the level of being "engaged in the business."  *See supra* III.A.1-.2.  As explained above, those antecedent arguments about the Rule's consistency with the GCA fail for several reasons, and Plaintiffs' attendant challenge to the Rule's presumptions accordingly fails too.

**5.**     Plaintiffs take issue with what they describe as "ATF's ultra vires choice to redefine unambiguous terms that Congress already defined" in the GCA—specifically, "dealer," "engaged in the business," and "to predominantly earn a profit"—and argue that the Rule's definitions of those three terms "are more expansive" than the statutory definitions.  Pls.' Br. at 43-44 (citing 18 U.S.C. § 921(a)(11)(a), (21)(C), (22)).   The Rule's definitions are perhaps "more expansive" in terms of word count.  *See, e.g.*, 27 C.F.R. § 478.13(a) (stating that "engaged in the business," in addition to the definition found at 18 U.S.C. § 921(a)(21)(C), "shall not include an auctioneer who provides only auction services on commission to assist in liquidating firearms at an estate-type auction").   Yet Plaintiffs do not appear to contend that such a superficial distinction is itself

unlawful.[23]  They instead assert that the Rule "redefine[s]" the three terms and thus "radically expand[s] the scope of federal criminal law to achieve administrative policy preferences," Pls.' Br. at 44, without explaining how, precisely, the Rule's definitions do so, or which parts of those definitions are allegedly unlawful.

The most charitable reading of Plaintiffs' argument here is that they are merely restating their same arguments about the Rule being inconsistent with the GCA—*e.g.*, that being "engaged in the business" requires proof of actual profit—just at a higher level of generality.  *See, e.g.*, Pls.' Br. at 44 (suggesting that ATF's use of "more expansive" definitions in the Rule constitutes "[l]egislati[ng] by executive fiat").  But again, those antecedent arguments rely on erroneous constructions of the GCA and case law interpreting it.  *See supra* III.A.1-.2. Plaintiffs' attack on certain definitions in the Rule simply amounts to a less precise iteration of those same arguments, and it fails for the same reasons.

**6.**     Finally, Plaintiffs invoke the "major questions doctrine," arguing vaguely that "application of the doctrine" here will "further demonstrate[] that Plaintiffs are likely to succeed on the merits" of their exceeds-statutory-authority claim.  Pls.' Br. at 44-45.  That doctrine, however, is wholly inapposite to this run-

---

[23] Plaintiffs do not question ATF's general authority to promulgate regulations that further define statutory terms; to the contrary, they appear to concede that ATF may issue such definitions "to administer [a] statute or to resolve ambiguity."  Pls.' Br. at 44; *see* 18 U.S.C. § 926(a) (authorizing the Attorney General, and by delegation ATF, to prescribe "such rules and regulations as are necessary to carry out the provisions of" the GCA).

of-the-mill APA case involving a challenge to a regulation implementing statutory terms. *See West Virginia v. EPA*, 597 U.S. 697, 721 (2022) (explaining that the "major questions doctrine" applies only "in certain extraordinary cases").

For one, the facets of the Rule Plaintiffs highlight cannot be fairly characterized as the sort of exercise of agency authority with "vast 'economic and political significance'" that implicates the major questions doctrine in the first place. *Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 594 U.S. 758, 764 (2021). *Compare, e.g.*, 89 Fed. Reg. at 29,072, 29,081-82 (estimating that, at most, roughly 95,500 unlicensed individuals "may be engaged in the business of firearms dealing . . . and thus potentially affected by" the Rule, and that "familiarization" and "licensing" costs related to the Rule will roughly total, at most, $36 million per year), *with Biden v. Nebraska*, 143 S. Ct. 2355, 2372 (2023) (involving a student loan forgiveness program that would have affected 43 *million* borrowers and involved $430 *billion* in student loans), *and West Virginia*, 597 U.S. at 724 (involving an agency action that would have "substantially restructure[d] the American energy market" and led to "unprecedented power over American industry").

Moreover, ATF's promulgation of the Rule in no way amounts to the agency "claim[ing] to discover in a long-extant statute an unheralded power representing a transformative expansion in its regulatory authority." *West Virginia*, 597 U.S. at 724 (cleaned up). To the contrary, ATF has regulated firearms dealing under the

49

GCA for decades.  The Rule's provisions either directly reflect statutory language or implement that language in a manner consistent with case law and ATF's authority to prescribe "such rules and regulations as are necessary to carry out the provisions of" the GCA, 18 U.S.C. § 926(a).  And to the extent the Rule "impose[s]" any new costs "on private citizens," Pls.' Br. at 44, such costs are directly traceable to *the BSCA*—a statute enacted with the express goal of expanding the scope of federal licensing requirements and which Plaintiffs do not challenge.  *Congress*, not ATF, thus "ma[de]" the "major policy decisions" to which Plaintiffs now object, *West Virginia*, 597 U.S. at 723, and the Rule simply implements those changes.  The major questions doctrine is therefore inapplicable here.  *See id.* (indicating that the doctrine is implicated when an agency attempts to make "major policy decisions" itself based on ambiguous or "oblique" statutory text).

### B.      The Rule Is Not Arbitrary and Capricious

Plaintiffs also wrongly contend that the Rule "constitutes arbitrary and capricious agency action."  Pls.' Br. at 46.  When reviewing a final agency action under the APA, a federal court must apply the "arbitrary and capricious" standard.  5 U.S.C. § 706(2)(A).  "This standard of review is 'exceedingly deferential' and provides the reviewing court with limited discretion to reverse an agency's decision."  *City of N. Miami v. FAA*, 47 F.4th 1257, 1266 (11th Cir. 2022) (citation omitted); *see Nat'l Mining Ass'n v. United Steel Workers*, 985 F.3d 1309, 1321 (11th

Cir. 2021) (noting that arbitrary and capricious review "presumes the validity of agency action"). A court must "simply ensure[] that the agency has acted within a zone of reasonableness," *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021), and the court may not "substitute [its] judgment for the agency's as long as" the latter's "conclusions are rational," *Miccosukee Tribe of Indians of Fla. v. United States*, 566 F.3d 1257, 1264 (2009). An agency decision accordingly must be upheld so long as it is "reasonable and reasonably explained." *FCC*, 592 U.S. at 423.

Plaintiffs first argue that the Rule represents a "radical" departure from ATF's "prior practice" and that ATF "failed to provide a sufficiently reasoned explanation for this arbitrary shift." Pls.' Br. at 46-47. Yet a change in agency policy requires only that the agency "display awareness that it *is* changing position" and that "the new policy is permissible under the statute, that there are good reasons for it, and that the agency *believes* it to be better." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). ATF easily satisfied this standard when issuing the Rule.

Indeed, in the Rule's preamble, ATF explained what aspects of the Rule differed from past practice and the reasons for those changes. For instance, ATF acknowledged that it had not previously promulgated a regulation providing a detailed definition of "engaged in the business" of dealing, and in fact decided not to do so in 1980. *See* 89 Fed. Reg. at 28,969-70. Yet ATF concluded that the Rule was necessary, in part, "[t]o implement the new statutory language in the BSCA,"

*id.* at 28,972, which expanded the statutory definition of being "engaged in the business."  *See id.* at 29,010 (noting that the Rule "updates ATF's regulations in accordance with the BSCA's new statutory definition of when a person is considered to be 'engaged in the business' and makes other related changes").  ATF further explained that the Rule was necessary to "provide clarity" as to when a federal firearms license is required and to "deter" unlawful unlicensed dealing, given that "ATF observed a significant level of noncompliance with the GCA's licensing requirements even prior to the BSCA."  89 Fed. Reg. at 28,968, 29,086.[24]  ATF also determined that the Rule would "improve public safety by helping to prevent persons who are prohibited from possessing firearms under Federal law from acquiring [them] and allowing law enforcement officers to trace firearms involved in crime."  *Id.* at 28,987.  By citing to such valid regulatory objectives, ATF more than adequately justified the changes reflected in the Rule.  *See FCC*, 592 U.S. at 423 ("A court simply ensures that the agency . . . has reasonably considered the relevant issues and reasonably explained the decision."); *see also Licon v. Ledezma*, 638 F.3d 1303, 1311 (10th Cir. 2011) (concluding that a regulation was not arbitrary and capricious because the agency reasonably explained that it promoted public safety).

---

[24] *See also* 89 Fed. Reg. at 28,973 ("[S]ince 1968, advancements in manufacturing (*e.g.*, 3D printing) and distribution technology (*e.g.*, internet sales) and changes in the marketplace for firearms and related products (*e.g.*, large-scale gun shows) have increased the ways in which individuals shop for firearms, and therefore have created a need for further clarity in the regulatory definition of 'dealer.'" (citing the NPRM)).

Plaintiffs additionally argue that ATF did not "meaningfully account[] for" the reliance interests of gunowners who possess firearms primarily for personal protection. Pls.' Br. at 48. They do not explain why, exactly, ATF was obligated to "meaningfully" consider how a Rule addressing firearms *dealing* might affect gunowners who simply *possess* a firearm, the vast majority of whom do not sell or transfer firearms even occasionally. *See* 89 Fed. Reg. at 29,072 (citing a survey finding that only "5 percent of the total population [of gunowners] transferred firearms in some manner over the course of five years").[25] In any event, ATF explicitly acknowledged that the Rule would lead to an increase in the number of firearms sellers who would become (or would need to become) licensed and an attendant decrease in the total number of private firearms sellers, as some would elect to leave the market entirely rather than obtain a license. *See id.* at 28,998, 29,071-72. ATF explained in detail how the Rule might affect firearms "accumulated primarily for personal protection," 27 C.F.R. § 478.11. *See* 89 Fed. Reg. at 29,037-40. ATF also meticulously estimated the costs of the Rule, *id.* at 29,070-82, and concluded that those costs were outweighed by the Rule's substantial benefits, including its "significant public safety benefits," *id.* at 29,082-86. Plaintiffs

---

[25] Plaintiffs cite without explanation that "about two-thirds of Americans report owning firearms primarily for 'defense' or 'protection.'" Pls.' Br. at 48. That unadorned figure is found in the Rule's preamble in a summary of comments ATF received during the notice-and-comment process. 89 Fed. Reg. at 29,036. And as cited by Plaintiffs, it appears to misleadingly inflate the number of Americans who actually own firearms. *See id.* at 29,072 (estimating that only between 22 and 32 percent of U.S. adults own at least one firearm).

identify no flaws in that cost-benefit analysis or otherwise explain how the analysis failed to adequately consider the Rule's potential impact on gunowners.   ATF therefore rationally determined that it was not precluded by any purported reliance interests from issuing a Rule designed to "help[] increase compliance with the GCA's licensing and recordkeeping requirements" and to "implement" the significant "statutory change" to the GCA made by the BSCA.  *Id.* at 28,968, 29,083.

### C.    The Rule is Not Unconstitutionally Vague

Plaintiffs fail to show that the Rule is vague, let alone unconstitutionally so. Under the Fifth Amendment's Due Process Clause, a statute or regulation is unconstitutionally vague only if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement."  *United States v. Woods*, 684 F.3d 1045, 1057 (11th Cir. 2012) (citation omitted).  And to succeed on a facial vagueness challenge—which Plaintiffs bring here—"the challenger must establish that no set of circumstances exists under which" the law being challenged "would be valid." *SisterSong Women of Color Reprod. Just. Collective v. Governor of Ga.*, 40 F.4th 1320, 1327 (11th Cir. 2022) (citation omitted).  That is, "the possibility of a valid application" of the law "necessarily precludes facial invalidity."  *Id.*

Plaintiffs do not even attempt to meet this "demanding standard."  *Id.*  The Rule, for one, defines "engaged in the business" and "predominantly earn a profit"—

two terms which determine whether a person must obtain a federal license—consistently with the GCA, the clarity of which Plaintiffs do not challenge.  Far from being vague, the Rule provides even more clarity than the statute by setting forth specific circumstances that give rise to presumptions that a person is "engaged in the business" of dealing in firearms or has the predominant intent to earn a profit, while also setting forth specific types of conduct that do not constitute being "engaged in the business" of dealing and can be used to rebut the Rule's presumptions.  Such specificity provides precisely the sort of notice that makes a law not vague.

Plaintiffs largely focus their vagueness arguments on the Rule's presumptions, contending that the presumptions themselves "do not provide fair notice of when a citizen acts in violation of the . . . laws governing firearms dealers." Pls.' Br. at 49.  Yet Plaintiffs do not assert that any specific presumption is impermissibly vague.  They instead appear to suggest that the presumptions are vague because they prescribe conduct that *presumptively* amounts to being "engaged in the business" or having the predominant intent to earn a profit, rather than definitively so.  *See* Pls.' Br. at 49 ("ATF has announced that a law-abiding citizen *might* be unlawfully engaged as a dealer . . . unless the citizen rebuts the presumption with so-called 'reliable evidence,' which is no standard at all.").  But Plaintiffs fail to explain how a presumption being *rebuttable* speaks to whether the facts and inferences the presumption encompasses are unconstitutionally vague.  *See*

*SisterSong*, 40 F.4th at 1327 ("The inquiry into whether a statute is vague looks only to whether the language of the law itself is vague." (cleaned up)); *cf. United States v. Williams*, 553 U.S. 285, 306 (2008) ("What renders a statute vague is not the possibility that it will sometimes be difficult to determine whether the incriminating fact it establishes has been proved; but rather the indeterminacy of precisely what that fact is.").  The categories of conduct that can be used to rebut the Rule's presumptions are also spelled out in clear detail.  *See, e.g.*, 27 C.F.R. § 478.13(e) (listing "reselling or otherwise transferring firearms" "[a]s bona fide gifts" or "[o]ccasionally to a licensee or to a family member for lawful purposes").  And Plaintiffs' suggestion that they are confused about what else might constitute "reliable evidence" sufficient to rebut the presumptions, Pls.' Br. at 49-50, borders on the frivolous.  *See League of Women Voters of Fla. Inc. v. Fla. Sec'y of State*, 66 F.4th 905, 946 (11th Cir. 2023) ("The plain meaning of [a word] is definite enough to give notice to ordinary citizens . . . .").

Plaintiffs also seem to suggest that the presumptions are unconstitutionally vague because they are "based on non-exhaustive criteria."  Pls.' Br. at 49; *see* 27 C.F.R. § 478.13(g).  Yet if certain firearms-related conduct does not fall within one of the Rule's presumptions, determining whether that conduct amounts to being "engaged in the business" would simply require referring back to the Rule's general definition of that term—namely, whether a person "devotes time, attention, and labor

to dealing in firearms as a regular course of trade or business to predominantly earn a profit through the repetitive purchase and resale of firearms."   27 C.F.R. § 478.13(a).   That definition is materially identical to the GCA's—which again, Plaintiffs do not challenge on vagueness grounds.

Finally, Plaintiffs appear to argue that the Rule fails to give fair notice because determining whether someone is "engaged in the business" is a "fact-specific inquiry" that varies on a "case-by-case basis."   Pls.' Br. at 49.   But that facet of the Rule is true of almost any statute or rule, and it is especially so in the context of the GCA.   *See Bailey*, 123 F.3d at 1392 ("In determining whether one is engaged in the business of dealing in firearms, the finder of fact must examine the intent of the actor *and all circumstances surrounding the acts alleged* to constitute engaging in the business." (emphasis added)).   Courts, in any event, have made clear that "[a] statute is not unconstitutionally vague for failing to describe explicitly" the full range of ways "in which [it] can be violated."   *Woods*, 684 F.3d at 1059.

In sum, the GCA gives fair notice of the conduct that amounts to being "engaged in the business" of firearms dealing—which Plaintiffs do not contest.   And the Rule, by setting forth specific conduct that presumptively does or does not constitute being "engaged in the business," certainly does as well.   Plaintiffs' void-for-vagueness claim therefore fails on the merits.

### D.   The Rule Comports with the Second Amendment

Plaintiffs also challenge the Rule on Second Amendment grounds, *see* Pls.' Br. at 50-57, but that claim fails as well because the Rule comports with the Second Amendment.  In *District of Columbia v. Heller*, 554 U.S. 570 (2008), the Supreme Court made clear that "longstanding . . . laws imposing conditions and qualifications on the commercial sale of arms" are "presumptively lawful regulatory measures." 554 U.S. at 626-27, 627 n.26.  And the Court's decision in *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022)—the case on which Plaintiffs chiefly rely here—"did nothing to disturb that part of *Heller*."  *McRorey v. Garland*, 99 F.4th 831, 836 (5th Cir. 2024).  More recently, in upholding a federal firearms statute against a Second Amendment challenge, the Court explained that "the Second Amendment permits more than just those regulations identical to ones that could be found in 1791," so long as a "challenged regulation is consistent with the principles that underpin our regulatory tradition."  *United States v. Rahimi*, 144 S. Ct. 1889, 1897-98 (2024).

In *Bruen*, both the majority opinion and Justice Kavanaugh's concurrence affirmed the constitutionality of "'shall-issue' licensing regimes," under which the right to carry weapons is conditioned on passing a "background check" and obtaining a license.  *Bruen*, 597 U.S. at 38 n.9; *see also id.* at 80 (Kavanaugh, J., concurring).  If it is thus permissible to require a license to *bear* arms—a right

expressly listed in the Second Amendment—there is no reason to think that it would violate the Second Amendment to require a license to *deal* firearms, an activity nowhere mentioned in the amendment's text. *See McRorey*, 99 F.4th at 836-37 (noting that "*Bruen* continued to distinguish the treatment of prohibitions on 'keep[ing] and bear[ing]'" from "other ancillary firearm regulations such as background checks preceding sale").

Furthermore, Plaintiffs' Second Amendment claim is foreclosed by binding Eleventh Circuit precedent, which has rejected a Second Amendment challenge to federal licensing requirements. *See United States v. Focia*, 869 F.3d 1269, 1284 (11th Cir. 2017) (rejecting a Second Amendment challenge to 18 U.S.C. § 922(a)(5) and explaining that § 922(a)(1)(A) "qualifies as the kind of 'presumptively lawful regulatory measure[]' described in *Heller*"). Plaintiffs argue that "*Focia*'s continuing vitality is questionable after *Bruen* and *Rahimi*" because it "rel[ied] in part on *Heller*'s . . . dicta" that regulations on commercial firearms sales are presumptively lawful. Pls.' Br. at 54. But under the Eleventh Circuit's "prior-panel-precedent rule[,] a prior panel's holding is binding on all subsequent panels unless and until it is overruled or undermined to the point of abrogation by the Supreme Court or by [the Eleventh Circuit] sitting *en banc*." *United States v. Dubois*, 94 F.4th 1284, 1293 (11th Cir. 2024) (cleaned up); *see id.* ("An intervening Supreme Court decision abrogates our precedent only if [it] is both 'clearly on point' and 'clearly

contrary to' our earlier decision."). And because *Focia* has not been so abrogated, that precedent "remains binding" here. *Id.* Indeed, neither *Bruen* nor *Rahimi* discussed *Focia* or commented on the precise issue of the constitutionality of licensing requirements for commercial firearms sales.

Nor did *Bruen* or *Rahimi* undermine the Eleventh Circuit's continued reliance on *Heller*'s instruction that certain firearms regulations are "presumptively lawful." 554 U.S. at 627 n.26. For instance, after *Heller*, the Eleventh Circuit relied on that language to uphold another category of presumptively lawful firearms regulations— namely, bans on felons possessing firearms. *United States v. Rozier*, 598 F.3d 768, 770-71 (11th Cir. 2010). The court later held post-*Bruen* that "*Bruen* did not abrogate *Rozier*" because the former case did not "demolish[] or eviscerat[e] *Rozier*'s reliance on" *Heller*'s "presumptively lawful" language. *Dubois*, 94 F.3d at 1293. And a separate panel recently concluded that *Rahimi* "does not change [the] analysis" that *Rozier* remains binding. *United States v. Hester*, No. 23-11938, 2024 WL 4100901, at *1 (11th Cir. Sept. 6, 2024) (per curiam). This reasoning applies with equal force to *Focia*, which also relied on *Heller*'s "presumptively lawful" language and whose binding effect was likewise not altered by *Bruen* or *Rahimi*.

Even if Plaintiffs' Second Amendment claim is not squarely foreclosed by circuit precedent, the result would still be the same. Both before and after *Bruen*, courts have regularly rejected arguments that the Second Amendment precludes

regulation of those engaged in the business of dealing firearms.  *See, e.g.*, *Teixeira v. Cnty of Alameda*, 873 F.3d 670 (9th Cir. 2017) (en banc); *United States v. Flores*, 652 F. Supp. 3d 796 (S.D. Tex. 2023).[26]  Plaintiffs, moreover, cite no case law supporting their contention that the Second Amendment confers an unfettered right to "sell" or "trade" arms "without a federal firearms license."  Pls. Br. at 51.  They cite *Ezell v. City of Chicago*, 651 F.3d 684, 704 (7th Cir. 2011), but that case held that the Second Amendment protected a right to practice shooting at a firing range, not to engage in the business of dealing firearms without a license.  Plaintiffs also cite *Teixeira*, which held that the Second Amendment implies a right "to acquire arms," but the *Teixeira* court also made clear that the Second Amendment did not confer a right "upon a proprietor of a commercial establishment to sell firearms." 873 F.3d at 677, 682.

Plaintiffs argue that "even a temporary or non-total deprivation" of a person's ability to engage in firearms transactions infringes on that person's Second Amendment rights.  Pls.' Br. at 52.  Yet multiple circuit courts have recently—and correctly—rejected such a contention.  *See McRorey*, 99 F.4th at 839-40 (upholding federal background check requirements because the "law is plain as can be that some

---

[26] *See also United States v. Duncan*, No. 7:20-cr-00167-M-3, 2023 WL 7346042, at *3 (E.D.N.C. Nov. 7, 2023) ("[I]mpos[ing] a condition, namely licensing, on firearms commerce . . . does not violate the Second Amendment"); *United States v. King*, 646 F. Supp. 3d 603, 607 (E.D. Pa. 2022) ("[T]he Second Amendment does not protect the *commercial* dealing of firearms"); *United States v. McNulty*, ---F Supp.3d.---, 2023 WL 4826950, at *4 (D. Mass. July 27, 2023); *United States v. Tilotta*, Case No. 3:19-cr-04768-GPC, 2022 WL 3924282, at *5 (S.D. Cal. Aug. 30, 2022).

amount of time for background checks is permissible"); *Md. Shall Issue, Inc. v. Moore*, -- F.4th --, 2024 WL 3908548, at *11 (4th Cir. Aug. 23, 2024) (en banc) (upholding a state shall-issue licensing law requiring a person to pass a background check and obtain a license before purchasing a handgun and rejecting the argument that "*any* delay resulting from compliance" with the law "qualifies as [an] 'infringement'" of Second Amendment rights).

Moreover, the Rule's modest requirements for commercial firearms sales are "consistent with the principles that underpin our regulatory tradition." *Rahimi*, 144 S. Ct. at 1898. As ATF explained in the Rule's preamble, "there is a robust historical tradition supporting the Government's authority to require licenses and inspection of firearms sellers." 89 Fed. Reg. at 29,002. In 1794, for example, Congress enacted a law temporarily making it unlawful "to export from the United States any cannon, muskets, pistols, bayonets, swords, cutlasses, musket balls, lead, bombs, grenades, gunpowder, sulpher, or saltpetre,'' Act of May 22, 1794, 1 Stat. 369, ch. 33, § 1, making clear that the Founding generation believed that it was constitutionally permissible to regulate arms sales.

Colonies and states in the early republic also regulated firearms commerce. For instance, at different times between 1651 and 1809, Massachusetts, Connecticut, and New Jersey all required licenses or inspection to export or sell gunpowder,

which was necessary to operate a firearm.[27]  An 1805 Massachusetts law and an 1821 Maine law required pistol barrels to be "proved," meaning inspected and marked, before they could be sold.[28]  In concluding that "[t]he historical record confirms that the right to sell firearms was not within the 'historical understanding of the scope of the [Second Amendment] right,'" *Teixeira*, 873 F.3d at 683 (citations omitted), the Ninth Circuit also cited additional historical materials showing that many colonies enacted restrictions on commercial sales of firearms to Indians, and Connecticut and Virginia "controlled more generally where colonial settlers could transport or sell guns," *id.* at 685.  These historical laws confirm that the government can lawfully regulate commerce in firearms and related products such as ammunition and

---

[27] *See* Colonial Laws of Massachusetts Reprinted from the Edition of 1672, at 126, Powder (1890) (1651 statute requiring a license to export gunpowder); 2 General Laws of Massachusetts from the Adoption of the Constitution to February, 1822, at 198-200, ch. 52, An Act Providing for the Appointment of Inspectors, and Regulating the Manufactory of Gun-Powder, secs. 1, 8 (1823) (1809 statute providing for the appointment of an ''inspector of gunpowder for every public powder magazine, and at every manufactory of gunpowder'' and imposing penalties for any sale or export of gunpowder ''before the same has been inspected and marked''); 15 The Public Records of the Colony of Connecticut, from May, 1775, to June, 1776, Inclusive 191, An Act for Encouraging the Manufactures of Salt Petre and Gun Powder (1890) (1775 Connecticut law establishing, among other things, that no gunpowder manufactured in the colony ''shall be exported out'' of the colony ''without [an applicable] licence''); Acts of the General Assembly of the State of New-Jersey, at a Session Begun at Princeton on the 27th Day of August 1776, and Continued by Adjournments 6, ch. 6, An Act for the Inspection of Gun-Powder, § 1 (1877) ("No person shall offer any gunpowder for sale ''without being previously inspected and marked as is herein after directed.''); *see also* Laws of the State of New Hampshire; With the Constitutions of the United States and of the State Prefixed 276-78, An Act to Provide for the Appointment of Inspectors and Regulating the Manufactory of Gunpowder, secs. 1, 8 (1830) (authorizing ''inspector of gunpowder for every public powder magazine, and at every manufactory of gunpowder in this state'' and imposing penalties for any sale or disposition of gunpowder ''before the same has been inspected and marked'').

[28] *See* 3 Laws of the Commonwealth of Massachusetts, from November 28, 1780, to February 28, 1807, at 259–61 (1807); 1 Laws of the State of Maine 546 (1830).

gunpowder. And the Rule's modest licensing requirements—which implement those imposed by the GCA and BSCA—"fit[] comfortably within this tradition." *Rahimi*, 144 S. Ct. at 1897.

Plaintiffs argue that the Rule is unconstitutional because there is no historical example of precisely the same type of regulation, and each historical regulation on firearms commerce cited by ATF differs from the Rule in some way. *See* Pls.' Br. at 53-57. Yet in doing so, Plaintiffs engage in the same sort of "misunderst[anding]" of "the methodology of [the Supreme Court's] recent Second Amendment cases" that the Court decried in *Rahimi*. 144 S. Ct. at 1897. Those precedents, the Court explained, "were not meant to suggest a law trapped in amber." *Id.* Rather, "the Second Amendment permits more than just those regulations identical to ones that could be found in 1791," so long as a "challenged regulation is consistent with the principles that underpin our regulatory tradition." *Id.* at 1897-98; *see Bruen*, 597 U.S. at 30 ("So even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster.").

*Rahimi* also rejected Plaintiffs' divide-and-conquer strategy of analyzing and then disregarding each historical regulation separately because none precisely matches the regulation under review. Instead, *Rahimi* held that two distinct historical regimes (surety bond laws and laws criminalizing "going armed" in a way that menaces others with firearms), "[t]aken together," supported the

constitutionality of 18 U.S.C. § 922(g)(8) by establishing the principle that the government may disarm a person who poses a clear threat of violence to others. *Rahimi*, 144 S. Ct. at 1901.  The Supreme Court acknowledged that the challenged law was "by no means identical to these founding era regimes," but underscored that it "d[id] not need to be." *Id.*  Similarly here, even though no historical regulation precisely matches the Rule, the wide variety of historical regulations on commercial firearms sales, taken together, establishes the principle that governments may regulate commerce in firearms to promote public safety.  Plaintiffs' Second Amendment challenge therefore fails.

### E.    Plaintiffs' Separation-of-Powers Claim Lacks Merit

Finally, Plaintiffs claim that "ATF's promulgation of the Final Rule violates . . . fundamental principles of separation of powers and non-delegation," Pls.' Br. at 58, but this conclusory assertion lacks merit.  Plaintiffs assert that the Rule "drastically expand[s] the scope of federal criminal laws governing firearms dealers" and thus amounts to "legislation by executive fiat." *Id.* at 57-58.  But the Rule, once again, simply implements the provisions of the GCA as amended by the BSCA.  In promulgating the Rule, moreover, ATF exercised authority delegated to it by an elected and democratically accountable Congress.  *See* 18 U.S.C. § 926(a). And the "statutory change" to the GCA the Rule implements (*i.e.*, the BSCA) was likewise enacted by an elected and democratically accountable Congress.

The gravamen of Plaintiffs' separation-of-powers claim is that ATF, in issuing the Rule, "usurp[ed] legislative power" by "prohibiting conduct protected by congressional enactment."  Pls.' Br. at 58.  Put another way, Plaintiffs effectively claim that the Rule is "in excess of" ATF's "statutory . . . authority" or "otherwise not in accordance with law"—a theory of relief that is indistinguishable from their APA claims.  5 U.S.C. § 706(2).  Their separation-of-powers claim thus amounts to little more than an attempt to repackage a statutory claim as a constitutional one and should be rejected.  *See Nw. Austin Mun. Util. Dist. No. One v. Holder*, 557 U.S. 193, 205 (2009) ("[I]t is a well-established principle . . . that normally the Court will not decide a constitutional question if there is some other ground upon which to dispose of the case." (citation omitted)).

## IV.    The Balance of the Equities and Public Interest Disfavor Injunctive Relief

The last two requirements for a preliminary injunction—which merge in this case, *see Georgia*, 46 F.4th at 1292—"involve a balancing of the equities between the parties and the public."  *Florida*, 19 F.4th at 1293.  That balance tips decidedly against preliminarily enjoining the Rule here.

Plaintiffs bear the burden of proving that they are entitled to preliminary relief, *see Vital Pharms., Inc.*, 23 F.4th at 1290-91, and as explained above, they fall well short of showing that they are substantially likely to succeed on the merits on any of their claims.  *See Kansas*, 2024 WL 3360533, at *7 (denying preliminary relief in

66

part because the plaintiffs "ha[d] not established that the state of play is so one-sided as to warrant injunctive relief at this point"). Plaintiffs have also failed to establish how they are harmed by the Rule, let alone irreparably so. Indeed, the Rule was in effect for nearly three months before Plaintiffs felt compelled to seek relief from it. Relatedly, because the preliminary relief Plaintiffs seek "would upend the current legal landscape as it has existed" for several months now, *id.* at *8, their claim that such relief would "preserve the status quo," Pls.' Br. at 62, rings hollow. Plaintiffs have consequently placed nothing on their side of the equities balance.

Conversely, Congress specifically amended the statutory definition of "engaged in the business" in the BSCA to encompass more firearms-related conduct and to reduce the volume of unlicensed dealing in firearms. And ATF lawfully issued the Rule to give effect to that legislative change. The federal government will thus be irreparably harmed if it is "enjoined by a court from effectuating" a statute "enacted by representatives of its people." *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers). Furthermore, courts have long recognized that regulations concerning "dealers in firearms" are "undeniably of central importance to federal efforts to prevent violent crime and to assist the States in regulating the firearms traffic within their borders." *United States v. Biswell*, 406 U.S. 311, 315 (1972). And preliminarily enjoining the Rule would significantly undermine the federal government's efforts to "prevent guns from falling into the wrong hands,"

*Abramski*, 573 U.S. at 172, jeopardizing public safety in turn. The consequences of continuing to permit firearms sellers to engage in conduct that Congress and ATF have identified as a significant source of unlicensed dealing thus weighs heavily against granting a preliminary injunction.

## V.    Any Relief Should Be Limited

For the reasons explained above, none of the plaintiffs here is entitled to the preliminary relief they request. But in the event the Court were to find that Plaintiffs have satisfied Article III's standing requirements and the requirements for a preliminary injunction, any relief the Court grants should be limited in two respects.

First, any relief should be limited to the two individual plaintiffs alone. As the Supreme Court has made clear, "[a] plaintiff's remedy must be tailored to redress the plaintiff's particular injury," *Gill v. Whitford*, 585 U.S. 48, 73 (2018), and "injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs," *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994) (citation omitted). Here, Butler and Glidewell are the only plaintiffs who claim with any degree of specificity that they are allegedly harmed by the Rule. *See, e.g.*, Butler Decl. ¶¶ 14-17. Enjoining the Rule's enforcement against those two would accordingly remedy the precise "inadequacy that produced" the lone injury that Plaintiffs attempt to "establish[]." *Gill*, 585 U.S. at 50.

Plaintiffs ask the Court to go much further, however, and preliminarily enjoin Defendants from enforcing the Rule against the individual plaintiffs *and all of the NRA's members*, Pls.' Br. at 63—ostensibly irrespective of whether those members even sell firearms, let alone in a manner that even comes close to implicating the Rule's definition of being "engaged in the business" of dealing. As explained above, the NRA fails to establish associational standing to obtain *any* relief on behalf of *any* of its members. But even if the Court were to conclude that Butler and Glidewell having standing enables it to proceed to the merits without resolving the NRA's standing, the Court still cannot "order relief to any uninjured plaintiff," *TransUnion*, 594 U.S. at 431, and it should be reluctant to issue a broad injunction "premised on the need to protect nonparties," *Georgia*, 46 F.4th at 1306. Yet the NRA effectively asks that any preliminary relief the Court might afford to the two individual plaintiffs here be bluntly extended to the organization's millions of members nationwide, regardless of whether those members are even allegedly affected by the Rule. Indeed, the NRA claims that, like Butler and Glidewell, "*[m]any* of [its] law-abiding members" wish to engage in "occasional sales" of firearms used for "personal protection" without having to obtain a federal firearms license. Compl. ¶¶ 27-28 (emphasis added). But that statement implicitly concedes that not all, or even most, do, meaning in turn that many NRA members will not suffer the lone injury Plaintiffs assert. Even assuming, moreover, that *some* NRA members might be allegedly

injured by the Rule, Plaintiffs provide the Court with no means of identifying those members from the many more uninjured ones.  Accordingly, between extending relief only to the two individual plaintiffs here, or issuing a sweeping injunction encompassing (allegedly) injured and (definitely) uninjured NRA members alike, the Court's choice is clear-cut—it should choose the former option.  *See Georgia*, 46 F.4th at 1306 ("[I]ndiscriminate relief should not be issued by default.").

Second, any injunctive relief should run only against those provisions of the Rule that Plaintiffs actually challenge and that the Court finds are likely unlawful. The Rule contains a "[s]everability" section expressing ATF's intent that the Rule's provisions be severable to the maximum extent possible, such that if any aspect of the Rule is held unlawful, the remainder "shall not be affected and shall be construed so as to give [it] the maximum effect permitted by law."  89 Fed. Reg. at 29,070. Because the Rule's provisions are independently effective, the Court can both provide "complete relief to" Plaintiffs and issue injunctive relief that is "no more burdensome to [Defendants] than necessary" by enjoining only the offending portions of the Rule and leaving the remainder intact.  *Madsen*, 512 U.S. at 765.

## CONCLUSION

For the reasons set forth above, the Court should deny Plaintiffs' Motion for Preliminary Injunction.

Dated: September 12, 2024

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

BRIGHAM J. BOWEN
Assistant Branch Director

*/s/ Zachary W. Sherwood*
ZACHARY W. SHERWOOD
(Indiana Bar No. 37147-49)
JEREMY S.B. NEWMAN
KERI L. BERMAN
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, DC 20005
zachary.w.sherwood@usdoj.gov
(202) 616-8467

*Counsel for Defendants*

## **CERTIFICATE OF SERVICE**

On September 12, 2024, I electronically submitted the foregoing document with the clerk of court for the U.S. District Court, Northern District of Alabama, using the electronic case filing system of the court. I hereby certify that I have served all parties electronically or by another manner authorized by Federal Rule of Civil Procedure 5(b)(2).

_/s/ Zachary W. Sherwood_
ZACHARY W. SHERWOOD
Trial Attorney
U.S. Department of Justice