FILED
2024 Nov-04 AM 08:46
U.S. DISTRICT COURT
N.D. OF ALABAMA

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ALABAMA**
**EASTERN DIVISION**

| | |
|---|---|
| **DON BUTLER, et al.,**<br>      Plaintiffs, | |
| **v.** | **Case No. 1:24-cv-975-CLM** |
| **MERRICK GARLAND,** *in his*<br>*official capacity as Attorney General*<br>*of the United States*, **et al.,**<br>      Defendants. | |

## ORDER

Plaintiffs Don Butler, David Glidewell, and the National Rifle Association ("NRA") sue Attorney General Merrick Garland, the Department of Justice, ATF Director Steven Dettelbach, and the ATF, asserting, among other claims, that the ATF's recently promulgated "Engaged in the Business" Final Rule exceeded the ATF's statutory authority in violation of the Administrative Procedure Act ("APA"). Butler, Glidewell, and the NRA also move for preliminary injunctive relief. (Doc. 7). The court held a hearing on Plaintiffs' motion on October 8, 2024.

*At the hearing*, Plaintiffs failed to offer enough evidence to show a substantial likelihood that Plaintiffs have standing or that Plaintiffs would suffer irreparable injury between the hearing and trial if the court didn't issue a preliminary injunction. The court emphasizes "at the hearing" because Plaintiffs supplemented their evidence after the hearing to address the court's concerns about standing and irreparable injury. And having reviewed the new evidence, the court acknowledges that it could make the difference.

That said, the court **DENIES** Plaintiffs' motion for a preliminary injunction. "A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). And "[t]he chief function of a preliminary injunction is to preserve the status quo until the merits of the controversy can be fully and fairly adjudicated." *Robinson v. Att'y Gen.*, 957 F.3d 1171, 1178 (11th Cir. 2020).

Rather than spend time supplementing the *preliminary* injunction record with new evidence and arguments about *preliminary* issues, the better course is to push this case to final resolution. The court does so by ordering the parties to follow this schedule:

| Event | Date/Deadline |
|---|---|
| Deadline for Defendants to respond to complaint and provide Plaintiffs' administrative record | November 15, 2024 |
| Plaintiffs' motion for summary judgment on the administrative record | December 6, 2024 |
| Defendants' opposition and cross-motion for summary judgment on the administrative record | January 3, 2025 |
| Plaintiffs' opposition and reply brief | January 17, 2025 |
| Defendants' reply brief | January 31, 2025 |

## BACKGROUND

Congress made it unlawful for anyone "except a licensed importer, licensed manufacturer, or licensed dealer, to engage in the business of importing, manufacturing, or dealing in firearms." 18 U.S.C. § 922(a)(1)(A). The ATF administers and enforces federal firearms laws like § 922(a). 28 U.S.C. § 599A(b)(1), (c)(1); 28 CFR § 0.130(a)(1)(2). On April 19, 2024, ATF issued a Final Rule to "clarif[y] what it means for a person to be 'engaged in the business' of dealing in firearms." 89 Fed. Reg. 28968.

This case turns on whether ATF exceeded its statutory authority in interpreting what Congress meant when it required those "engaged in the business" of dealing in firearms to obtain a federal firearms license. So the court starts by explaining how Congress defines "engaged in the business" and how the Final Rule interprets the "engaged in the business" definition.

The court then turns to Plaintiffs' declarations, which describe how the Final Rule impacts them. As noted in the introduction, Plaintiffs filed two sets of declarations: one before the hearing and another after. The court details both, and in the process highlights why the evidence presented at the hearing was insufficient to warrant preliminary relief.

### A.     The Gun Control Act of 1968

In 1968, Congress enacted the Gun Control Act ("GCA"), which imposes strict requirements on firearms dealers and severe consequences for violating these requirements. Under the GCA, it is unlawful for anyone without a license "to engage in the business of . . . dealing in firearms." 18 U.S.C. § 922(a)(1)(A). The GCA also imposed rules on how applicants are to obtain their licenses. *See* 18 U.S.C. § 923. The GCA defined "dealer" to mean:

> A. any person engaged in the business of selling firearms at wholesale or retail,
>
> B. any person engaged in the business of repairing firearms or making or fitting special barrels, stocks, or trigger mechanisms to firearms, or
>
> C. any person who is a pawnbroker.

18 U.S.C. § 921(a)(11). But the GCA did not define the phrase "engaged in the business."

Today, a person who is found to have violated the GCA by willfully engaging in the business of dealing in firearms without a federal firearms license faces up to five years' imprisonment, a fine of up to $250,000, or both. *See* 18 U.S.C. §§ 922(a)(1)(A), 924(a)(1)(D), 3571(b)(3).

### B.      The Firearms Owners' Protection Act

In 1986, Congress amended the GCA with the Firearms Owners' Protection Act ("FOPA"). FOPA modified the GCA by defining what the term "engaged in the business" means:

> [A]s applied to a dealer in firearms, . . . a person who devotes time, attention, and labor to dealing in firearms as a regular course of trade or business with the principal objective of livelihood and profit through the repetitive purchase and resale of firearms, but such term shall not include a person who makes occasional sales, exchanges, or purchases of firearms for the enhancement of a personal collection or for a hobby, or who sells all or part of his personal collection of firearms[.]

Pub. L. 99-308, § 1(b), 100 Stat. 449, 450 (May 19, 1986) (codified at 18 U.S.C. § 921(a)(21)(C)). FOPA also defined "with the principal objective of livelihood and profit" to mean "that the intent underlying the sale or disposition of firearms is predominantly one of obtaining livelihood and pecuniary gain, as opposed to other intents, such as improving or liquidating a personal firearms collection." *Id.* (codified at 18 U.S.C. § 921(a)(22)).

A few months later, Congress amended the definition of "with the principal objective of livelihood and profit" by inserting this provision at the end of the definition:

> *Provided*, That proof of profit shall not be required as to a person who engages in the regular and repetitive purchase and disposition of firearms for criminal purposes or terrorism.

18 U.S.C. § 921(a)(22).

### C.     The Bipartisan Safer Communities Act

In response to several deadly mass shootings, Congress passed the Bipartisan Safer Communities Act of 2022. This Act modified the definition of "engaged in the business" by replacing the phrase "with the principal objective of livelihood and profit" with "to predominately earn a profit." Pub. L. 117-159, 136 Stat. 1313, 1324 (June 25, 2022). So a dealer is now "engaged in the business" of selling firearms if he is:

> [A] person who devotes time, attention, and labor to dealing in firearms as a regular course of trade or business to ==predominantly earn a profit== through the repetitive purchase and resale of firearms, but such term shall not include a person who makes occasional sales, exchanges, or purchases of firearms for the enhancement of a personal collection or for a hobby, or who sells all or part of his personal collection of firearms[.]

18 U.S.C. § 921(a)(21)(C) (highlight added). Congress also altered § 922(a)(22) to say:

> The term =="to predominately earn a profit"== means that the intent underlying the sale or disposition of firearms is ==predominately one of obtaining pecuniary gain==, as opposed to other intents, such as improving or liquidating a personal firearms collection: *Provided*, That proof of profit shall not be required as to a person who engages in the regular and repetitive purchase and disposition of firearms for criminal purposes or terrorism.

18 U.S.C. § 921(a)(22) (highlights added).

### D.    "Engaged in the Business" Final Rule

Following enactment of the Bipartisan Safer Communities Act, President Biden instructed the Attorney General to "clarify the definition of who is engaged in the business of dealing in firearms, and thus required to become Federal firearms licensees (FFLs)." Executive Order 14092 § 3(a)(i). In response, the ATF promulgated the Final Rule at issue to "clarif[y] what it means for a person to be 'engaged in the business' of dealing in firearms and to have the intent to 'predominantly earn a profit' from the sale or disposition of firearms." 89 Fed. Reg. 28968. The Final Rule has been codified in 27 CFR Part 478.

Plaintiffs challenge several aspects of the Final Rule. First, Plaintiffs challenge the Final Rule's assertion that there is no minimum threshold number of firearms purchased or sold or minimum number of transactions that triggers the licensing requirements:

> (b) Fact-specific inquiry. Whether a person is engaged in the business as a dealer under paragraph (a) of this section is a fact-specific inquiry. Selling large numbers of firearms or engaging or offering to engage in frequent transactions may be highly indicative of business activity. However, there is no minimum threshold number of firearms purchased or sold that triggers the licensing requirement. Similarly, there is no minimum number of transactions that determines whether a person is "engaged in the business" of dealing in firearms. For example, even a single firearm transaction or offer to engage in a transaction, when combined with other evidence (e.g., where a person represents to others a willingness and ability to purchase more firearms for resale), may require a license; whereas a single isolated firearm transaction without such evidence would not require a license. At all times, the determination of whether a person is engaged in the business of dealing in firearms is based on the totality of the circumstances.

27 CFR § 478.13(b) (highlight added).

Plaintiffs also challenge ATF's definition of predominantly earn a profit, which says that obtaining a pecuniary gain isn't required for someone to have the intent necessary to be considered a firearms' dealer:

> (d) Predominantly earn a profit—
>
> (1) Definition. The intent underlying the sale or disposition of firearms is predominantly one of obtaining pecuniary gain, as opposed to other intents, such as improving or liquidating a personal firearms collection: Provided, that proof of profit, including the intent to profit, shall not be required as to a person who engages in the regular and repetitive purchase and disposition of firearms for criminal purposes or terrorism. For purposes of this section, a person may have the intent to profit even if the person does not actually obtain the intended pecuniary gain from the sale or disposition of firearms.

27 CFR § 478.13(d)(1) (highlight added).

And Plaintiffs say that ATF's definition of "personal collection" eradicates the safe harbor for personal collections of firearms found in 18 U.S.C. § 921(a)(21)(C) by excluding firearms accumulated primarily for personal protection from this definition:

> Personal collection (or personal collection of firearms, or personal firearms collection)—
>
> (1) General definition. Personal firearms that a person accumulates for study, comparison, exhibition (e.g., collecting curios or relics, or collecting unique firearms to exhibit at gun club events), or for a hobby (e.g., noncommercial, recreational activities for personal enjoyment, such as hunting, skeet, target, or competition shooting, historical re-enactment, or noncommercial firearms safety instruction). The term shall not include any firearm purchased for the purpose of resale with the predominant intent to earn a profit (e.g., primarily for a commercial purpose or financial gain, as distinguished from

personal firearms a person accumulates for study, comparison, exhibition, or for a hobby, but which the person may also intend to increase in value). In addition, the term shall not include firearms accumulated primarily for personal protection: Provided, that nothing in this definition shall be construed as precluding a person from lawfully acquiring firearms for self-protection or other lawful personal use.

27 CFR § 478.11 (highlights added).

Finally, Plaintiffs say that three sets of presumptions for civil and administrative proceedings created by the Final Rule are atextual. The first set of presumptions is that "absent reliable evidence to the contrary," a person is "presumed to be engaged in the business of dealing in firearms" when it is shown that the person:

(1) Resells or offers for resale firearms, and also represents to potential buyers or otherwise demonstrates a willingness and ability to purchase and resell additional firearms (i.e., to be a source of additional firearms for resale);

(2) Repetitively purchases for the purpose of resale, or repetitively resells or offers for resale, firearms—

(i) Though straw or sham businesses, or individual straw purchasers or sellers; or

(ii) That cannot lawfully be purchased, received, or possessed under Federal, State, local or Tribal law, including:

(A) Stolen firearms (e.g., 18 U.S.C. § 922(j));

(B) Firearms with the licensee's serial number removed, obliterated, or altered, or not identified as required by law (e.g., 18 U.S.C. 922(k) or 26 U.S.C. 5861(i));

(C) Firearms imported in violation of law (e.g., 18 U.S.C. 922(l), 22 U.S.C. 2278, or 26 U.S.C. 5844, 5861(k)); or

(D) Machineguns or other weapons defined as firearms under 26 U.S.C. 5845(b) that cannot lawfully be possessed (e.g., 18 U.S.C. 922(o); 26 U.S.C. 5861(d));

(3) Repetitively resells or offers for resale firearms—

(i) Within 30 days after the person purchased the firearms; or

(ii) Within one year after the person purchased the firearms if they are—

(A) New, or like new in their original packaging; or

(B) The same make and model, or variants thereof;

(4) As a former licensee (or responsible person acting on behalf of the former licensee), resells or offers for resale to a person (other than a licensee in accordance with § 478.57 or § 478.78) firearms that were in the business inventory of the former licensee at the time the license was terminated (i.e., license revocation, denial of license renewal, license expiration, or surrender of license), whether or not such firearms were transferred to a responsible person of the former licensee after the license was terminated in accordance with § 478.57(b)(2) or § 478.78(b)(2); or

(5) As a former licensee (or responsible person acting on behalf of the former licensee), resells or offers for resale firearms that were transferred to the licensee's personal collection or otherwise as personal firearms in accordance with 18 U.S.C. 923(c) and 27 CFR 478.125a(a) prior to the time the license was terminated, unless:

(i) The firearms were received and transferred without any intent to willfully evade the restrictions placed on licensees by 18 U.S.C. chapter 44; and

(ii) One year has passed from the date of transfer to the licensee's personal collection or otherwise as personal firearms.

27 CFR § 478.13(c).

The next set of presumptions is that "absent reliable evidence to the contrary," a person is presumed "to have the intent to predominantly earn a profit through the repetitive purchase and resale of firearms" when it is shown that the person:

(i) Repetitively or continuously advertises, markets, or otherwise promotes a firearms business (e.g., advertises or posts firearms for resale, including through the internet or other digital means, establishes a website to offer their firearms for resale, makes available business cards, or tags firearms with sales prices), regardless of whether the person incurs expenses or only promotes the business informally;

(ii) Repetitively or continuously purchases, rents, or otherwise exchanges (directly or indirectly) something of value to secure permanent or temporary physical space to display firearms they offer for resale, including part or all of a business premises, a table or space at a gun show, or a display case;

(iii) Makes and maintains records to document, track, or calculate profits and losses from firearms repetitively purchased for resale;

(iv) Purchases or otherwise secures merchant services as a business (e.g., credit card transaction services, digital wallet for business) through which the person intends to repetitively accept payments for firearm transactions;

(v) Formally or informally purchases, hires, or otherwise secures business security services (e.g., a central station-monitored security system registered to a business, or guards for security) to protect firearm assets and repetitive firearms transactions;

> (vi) Formally or informally establishes a business entity, trade name, or online business account, including an account using a business name on a social media or other website, through which the person makes, or offers to make, repetitive firearms transactions; or
>
> (vii) Secures or applies for a State or local business license to purchase for resale or to resell merchandise that includes firearms.

27 CFR § 478.13(d)(2).

The final set of presumptions states that a person shouldn't "be presumed to be engaged in the business of dealing in firearms when reliable evidence shows that the person is only reselling or otherwise transferring firearms":

> (1) As bona fide gifts;
> (2) Occasionally to obtain more valuable, desirable, or useful firearms for the person's personal collection;
> (3) Occasionally to a licensee or to a family member for lawful purposes;
> (4) To liquidate (without restocking) all or part of the person's personal collection; or
> (5) To liquidate firearms—
> (i) That are inherited; or
> (ii) Pursuant to a court order; or
> (6) To assist in liquidating firearms as an auctioneer when providing auction services on commission at an estate-type auction.

27 CFR § 478.13(e).

### E.    The Plaintiffs, as described in their initial declarations

Plaintiffs Don Butler and David Glidewell, who are both members of the NRA, say that they intend to occasionally buy, sell, and trade firearms to enhance their personal collections of firearms maintained for their personal protection but fear that the Final Rule requires them to obtain a federal firearms license before doing so.

1. *Don Butler*: Butler is a retired engineer who lives in Talladega, Alabama. (Doc. 8-1, ¶¶ 2–3). Here's how Butler's initial declaration described his personal collection of firearms and why he thinks the Final Rule could require him to obtain a federal firearms license:

> 7. I have owned guns for several decades. I presently own a personal collection of firearms that I have accumulated over my decades of gun ownership.
>
> 8. I occasionally buy, trade, and sell firearms through unlicensed private sales to enhance my personal collection, which I maintain principally for my personal protection. By selling guns that I no longer want, I can free up funds to purchase newer or more technologically advanced models as finances permit. In that regard, I have sold firearms for the purpose of making enough money to afford a newer or different firearm. I also can accomplish the same goal by trading my firearms for others.
>
> 9. I have bought and then subsequently traded or sold, several firearms in private transactions over my decades of gun ownership.
>
> 10. One of my principal motivations for buying, selling, and trading firearms is my personal protection, rather than for study, comparison, exhibition, or hobby such as hunting, skeet, target, competition shooting, historical reenactment, or safety instruction.

11. On at least one prior occasion, I have informally communicated my willingness to sell or trade a firearm in my possession.

12. I have never held a federal firearms license, but I have never sold firearms as part of a business or to make a livelihood.

13. I firmly believe that my engagement in private transactions involving firearms always has been, and still is, lawful under federal statute and protected by the Second Amendment.

14. I believe that the ATF's recent "engaged in the business" rule prevents me from engaging in private transactions involving firearms.

15. I intend to continue occasionally buying, selling, and trading my firearms for the purpose of enhancing my personal collection, and I would do so (including in the near future) but for my fear of administrative, civil, or even criminal enforcement against me.

16. I would continue to occasionally communicate my willingness to sell or trade a firearm but for my fear of administrative, civil, or even criminal enforcement proceedings against me.

17. As a result of the ATF's "engaged in the business" final rule, I am uncertain about what my rights are and whether I will be subject to enforcement proceedings for engaging in protected private transactions involving firearms. Because of fear of enforcement proceedings, the uncertainties caused by the ATF's rule will continue to frustrate my right to keep and bear arms, and my right to engage in protected activity. Absent immediate relief, I will be forced to cease protected conduct or obtain a costly and burdensome federal firearms license.

(*Id.*, ¶¶ 7–17).

2. *David Glidewell*: Glidewell is retired from a career in residential construction and lives in Ragland, Alabama. (Doc. 8-2, ¶¶ 2–3). Like Butler, Glidewell said in his initial declaration that he fears that the Final Rule prevents him from engaging in private firearms transactions unless he obtains a federal firearms license:

> 6. I have owned guns for several decades. I presently own a personal collection of firearms that I have accumulated over my decades of gun ownership.
>
> 7. I occasionally buy, trade, and sell firearms through unlicensed private sales to enhance my personal collection, which I maintain principally for my personal protection. By selling guns that I no longer want, I can free up funds to purchase newer or more technologically advanced models as finances permit. In that regard, I have sold firearms for the purpose of making enough money to afford a newer or different firearm. I also can accomplish the same goal by trading my firearms for others.
>
> 8. I have bought and then subsequently traded or sold, several firearms in private transactions over my decades of gun ownership.
>
> 9. One of my principal motivations for buying, selling, and trading firearms is my personal protection, rather than for study, comparison, exhibition, or hobby such as hunting, skeet, target, competition shooting, historical reenactment, or safety instruction.
>
> 10. On at least one prior occasion, while conducting a private firearm transaction, I have communicated to the other party that I could be a source of additional firearms as circumstances permit.

11. On at least one prior occasion, I have informally communicated my willingness to sell or trade a firearm in my possession.

12. I have never held a federal firearms license, but I have never sold firearms as part of a business or to make a livelihood.

13. I firmly believe that my engagement in private transactions involving firearms always has been, and still is, lawful under federal statute and protected by the Second Amendment.

14. I believe that the ATF's recent "engaged in the business" rule prevents me from engaging in private transactions involving firearms.

15. I intend to continue occasionally buying, selling, and trading my firearms for the purpose of enhancing my personal collection, and I would do so (including in the near future) but for my fear of administrative, civil, or even criminal enforcement against me.

16. I would continue to occasionally communicate my willingness to sell or trade a firearm but for my fear of administrative, civil, or even criminal enforcement proceedings against me.

17. As a result of the ATF's "engaged in the business" final rule, I am uncertain about what my rights are and whether I will be subject to enforcement proceedings for engaging in protected private transactions involving firearms. Because of fear of enforcement proceedings, the uncertainties caused by the ATF's rule will continue to frustrate my right to keep and bear arms, and my right to engage in protected activity. Absent immediate relief, I will be forced to cease protected conduct or obtain a costly and burdensome federal firearms license.

(Doc. 8-2, ¶¶ 6–17).

### F.   Plaintiffs' Complaint + Motion for Preliminary Injunction

Butler, Glidewell, and the NRA sued Defendants three months after the Final Rule was issued. Around a month later, Butler, Glidewell, and the NRA moved for preliminary injunctive relief. Plaintiffs' complaint and motion raise five challenges to the Final Rule: (1) the Final Rule exceeds the ATF's statutory authority (Count 1); (2) the Final Rule is arbitrary and capricious (Count 2); (3) the Final Rule is void for vagueness (Count 3); (4) the Final Rule violates the Second Amendment (Count 4); and (5) the Final Rule violates the Non-Delegation and Take Care Clauses of Articles I and II of the U.S. Constitution (Count 5). So Plaintiffs ask the court to enter an order that preliminarily enjoins Defendants from enforcing the Final Rule against Butler, Glidewell, and the NRA's members pending resolution of this lawsuit.

Defendants responded to Plaintiffs' motion by asserting that (a) Plaintiffs lack standing to challenge the rule, (b) Plaintiffs haven't shown irreparable harm, (c) Plaintiffs aren't substantial likely to succeed on the merits, and (d) the balance of equities and public interest disfavor granting injunctive relief. Defendants also say that if the court grants Plaintiffs' motion, the court should (a) limit the injunctive relief to Butler and Glidewell, and (b) enjoin only those aspects of the Final Rule that the court finds likely unlawful.

The court held a hearing on the motion for preliminary injunction on October 8. Though the court offered the parties the opportunity to present evidence and witness testimony at the hearing, they declined.

At the hearing, the court questioned whether Butler and Glidewell's initial declarations established standing or irreparable injury. As for standing, the court expressed concerns that Butler and Glidewell's statements that they intend to continue occasionally buying, selling, or trading firearms "in the near future" didn't provide concrete of enough plans to establish the threat of an imminent future injury. The court also wanted to know whether Plaintiffs could challenge aspects of the Final Rule not directly linked to their alleged injuries and the timeline for moving this case toward final resolution. So at the end of the hearing, the court invited the parties to file supplemental briefing on these topics.

### G.    Supplemental Briefing + Declarations

The parties timely filed the supplemental briefs, and the Plaintiffs filed new declarations. In their supplemental brief, Plaintiffs asserted (a) that Butler and Glidewell's initial declarations established imminent harm, and (b) that the court should consider supplemental declarations from Butler and Glidewell that further established that they have standing. Butler's supplemental declaration said this:

> 3. It has come to my attention that the Court would appreciate additional details about my intentions to privately buy, trade, and sell firearms to enhance my collection. The best way to describe my intention is present, immediate, and ongoing. I own a few firearms that I intend to sell or trade so that I could obtain different firearms, and I would do so tomorrow if the final rule did not create a credible threat of enforcement proceedings. At most, it would only take me a couple of weeks to find someone willing to trade or buy one of my firearms, likely through a friend or at one of the gun shows in the Birmingham area this fall.
>
> 4. For example, prior to this lawsuit, I bought a Kel-Tek .22 magnum pistol for the purpose of carrying it publicly for my self-defense. After shooting it at my local club, I decided that the pistol was not reliable enough for my self-defense needs. My local gunsmith advised me that sending the pistol back to the manufacturer was not a viable option, so I decided (again, prior to filing this lawsuit) that I need to sell or trade it so that I can obtain a more reliable pistol for my self-defense needs.
>
> 5. At the time we filed this lawsuit, I intended to purchase (and would have purchased) a Smith & Wesson .22 magnum pistol because it is more reliable than my current pistol, and I intended to sell or trade my Kel-Tek pistol to help me pay for the new one. I have now purchased that Smith & Wesson, but I still intend to sell or trade my Kel-Tek pistol so that I can continue to upgrade my personal collection. I intend to sell or

trade my Kel-Tek pistol as soon as tomorrow, and would do so if it were not for the final rule.

6. In July 2024, just two weeks before filing this lawsuit, I missed an opportunity to trade my Kel-Tek pistol to a friend who offered to exchange it for an Austrian-made 9 millimeter. I could not trade my pistol because of my credible fear of enforcement under the final rule. I see this friend frequently (and, in fact, I expect to see him today), and I am confident that I could trade my Kel-Tek pistol to him for his 9 millimeter or another firearm, or sell him the Kel-Tek outright, if I were not risking enforcement under the final rule by doing so.

7. In addition to my intention of trading my Kel-Tek pistol to that friend or another friend through word of mouth, I also intend to (and would) attend an appropriate gun show for the purpose of selling or trading it. For example, there is a gun show in Hoover, Alabama on October 19, and another in Trussville, Alabama on November 2. I would attend those trade shows or a similar one for the purpose of selling or trading my Kel-Tek pistol, but for the final rule.

8. I also have other firearms that I would immediately sell or trade through private transactions, so that I can buy others.

(Doc. 14-1, ¶¶ 3–8).

Glidewell's supplemental declaration similarly elaborated on why he contends the Final Rule injures him:

4. My intent to engage in the private transactions I discussed in my original declaration is present, immediate, and ongoing. I own a firearm right now that I intend to (and would) sell immediately so that I can afford to purchase a newer and better firearm for my protection. I also intend to (and would) communicate during that transaction that I could be a source of other firearms in the future, as circumstances permit. I intend to (and would) do each of these things today but for the final

rule, and it would only take me a few weeks, at most, to find an interested party willing to purchase my pistol. But I cannot do any of these things because the final rule creates a credible risk that I will face enforcement proceedings.

5. During this lawsuit, I have already missed an opportunity to upgrade my personal collection. I own a Taurus pistol that I have been interested in selling both before and during this lawsuit. I would sell that pistol to one of my several interested friends so that I can afford to purchase a newer, more reliable, and upgraded Taurus G3 9 millimeter pistol through my local dealer.

6. My local licensed dealer had a G3 in stock, and I intended to (and still intend to) sell my old pistol so that I could purchase the newer model from my dealer. But my local dealer sold the pistol that was in his stock, so I have lost the opportunity to buy that specific pistol. If not for the risk of enforcement proceedings under the final rule, I would immediately sell my old pistol to one of my friends so that I can buy a G3 as soon as I find an available one. And to sell my old pistol, I would only have to work through my list of friends until one of them agreed to buy it from me.

(Doc. 14–2, ¶¶ 4–6).

## STANDARD OF REVIEW

"A preliminary injunction is appropriate only when the moving party can show that: (1) it has a substantial likelihood of success on the merits; (2) it will suffer irreparable injury unless an injunction issues; (3) this threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) the injunction would not be adverse to the public interest." *Honeyfund.com Inc. v. Governor*, 94 F.4th 1272, 1277 (11th Cir. 2024) (quotations omitted). The "[f]ailure to show any of the four factors is fatal." *ACLU of Fla., Inc. v. Miami-Dade Cnty. Sch. Bd.*, 557 F.3d 1177, 1198 (11th Cir. 2009).

Preliminary injunctions are designed to "preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981). Thus, "the findings of fact and conclusions of law made by a court granting [or denying] a preliminary injunction are not binding at trial on the merits." *Id.* (citations omitted).

## DISCUSSION

Before analyzing the preliminary injunction factors, the court must determine whether Plaintiffs have standing. *See Speech First, Inc. v. Cartwright*, 32 F.4th 1110, 1118–19 (11th Cir. 2022). And before it can do that, the court must decide whether it can or should consider Plaintiffs' supplemental declarations.

## I.   Supplemental Declarations

The court did not intend for Plaintiffs to submit new evidence after the preliminary injunction hearing. As the court stated during the hearing, neither side took the court up on its offer to present witness testimony or offer exhibits during the hearing, so the court planned to promptly decide Plaintiffs' motion on the declarations in the record, the parties' briefs, and the arguments made during the hearing so it could move toward final resolution.

That said, the court has "broad discretion" in deciding how to best manage the cases before it. *See Smith v. Psychiatric Sols., Inc.*, 750 F.3d 1253, 1262 (11th Cir. 2014). And when a moving party files new evidence that the nonmovant hasn't had an opportunity to respond to, the court has two options: either (1) consider the evidence after permitting the nonmoving party to respond or (2) avoid considering any new material that the moving party has presented. *See Atl. Specialty Ins. Co. v. Digit Dirt Worx, Inc.*, 793 F. App'x 896, 901–02 (11th Cir. 2019).

The court finds that the interests of justice and judicial efficiency counsel against considering the supplemental declarations in ruling on Plaintiffs' motion for preliminary injunction. Again "[a] preliminary injunction is an extraordinary remedy never awarded as of right." *Winter*, 555 U.S. at 24. And Plaintiffs' request that the court consider the late filed supplemental declarations contradicts "the very idea of a *preliminary* injunction," which "is

premised on the need for speedy and urgent action to protect a plaintiff's rights before a case can be resolved on the merits." *Wreal, LLC v. Amazon.com, Inc.*, 840 F.3d 1244, 1248 (11th Cir. 2016). As Plaintiffs acknowledge, the court would need to allow Defendants to respond to the supplemental declarations before considering them. (*See* Doc. 14, p. 13). So considering the declarations would only delay resolution of Plaintiffs' preliminary motion—thus delaying resolution of the ultimate issue.

Plaintiffs have also failed to explain why they could not have provided the court with the information in the supplemental declarations sooner. This information was exclusively within Plaintiffs' control and known to them before they filed this lawsuit. Plus, Plaintiffs have always known that they bear the burden to establish standing and that something more than "some day intentions" to sell firearms from their personal collections was needed to show "actual or imminent" injury. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 564 (1992).

Most importantly, the court gave Plaintiffs a chance to testify or present additional evidence at the preliminary injunction hearing. The court initially set aside the entire day for the hearing. The court then reached out to the parties and asked them if they planned to call any witnesses. Both sides said "no," so the court moved the hearing to the afternoon. Even then, the court offered to hear witness testimony that would have probed (among other things) Plaintiffs' injuries.

But no one testified. And consideration of Plaintiffs' late-filed paper evidence would conflict with the expedited nature of preliminary injunction proceedings because it would (a) require the court to give Defendants time to respond and offer any new evidence they wish and (b) take the court's focus off expeditiously reaching a final decision on the merits. (Indeed, the filing of the supplemental declarations has already delayed the court's resolution of Plaintiffs' motion). The court will thus not consider the Plaintiffs' supplemental declarations in ruling on the motion for preliminary injunction.

## II.  Standing

To have Article III standing, a plaintiff must show three things: (1) he has suffered an injury in fact; (2) the injury is fairly traceable to conduct of the defendant; and (3) a favorable decision would redress the injury. *Lujan*, 504 U.S. at 560–61. At the preliminary injunction stage, "the plaintiff must make a 'clear showing' that" he "is 'likely' to establish each element of standing." *Murthy v. Missouri*, 144 S. Ct. 1972, 1986 (2024).

Organizations, like the NRA, have "associational standing to enforce the rights of their members when (a) their members would otherwise have standing to sue in their own right; (b) the interests the lawsuit seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Dream Defs. v. Gov'r of the State of Fla.*, 57 F.4th 879, 886 (11th Cir. 2023) (cleaned up). Defendants dispute only whether the NRA can meet this first requirement. And because Butler and Glidewell are members of the NRA, the NRA can establish that its members have standing to sue in their own right if Butler and Glidewell show that they have standing. *See Summers v. Earth Island Inst.*, 555 U.S. 488, 498 (2009) (organizational standing established if at least one identified member has suffered or will suffer harm).

Plaintiffs' standing thus turns on whether Butler or Glidewell has suffered an injury in fact that is fairly traceable to Defendants and redressable by this court.[1]

### 1.  Injury-in-fact requirement (in general)

To establish that he's suffered an injury-in-fact, a plaintiff must show "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560.

---

[1] The NRA satisfies the other two elements of associational standing. Protecting the statutory and constitutional firearms rights of its members is germane to the NRA's organizational purpose. And a pre-enforcement challenge to ATF regulations that seeks declaratory and injunctive relief doesn't require the participation of the NRA's members. *See Baughcum v. Jackson*, 92 F.4th 1024, 1031 (11th Cir. 2024).

"A threat of future injury is sufficient to establish standing when the threatened injury is certainly impending or there is a substantial risk that the harm will occur." *Dream Defs.*, 57 F.4th at 887 (quotations omitted). And "[w]hen an individual is subject to such a threat, an actual arrest, prosecution or other enforcement action is not a prerequisite to challenging the law." *Id.* Instead, a plaintiff must only "show (1) that he has an intention to engage in a course of conduct arguably affected with a constitutional interest, (2) that his conduct is arguably proscribed, and (3) that he is subject to a credible threat of enforcement." *Speech First*, 32 F.4th at 1119–20 (quotations omitted).

Plaintiffs point to these allegations in Butler and Glidewell's initial declarations as establishing an actual or imminent threat of injury:

> 8. I occasionally buy, trade, and sell firearms through unlicensed private sales to enhance my personal collection, which I maintain principally for my personal protection. By selling guns that I no longer want, I can free up funds to purchase newer or more technologically advanced models as finances permit. In that regard, I have sold firearms for the purpose of making enough money to afford a newer or different firearm. I also can accomplish the same goal by trading my firearms for others.
>
> 9. I have bought and then subsequently traded or sold, several firearms in private transactions over my decades of gun ownership.
>
> 10. One of my principal motivations for buying, selling, and trading firearms is my personal protection, rather than for study, comparison, exhibition, or hobby such as hunting, skeet, target, competition shooting, historical reenactment, or safety instruction.
>
> 11. On at least one prior occasion, I have informally communicated my willingness to sell or trade a firearm in my possession.

> ***
>
> 14. I believe that the ATF's recent "engaged in the business" rule prevents me from engaging in private transactions involving firearms.
>
> 15. I intend to continue occasionally buying, selling, and trading my firearms for the purpose of enhancing my personal collection, and I would do so (including in the near future) but for my fear of administrative, civil, or even criminal enforcement against me.
>
> 16. I would continue to occasionally communicate my willingness to sell or trade a firearm but for my fear of administrative, civil, or even criminal enforcement proceedings against me.

(Doc. 8-1, ¶¶ 8–11, 14–16); *see also* (Doc. 8-2, ¶¶ 7–11, 14–16) (same).

As you can see, neither Butler nor Garland provides specifics about their future dealings, just a general intention to act at an unknown date in the future (perhaps even a date beyond the final resolution of this case). Courts call these "some day intentions," and the Supreme Court has said that some day intentions "do not support a finding of the 'actual or imminent' injury" that is required to establish standing. *See Lujan*, 504 U.S. at 564. To explain why, the court delves into Supreme Court and Eleventh Circuit precedent on what's required to meet the imminent injury requirement.

A. *SCOTUS*: The court starts with *Lujan*. In *Lujan*, environmental organizations sought an injunction that would force federal agencies to consult with the Secretary of the Interior about threats to endangered species caused by agency action outside the United States. *See id.* at 558–59. The organizations submitted affidavits from two of their members to show that the lack of consultation injured them. *Id.* at 563. Joyce Kelly said that she had traveled to Egypt in 1986, observed the traditional habitat of the Nile crocodile, intended to travel to Egypt again, and hoped that she would directly view the Nile crocodile during the future trip. *Id.*

Amy Skilbred stated that she had visited Sri Lanka in 1981 and observed the habitat of the Asian elephant and leopard. *Id.* "[A]lthough [Skilbred] was unable to see any of the endangered species[,] . . . she intend[ed] to return to Sri Lanka in the future and hope[d] to be more fortunate in spotting at least the endangered elephant and leopard." *Id.* (quotations omitted). But when asked at her deposition when she intended to return to Sri Lanka, Skilbred responded "I don't know when." *Id.* at 564 (cleaned up).

The Court held that these affidavits failed to show imminent injury. *Id.* "That the women 'had visited' the areas of the projects before the projects commenced prove[d] nothing." *Id.* And their "profession of an intent to return to the places they had visited before . . . is simply not enough." *Id.* (cleaned up). As the Court explained, "[s]uch 'some day' intentions—without any description of concrete plans, or indeed even any specification of *when* the some day will be—do not support a finding of the 'actual or imminent' injury" required. *Id.*

In contrast, the Court found an imminent threat of future injury when Plaintiff Adarand showed that "sometime in the relatively near future it will bid on another Government contract that offers financial incentives to a prime contractor for hiring disadvantaged subcontractors." *Adarand Constr., Inc. v. Pena*, 515 U.S. 200, 211 (1995). In that case, Adarand's general manager testified that his company bids on every guardrail project in Colorado. *Id.* at 212. And the documentary evidence showed that the Central Federal Lands Highway Division ("CFLHD") let around "1 ½ contracts per year that could injure Adarand in the manner it allege[d]." *Id.* Because the evidence suggested "that the CFLHD is likely to let contracts involving guardrail work that contain a subcontractor compensation clause at least once per year in Colorado, that Adarand is very likely to bid on each such contract, and that Adarand often must compete for such contracts against small disadvantaged businesses," the Court was satisfied that Adarand had standing. *Id.*

The Court also found that parents had standing to challenge their children's school district's reliance on race to determine which public schools certain children may attend. *See Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 709–10, 718 (2007). The Court rejected the school district's argument that the parents' injury was too speculative because they would "only be affected if their children seek to enroll in a Seattle public

high school and choose an oversubscribed school that is integration positive." *Id.* at 718. Instead, the Court found that the parents had standing because they had children in the district's elementary, middle, and high school who because of the district's policy "may be denied admission to the high schools of their choice when they apply for those schools in the future." *Id.* (quotations omitted).

B. *Eleventh Circuit*: The Eleventh Circuit has elaborated on what is required to show an imminent threat of future injury in four cases. In *Elend v. Basham*, 471 F.3d 1199 (11th Cir. 2006), the plaintiffs' alleged future intentions weren't specific enough to establish standing. In that case, the plaintiffs protested a speech by President Bush in Florida, and the Secret Service ordered them to move to a "First Amendment protest zone." *Id.* at 1203. The plaintiffs alleged that others who were protesting in support of President Bush weren't required to move to this protest zone, so they sued the Secret Service, seeking an injunction against further violations of their First and Fourteenth Amendment rights. *Id.* To show that they were likely to suffer future injury, the plaintiffs alleged that they "fully intend to peacefully express their viewpoints in the future in a manner similar to their activities on November 2, 2002, in concert with presidential appearances at the USF Sun Dome and at other locations around the country." *Id.* at 1204.

The circuit court found that these allegations weren't enough to establish an actual or imminent injury. *Id.* at 1209. The court noted that the plaintiffs had failed "to provide any limitation on the universe of possibilities of when or where or how such a protest might occur" because "[o]ther than the one instance in November 2002, we are not even given a description of Plaintiffs' past conduct from which to infer that they might act in a similar manner in the future." *Id.* Plus, the court found that the plaintiffs' statements that they planned to protest in the same way in the future were like the "some day intentions" in *Lujan* that failed to establish an injury-in-fact. *See id.*

The circuit court, however, found that the plaintiffs in *Fla. State Conf. of NAACP v. Browning*, 522 F.3d 1153 (11th Cir. 2008), satisfied the immediacy requirement. In that case, voting rights organizations sued the State of Florida, asserting that the state's requirement that information in voter registration applications match the information in the state's driver's license

and social security databases violated their members' constitutional and statutory rights to vote. *See id.* at 1156–58. The court found the imminent injury requirement was met because "[t]he alleged injury in this case, denial of voter registration and hence the right to have one's vote counted, will occur if at all before the scheduled elections in November 2008." *Id.* at 1161. And the plaintiffs had asserted that "they intend to increase voter registration and anticipate increased registration applications ahead of the upcoming presidential election." *Id.* So the court held that unlike in *Elend*, the plaintiffs had adequately "alleged when and in what manner the[ir] alleged injuries are likely going to occur." *Id.*

The third case discussing the immediacy requirement is *ACLU of Fla., Inc. v. Miami-Dade Cnty. Sch. Bd.*, 557 F.3d 1177 (11th Cir. 2009). There, the plaintiffs sued the Miami-Dade County School Board for removing *Vamos a Cuba* and replacing the "A Visit to" book series from libraries within the school district after a parent complained about *Vamos a Cuba*'s portrayal of life in Cuba. *See id.* at 1183–88. One plaintiff was a parent who said that (1) his son was a student at an elementary school in the district; (2) he had seen *Vamos a Cuba* in his son's school library; and (3) "he had planned to check the book out of the library with his son in the future but they will be unable to do so when school resumes on August 14, 2006 because of the School Board's order removing the series." *Id.* at 1188 (quotations omitted).

Another plaintiff was the ACLU whose director stated that its members included many parents of children who attended Miami-Dade County elementary and middle schools and wanted their children to have access to the books the School Board removed from the library. *See id.* Based on the parent's declaration, the circuit court found that the plaintiffs had standing to challenge the removal of *Vamos a Cuba* but not the other books in the "A Visit to" series. *Id.* at 1195–98. In making this determination, the court compared *Elend* with *Fla. NAACP* and found that key to both decisions was that "immediacy requires . . . that the anticipated injury occur within some fixed period of time in the future." *Id.* at 1193 (cleaned up). Thus, "[i]mmediacy, in this context, means reasonably fixed and specific in time and not too far off." *Id.* at 1193–94. Applying this standard, the court found that the parent's plan for his son to check out *Vamos a Cuba* when school resumed after summer break met the immediacy requirement. *Id.* at 1194–95.

But the court found that none of the declarations in the record stated that any parent or child intended to check out the other books in the "A Visit to" series when school resumed in August. *Id.* at 1196. Because the plaintiffs did not state, "with sufficient specificity their plans for accessing the [other] books in the 'A Visit to' series" and gave no "indication of some fixed period of time in the reasonably foreseeable future during which they want to use the books," the circuit court found that they hadn't met their burden to show that they faced a threat of imminent injury. *Id.* at 1197.

Most recently, the circuit court found that an ADA tester plaintiff had standing to seek injunctive relief from a supermarket where he contended he encountered ADA barriers. *Houston v. Marod Supermarkets, Inc.*, 733 F.3d 1323, 1325–26 (11th Cir. 2013). The plaintiff testified that he had twice shopped at the Presidente Supermarket in Miami-Dade County. *Id.* at 1327. And he explained that he traveled to Miami-Dade County "on a regular basis" because he was the vice-president of the advocacy group Access 4 All, Inc., which was represented by a law firm located in Miami-Dade County. *Id.* The law firm, whose offices the plaintiff anticipated visiting in the near future, was only 1.8 miles from the Presidente Supermarket, and the plaintiff's usual route from his home to the law office took him "right past" the supermarket. *Id.* So the plaintiff said that if the supermarket was ADA compliant "he would return to the . . . store to shop." *Id.*

The court found that the plaintiff had established an imminent threat of future injury because he had been to the store in the past, wants to return, and makes frequent trips past the store, which "render[s] it likely that he would do so were it not for the alleged ADA violations." *Id.* at 1337. And the court noted that the plaintiff's desire to visit the store during near future trips to his lawyer's office provided "the 'description of concrete plans' that the Supreme Court found missing in *Lujan.*" *Id.* at 1340. So the court found that the plaintiff had standing to seek injunctive relief.

### 2.   Pre-enforcement review cases

The Eleventh Circuit and other circuit courts have also applied the immediacy requirement from *Lujan* in cases, like this one, that seek pre-enforcement review of statutes, rules, or regulations.

A. *Eleventh Circuit*: To meet the immediacy requirement in pre-enforcement review cases, the Eleventh Circuit has required plaintiffs to show that they have "***an unambiguous intention at a reasonably foreseeable time* to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by statute or rule.**" *Bloedorn v. Grube*, 631 F.3d 1218, 1228 (11th Cir. 2011) (emphasis added). In *Bloedorn*, the circuit court found that the plaintiff had met this requirement because (a) he had been arrested for refusing to comply with GSU's Speech Policy, (b) he wanted to speak at other locations on GSU's campus without obtaining a permit but the Speech Policy prohibited him from doing so, and (c) he intended to return and proselytize on the GSU campus but hadn't because of fear of re-arrest. *Id.* at 1229.

Applying *Bloedorn* in an unpublished opinion, the circuit found that another street preacher had "failed to provide the location of his free speech activity with the requisite specificity to demonstrate a substantial likelihood of future injury." *LaCroix v. Lee County, Fla.*, 819 F. App'x 839, 843 (11th Cir. 2020). That's because the plaintiff hadn't "averred that he intends to preach specifically at permitted events in Lee County in the future." *Id.* at 844. Instead, he simply stated that from January 2018 to December 2021 he had "concrete plans to engage in his constitutionally protected activity by peacefully expressing religious, political, and social speech within the County's Public Spaces located in the County." *Id.* at 842.

The circuit court's other pre-enforcement review cases do not explicitly discuss the immediacy requirement but confirm that an actual or imminent injury is needed to establish standing. For example, in *Wollschlaeger v. Gov'r, Fla.*, 848 F.3d 1293, 1304 (11th Cir. 2017) (en banc), the doctor-plaintiffs asserted that they "routinely ask[ed] all patients (or their parents) about firearm ownership" but had stopped because of the challenged state law. Thus, it was reasonably foreseeable that the doctors would engage in self-censorship each time they saw a patient. *See id.* And in *Dream Defenders*, the plaintiffs established standing by showing that the challenged law caused them to cancel specific protests they had planned for the anniversary of George Floyd's death. 57 F.4th at 887.

Finally, the circuit court found an injury-in-fact in *West Virginia by and through Morrisey v. U.S. Dep't of the Treasury*, 59 F.4th 1124, 1137 (11th Cir. 2023), because the plaintiff-states had "enacted tax cuts and related revenue laws that could reduce their net tax revenue and trigger the offset provision" that they challenged. "All the States [had] enacted revenue-related laws dealing with, among other things, tax credits, exemptions, phaseouts, and reductions after March 3, 2021, the beginning of the" offset provision's covered period. *Id.* And Alabama State Senator Albritton testified that because of concerns of a recoupment action the State had paused consideration of a specific budget bill that the Finance and Tax Committee had approved and that the Legislature had wanted to pass that year. (Decl. of Senator Greg Albritton ¶ 8, ECF 28 at 91, No. 22-10168 (11th Cir.)). As a result, the States showed that the Alabama Legislature's concrete plans to engage in an intended course of conduct were being impeded by the conditions imposed by the offset provision they challenged.

B. *Out-of-circuit precedent*: Other circuits have applied the immediacy requirement of *Lujan* to pre-enforcement challenges to federal firearms regulations. In *Montana Shooting Sports Ass'n v. Holder*, 727 F.3d 975, 978 (9th Cir. 2013), the plaintiff sought to manufacture and sell firearms to fellow Montanans without complying with federal firearms regulations. The Ninth Circuit found that the plaintiff had standing because he established that he would manufacture and sell an unlicensed .22 caliber rifle that he dubbed the "Montana Buckaroo" if the court ruled in his favor. *Id.* at 980.

The plaintiff did "not merely allege[ ] a vague desire to manufacture and sell unlicensed firearms if he [won the] lawsuit, but . . . made specific allegations substantiating his claims." *Id.* For example, he (a) asserted that he has a background in running his own shooting range equipment manufacturing business, (b) identified suppliers for the component parts of the Buckaroo, (c) contended that he had design plans that were ready to be loaded into the manufacturing equipment, and (d) identified hundreds of customers who had ordered the Buckaroo at his asking price. *See id.* As the circuit court explained, these allegations included "much more than the some day intentions . . . held insufficient for standing." *Id.* (quotations omitted).

In *Paxton v. Dettelbach*, 105 F.4th 708, 713 (5th Cir. 2024), the Fifth Circuit held that the plaintiffs' declarations did not establish that their feared injury was imminent. In that case, the plaintiffs challenged federal regulations on making silencers for personal use. *Id.* at 710. To establish an injury-in-fact, the plaintiffs relied on this statement from their declarations:

> I intend to personally manufacture a firearm suppressor for my own non-commercial, personal use. The firearm suppressor will be manufactured in my home from basic materials without the inclusion of any part imported from another state other than a generic and insignificant part, such as a spring, screw, nut, or pin.

*Id.* at 712.

The circuit court noted that this statement provided no information about the specific type of silencer the plaintiffs intended to make or what parts they intended to use to make it. *Id.* at 714. The court then explained that unlike the allegations in *Montana Shooting*, the plaintiffs' declarations "expressed only a vague intention to make a silencer at some indeterminate point in the future." *Id.* So the circuit court found that these "professed 'some day intentions' to make a silencer, without any concrete details concerning the type of silencer they will make or even when they will make it, [were] insufficient to establish injury in fact." *Id.*

### 3.   Plaintiffs' declarations

Having discussed the relevant precedent, the court turns to the evidence of imminent threat of injury that Butler and Glidewell provided in their initial declarations. Again, Glidewell described his past private firearms transactions like this:

> 7. I occasionally buy, trade, and sell firearms through unlicensed private sales to enhance my personal collection, which I maintain principally for my personal protection. By selling guns that I no longer want, I can free up funds to purchase newer or more technologically advanced models as finances permit. In that regard, I have sold firearms for the

> purpose of making enough money to afford a newer or different
> firearm. I also can accomplish the same goal by trading my
> firearms for others.
>
> 8. I have bought and then subsequently traded or sold, several
> firearms in private transactions over my decades of gun
> ownership.
>
> 9. One of my principal motivations for buying, selling, and
> trading firearms is my personal protection, rather than for
> study, comparison, exhibition, or hobby such as hunting, skeet,
> target, competition shooting, historical reenactment, or safety
> instruction.
>
> 10. On at least one prior occasion, while conducting a private
> firearm transaction, I have communicated to the other party
> that I could be a source of additional firearms as circumstances
> permit.
>
> 11. On at least one prior occasion, I have informally
> communicated my willingness to sell or trade a firearm in my
> possession.

(Doc. 8-2, ¶¶ 7–11). Butler's declaration includes nearly identical allegations.
*See* (Doc. 8-1, ¶¶ 7–11).

And Butler and Glidewell both said this about their future plans to sell firearms:

> 14. I believe that the ATF's recent "engaged in the business"
> rule prevents me from engaging in private transactions
> involving firearms.
>
> 15. I intend to continue occasionally buying, selling, and trading
> my firearms for the purpose of enhancing my personal
> collection, and I would do so (including in the near future) but

> for my fear of administrative, civil, or even criminal enforcement against me.
>
> 16. I would continue to occasionally communicate my willingness to sell or trade a firearm but for my fear of administrative, civil, or even criminal enforcement proceedings against me.

(Doc. 8-1, ¶¶ 14–16; Doc. 8-2, ¶¶ 14–16).

A. *Analysis*: Butler and Glidewell's allegations that they would continue to occasionally buy, sell, and trade firearms but for the Final Rule are like the "some day" intentions that failed to establish an injury in fact in *Lujan*, *Elend*, and *Paxton*. Plaintiffs have presented no evidence of how often Butler and Glidewell have sold firearms in the past. *Cf. Adarand Constr., Inc.*, 515 U.S. at 212 (relying on evidence that company bid on every guardrail project in Colorado); *Houston*, 733 F.3d at 1327 (explaining that plaintiff traveled to Miami-Dade County regularly to visit his attorney). Instead, like in *Elend*, "we are not . . . given a description of Plaintiffs' past conduct from which to infer that they might act in a similar manner in the future." *Elend*, 471 F.3d at 1209. So the court cannot tell whether it's been months, years, or decades since Plaintiffs have sold a firearm or infer from Butler and Glidewell's past conduct when they are likely to sell a firearm again.

Nor do Butler and Glidewell's assertions about their future intentions satisfy *Lujan*'s immediacy requirement. "Immediacy, in this context, means reasonably fixed and specific in time and not too far off." *ACLU of Fla.,* 557 F.3d at 1193–94. And though Butler and Glidewell both stated that they intended to sell firearms "in the near future," their initial declarations fail to allege a specific and fixed period of time in the future in which Butler and Glidewell would make these firearms sales. Instead, Butler and Glidewell have simply stated that they intend to "occasionally" sell firearms "at some indeterminate point in the future." *Paxton*, 105 F.4th at 714.

Finally, Butler and Glidewell's declarations lack the description of concrete plans that *Lujan* requires. Unlike their supplemental declarations, Butler and Glidewell's initial declarations include no details about their plans to make occasional future sales. For example, they do not explain whether they currently own firearms that they are interested in selling, if they know of any interested buyers, or how long they think it will take them to find a willing buyer. *Cf. Montana Shooting*, 727 F.3d at 980 (identifying both the suppliers for the component parts of the Buckaroo and hundreds of customers who had ordered the Buckaroo at the plaintiff's asking price). As a result, the evidence presented at the preliminary injunction hearing did not "make a 'clear showing' that" Plaintiffs are likely to establish a threat of an imminent future injury. *See Murthy*, 144 S. Ct. at 1986.[2]

B. *Counterargument*: Plaintiffs say that it's enough to allege that Butler and Glidewell have "near future" plans to continue occasional private firearms transactions. But the cases Plaintiffs cite are distinguishable. For example, in *Stevens v. Premier Cruises, Inc.*, 215 F.3d 1237, 1239 (11th Cir. 2000), the Eleventh Circuit held that a plaintiff's allegations that "in the near future, she would take another cruise aboard Defendant's ship" cured her original complaint's failure to plead standing. Though *Stevens* is the case most favorable to Plaintiffs, the court finds that it doesn't show that Plaintiffs' initial declarations established standing for two reasons. First, the plaintiff in *Stevens* included more concrete details about her plans than Butler and Glidewell did. She alleged that it was her intent to "in the near future" take a cruise with a specific cruise line aboard a specific cruise ship. *See id.* And you can go on a cruise on an individual cruise ship only at specific times. In contrast, Butler and Glidewell did not provide any detail about whether they currently owned guns that they would sell or if they knew of any interested buyers. So Plaintiffs failed "to provide any limitation on the universe of possibilities of when or where or how" the occasional private firearms transactions would occur. *See Elend*, 471 F.3d at 1209.

---

[2] Plaintiffs alternatively assert that they have established injury because of the lost time, money, and regulatory burdens associated with obtaining a federal firearms license. But Butler and Glidewell's declarations include no description of concrete plans to obtain a license. So Plaintiffs' argument that they will be injured by incurring compliance costs is too speculative to confer standing. *Lujan*, 504 U.S. at 564.

Second, Plaintiffs ask the court to find that they have standing to obtain a preliminary injunction and are seeking to establish standing with Butler and Glidewell's sworn testimony. When the parties ask the court to consider evidence outside the pleadings in assessing its jurisdiction, the court "is free to weigh the facts and is not constrained to view them in the light most favorable to the plaintiff." *Houston*, 733 F.3d at 1336 (quotations omitted). Plus, to establish standing at the preliminary injunction stage, Plaintiffs must "make a 'clear showing' that" they are "'likely' to establish each element of standing." *Murthy*, 144 S. Ct. at 1986. Thus, the court's standing analysis slightly differs from the standing analysis the court would employ in assessing a typical motion to dismiss like in *Stevens*.

This case is also unlike *Baughcum v. Jackson*, 92 F.4th 1024, 1031 (11th Cir. 2024), in which the plaintiffs challenged a Georgia law that prohibited those under 21 who hadn't served in the military from carrying a weapon. Unlike the plaintiffs here, the plaintiffs in *Baughcum* didn't have to do anything but desire to carry a weapon for the firearms regulation that they challenged to affect them. That's because it was the plaintiffs' status as persons under 21 who hadn't served in the military and not some intended future conduct that made them ineligible to carry weapons. *See id.* at 1032.

Finally, the court disagrees with Plaintiffs' characterization of the evidence presented in *Morrisey* as not including discussion of a budget bill under consideration. There, Senator Albritton stated that there was a specific budget bill that all twelve members of the Alabama Legislature's Finance and Tax Committee had approved but that the Legislature postponed considering because of uncertainty caused by the federal law the States challenged. (Decl. of Senator Greg Albritton ¶ 8, ECF 28 at 91, No. 22-10168 (11th Cir.)) The Legislature wanted to "pass the bill [that] year" but felt that it would be risky to do so. (*See id.*). This declaration provides the concrete detail and evidence of a reasonably specific and fixed period of time in which the Legislature intended to pass a budget bill that Butler and Glidewell's initial declarations lacked. So *Morrisey* doesn't help Plaintiffs.

—

In short, Butler and Glidewell's initial declarations did not establish that either Plaintiff faces the threat of imminent future injury needed to have standing to seek injunctive relief. So the court will deny Plaintiffs' motion for preliminary injunction because Plaintiffs failed to show a substantial likelihood that they have standing.

## III.   Irreparable Harm

Plaintiffs also bear the burden to establish that they will suffer irreparable harm unless the court enjoins enforcement of the Final Rule between now and the end of this litigation. *See Wreal*, 840 F.3d at 1247. The mere possibility of "irreparable injury is not enough" to meet this standard. *See State of Florida v. Dep't of Health & Hum. Servs.*, 19 F.4th 1271, 1291 (11th Cir. 2021).

The court finds that Plaintiffs failed to establish irreparable harm for two reasons.[3]

**A. Evidence of Immediate Injury:**  Plaintiffs have failed to show that unless the court enjoins Defendants they will suffer an immediate injury. Plaintiffs say that the Final Rule irreparably harms them for three reasons: (1) they face the threat of potential prosecution for activity allowed under federal law, (2) deprivation of Second Amendment rights is presumed to be irreparable, and (3) the federal government's sovereign immunity prevents Plaintiffs from recovering monetarily for any compliance costs or lost business opportunities they incur because of the Final Rule.

Even if Plaintiffs' initial declarations established that Butler and Glidewell face a threat of future injury, they do not establish that this future injury will occur between now and the end of this litigation. Again, other than saying that they planned to sell firearms "in the near future" Butler and Glidewell's declarations included no information about when they intended to

---

[3] Defendants also argue that Plaintiffs' slow pace in filing their complaint, then moving for a preliminary injunction, cuts against Plaintiff's argument that they face immediate harm that needs immediate relief. *See Wreal*, 840 F.3d at 1248 ("A delay in seeking a preliminary injunction of even only a few months—though not necessary fatal—militates against a finding of irreparable harm."). Because Plaintiffs' evidence fails to establish an immediate injury, the court needn't discuss the timing of their filings.

sell their firearms. Without more detail about Butler and Glidewell's plans, the court cannot say that they will have to choose between engaging in conduct that they view as unlawfully proscribed or refraining from conduct that they view as lawful before the court resolves this case on the merits. *Cf. Farmworker Ass'n of Fla., Inc. v. Moody*, 2024 WL 2310150, at *17 (S.D. Fla. May 22, 2024). Nor have Plaintiffs shown that their Second Amendment rights will be irreparably harmed before this litigation ends.

As for Plaintiffs' arguments about compliance costs and lost business opportunities, Butler and Glidewell haven't shown that they've taken any steps to get a federal firearms license or given the court any concrete evidence that they will get a license absent an injunction. Nor have Plaintiffs shown that failure to enjoin the Final Rule will cost Butler or Glidewell lost business opportunities. While lost business opportunities is the type of irreparable harm that can support issuing an injunction, Butler and Glidewell's declarations did not establish that they will lose the opportunity to sell their firearms while this litigation is pending. Again, Butler and Glidewell's declarations did not explain whether anyone was interested in buying their firearms or whether any interested customers would disappear during the pendency of this lawsuit. Thus, Plaintiffs haven't shown that they will suffer immediate, irreparable harm unless the court preliminarily enjoins the Final Rule.

**B. Swift Ruling:** Plaintiffs' irreparable harm argument is also undermined by how swiftly the court finds it can resolve this case. As this chart shows, the parties can present this case for final resolution by the end of January—less than three months from now:

| Event | Date/Deadline |
|---|---|
| Deadline for Defendants to respond to complaint and provide Plaintiffs' administrative record | November 15, 2024 |
| Plaintiffs' motion for summary judgment on the administrative record | December 6, 2024 |
| Defendants' opposition and cross-motion for summary judgment on the administrative record | January 3, 2025 |

| Plaintiffs' opposition and reply brief | January 17, 2025 |
| Defendants' reply brief | January 31, 2025 |

The court will work expeditiously to resolve the case soon after the parties' cross-motions for summary judgment have been fully briefed. Given the swiftness with which the court thinks it can move to have this case fully resolved, the court finds it can ensure Plaintiffs will not suffer irreparable harm without needing to enter a preliminary injunction.

—

In summary, the court will deny Plaintiffs' motion for preliminary injunction for failure to establish standing and irreparable harm.

Again, this ruling is based on only Plaintiffs' initial declarations—*i.e.,* the only evidence presented at the hearing. And "the findings of fact and conclusions of law made by a court granting [or denying] a preliminary injunction are not binding at trial on the merits," *Univ. of Texas*, 451 U.S. at 395, particularly when Plaintiffs have shown that they can offer evidence that may overcome the deficiencies outlined above. In other words, nothing in this order will tie the court's hands when it rules on the parties' upcoming cross-motions for summary judgment.

## CONCLUSION

For these reasons, the court **DENIES** Plaintiffs' motion for preliminary injunction (doc. 7). The court will enter a separate scheduling order consistent with the schedule discussed in this order.

**Done** and **Ordered** on November 4, 2024.

**COREY L. MAZE**
UNITED STATES DISTRICT JUDGE