FILED

2025 Jan-03  PM 04:08
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## EASTERN DIVISION

DON BUTLER, *et al.*,

     *Plaintiffs*,

  v.

MERRICK GARLAND, in his official capacity as Attorney General of the United States, *et al.*,

     *Defendants*.

Case No. 1:24-cv-00975-CLM

## BRIEF IN SUPPORT OF DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................1

BACKGROUND .................................................................................................2

I.   Statutory and Regulatory Background ...............................................2

    A.  The Gun Control Act of 1968 ........................................................2

    B.  The Bipartisan Safer Communities Act of 2022 ............................6

    C.  The Final Rule ................................................................................8

    D.  Legal Challenges to the Rule ......................................................13

II.  Procedural History .............................................................................14

RESPONSE TO PLAINTIFFS' STATEMENT OF UNDISPUTED FACTS ........15

LEGAL STANDARD ........................................................................................18

ARGUMENT ....................................................................................................18

I.   Plaintiffs Lack Standing to Challenge the Rule ...............................18

    A.  The Individual Plaintiffs Lack Standing to Bring a Pre-Enforcement Challenge Against the Rule ...........................................................20

    B.  The NRA Lacks Associational Standing ......................................29

    C.  Plaintiffs Lack Standing to Challenge Rule Provisions That Do Not Affect Them ..................................................................................29

II.  Defendants Are Entitled to Summary Judgment on the Merits ........31

    A.  The Rule Is Consistent with the GCA and ATF's Authority .....31

       1.  The GCA Requires Intent to Profit, Not Actual Profit .......31

       2.  Federal Law Does Not Set A Numerical Threshold for Firearms Transactions That Require a License ................................35

       3.  The Rule Properly Defines "Personal Collection." ............39

       4.  The Rule's Presumptions Are a Lawful Exercise of ATF's Authority .................................................................................45

       5.  ATF Has Authority to Define Statutory Terms ..................51

       6.  The Rule of Lenity Is Inapplicable ....................................54

    B.  The Rule Is Not Arbitrary and Capricious ..................................55

C.  The Rule is Not Unconstitutionally Vague ..................................................58

D.  The Rule Comports with the Second Amendment .....................................61

E.  Plaintiffs' Separation-of-Powers Claim Lacks Merit ...............................67

III.  Any Relief Should Be Appropriately Limited ...................................................68

CONCLUSION .......................................................................................................70

# TABLE OF AUTHORITIES

## Cases

*Abramski v. United States,*
   573 U.S. 169 (2014) ........................................................................1, 3

*Alaska Airlines, Inc. v. Brock,*
   480 U.S. 678 (1987) ..............................................................................70

*Arizona v. Biden,*
   40 F.4th 375 (6th Cir. 2022)..................................................................70

*Ascendium Educ. Sols., Inc. v. Cardona,*
   78 F.4th 470 (D.C. Cir. 2023) ......................................................... 30, 31

*Avirgan v. Hull,*
   932 F.2d 1572 (11th Cir. 1991).............................................. 16, 17, 18

*Barber v. Thomas,*
   560 U.S. 474 (2010) ..............................................................................54

*Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Eng'rs,*
   781 F.3d 1271 (11th Cir. 2015)....................................................... 68, 69

*Blanco v. Samuel,*
   91 F.4th 1061 (11th Cir. 2024)..............................................................18

*Bloedorn v. Grube,*
   631 F.3d 1218 (11th Cir. 2011)..............................................................23

*Bryan v. United States,*
   524 U.S. 184 (1998) ................................................................................4

*CAMP Legal Def. Fund, Inc. v. City of Atlanta,*
   451 F.3d 1257 (11th Cir. 2006)..............................................................30

*City of Los Angeles v. Lyons,*
   461 U.S. 95 (1983) ................................................................................27

*City of N. Miami v. FAA,*
   47 F.4th 1257 (11th Cir. 2022)..............................................................55

*Clapper v. Amnesty Int'l USA*,
    568 U.S. 398 (2013) ..................................................................... 19, 27

*Cole v. USDA*,
    33 F.3d 1263 (11th Cir. 1994) ........................................... 47, 48, 49, 50

*SisterSong Women of Color Reprod. Just. Collective v. Governor of Ga.*,
    40 F.4th 1320 (11th Cir. 2022) ................................................... 59, 60

*Common Cause/Ga. v. Billups*,
    554 F.3d 1340 (11th Cir. 2009) .........................................................19

*Competitive Enter. Inst. v. FCC*,
    970 F.3d 372 (D.C. Cir. 2020) ..........................................................31

*Corbett v. Transp. Sec. Admin.*,
    930 F.3d 1225 (11th Cir. 2019) .................................................. 20, 27

*Davis v. FEC*,
    554 U.S. 724 (2008) ........................................................................30

*District of Columbia v. Heller*,
    554 U.S. 570 (2008) .................................................................. 61, 63

*Douglas v. Yates*,
    535 F.3d 1316 (11th Cir. 2008) ........................................................42

*Dream Defs. v. Governor of the State of Fla.*,
    57 F.4th 879 (11th Cir. 2023) .................................................... 20, 21

*Ezell v. City of Chicago*,
    651 F.3d 684 (7th Cir. 2011) ...........................................................64

*FCC v. Fox Television Stations, Inc.*,
    556 U.S. 502 (2009) ........................................................................56

*FCC v. Prometheus Radio Project*,
    592 U.S. 414 (2021) ........................................................... 55, 56, 58

*FDA v. All. for Hippocratic Med.*,
    602 U.S. 367 (2024) .................................................................. 19, 29

*Florida v. HHS*,
    19 F.4th 1271 (11th Cir. 2021)................................................................69

*Francis v. Franklin*,
    471 U.S. 307 (1985) .............................................................................50

*Ga. Republican Party v. SEC*,
    888 F.3d 1198 (11th Cir. 2018)...............................................................19

*Gardner v. Grandolsky*,
    585 F.3d 786 (3d Cir. 2009) ..................................................................52

*Georgia v. President of the United States*,
    46 F.4th 1283 (11th Cir. 2022)..................................................... 45, 69

*Gill v. Whitford*,
    585 U.S. 48 (2018) ...............................................................................68

*Greater Birmingham Ministries v. Sec'y of State for State of Ala.*,
    992 F.3d 1299 (11th Cir. 2021)...............................................................29

*Harrell v. The Fla. Bar*,
    608 F.3d 1241 (11th Cir. 2010)...............................................................30

*Holland Livestock Ranch v. United States*,
    655 F.2d 1002 (9th Cir. 1981) ...............................................................47

*Huddleston v. United States*,
    415 U.S. 814 (1974) ...............................................................................3

*Int'l Union v. MSHA*,
    68 F. App'x 205 (D.C. Cir. 2003) .......................................................45

*Jewell v. United States*,
    749 F.3d 1295 (10th Cir. 2014)...............................................................53

*K Mart Corp. v. Cartier, Inc.*,
    486 U.S. 281 (1988) .............................................................................70

*Kansas v. Garland*,
    No. 2:24-cv-88, 2024 WL 2384611 (E.D. Ark. May 23, 2024)...........13

*Kansas v. Garland*,
   No. 6:24-cv-1086, 2024 WL 3360533 (D. Kan. July 10, 2024) ........................13

*Klayman v. President of U.S.*,
   689 F. App'x 921 (11th Cir. 2017)........................................................22

*LaCroix v. Lee Cnty.*,
   819 F. App'x 839 (11th Cir. 2020)........................................................22

*League of Women Voters of Fla. Inc. v. Fla. Sec'y of State*,
   66 F.4th 905 (11th Cir. 2023) ..............................................................61

*Licon v. Ledezma*,
   638 F.3d 1303 (10th Cir. 2011) ....................................................... 52, 58

*Lujan v. Defs. of Wildlife*,
   504 U.S. 555 (1992) ..................................................................... 18, 19

*Mass. Dep't of Revenue v. Shek*,
   947 F.3d 770 (11th Cir. 2020) ............................................................53

*McRorey v. Garland*,
   99 F.4th 831 (5th Cir. 2024) ....................................................... 61, 62, 64

*Md. Shall Issue, Inc. v. Moore*,
   116 F.4th 211 (4th Cir. 2024)..............................................................65

*Miccosukee Tribe of Indians of Fla. v. United States*,
   566 F.3d 1257 (2009) ................................................................... 55-56

*Muransky v. Godiva Chocolatier, Inc.*,
   979 F.3d 917 (11th Cir. 2020) ......................................................... 18-19

*Murthy v. Missouri*,
   603 U.S. 43 (2024) ..........................................................................30

*N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*,
   597 U.S. 1 (2022) ..................................................................... 61, 62, 63

*Nat'l Credit Union Admin. v. First Nat'l Bank & Trust Co.*,
   522 U.S. 479 (1998) ........................................................................42

*Nat'l Mining Ass'n v. United Steel Workers*,
   985 F.3d 1309 (11th Cir. 2021) ...........................................................55

*Nat'l Rifle Ass'n v. Brady*,
   914 F.2d 475 (4th Cir. 1990) ........................................... 48, 51, 52, 54

*Nw. Austin Mun. Util. Dist. No. One v. Holder*,
   557 U.S. 193 (2009) ...........................................................................67

*Paxton v. Dettelbach*,
   105 F.4th 708 (5th Cir. 2024) ............................................... 24, 25, 26

*Pugin v. Garland*,
   599 U.S. 600 (2023) ...........................................................................44

*Republic Aviation Corp. v. NLRB*,
   324 U.S. 793 (1945) ...........................................................................47

*Signor v. Safeco Ins. Co. of Ill.*,
   72 F.4th 1223 (11th Cir. 2023) ...........................................................18

*Susan B. Anthony List v. Driehaus*,
   573 U.S. 149 (2014) ........................................................ 19, 21, 22, 27

*Teixeira v. Cnty. of Alameda*,
   873 F.3d 670 (9th Cir. 2017) ....................................................... 64, 66

*Texas v. ATF*,
   -- Supp. 3d --, 2024 WL 2967340 (N.D. Tex. June 11, 2024) .................... 14, 27

*Thai Meditation Ass'n of Ala., Inc. v. City of Mobile*,
   83 F.4th 922 (11th Cir. 2023) .............................................................18

*TocMail, Inc. v. Microsoft Corp.*,
   67 F.4th 1255 (11th Cir. 2023) ...........................................................19

*United States v. Tyson*,
   653 F.3d 192 (3d Cir. 2011) ........................................................ 32, 37

*U.S. Steel Corp. v. Astrue*,
   495 F.3d 1272 (11th Cir. 2007) ................................................... 47, 49

*United States v. Baptiste*,
　607 F. App'x 950 (11th Cir. 2015)........................................................37

*United States v. Carter*,
　801 F.2d 78 (2d Cir. 1986) ...................................................................37

*United States v. Dawson*,
　64 F.4th 1227 (11th Cir. 2023)..............................................................55

*United States v. Dubois*,
　94 F.4th 1284 (11th Cir. 2024)........................................................ 63, 64

*United States v. Duncan*,
　No. 7:20-cr-00167-M-3, 2023 WL 7346042 (E.D.N.C. Nov. 7, 2023) ..............64

*United States v. Flores*,
　652 F. Supp. 3d 796 (S.D. Tex. 2023)....................................................64

*United States v. Focia*,
　869 F.3d 1269 (11th Cir. 2017) ...................................................... 32, 62

*United States v. Gray*,
　470 F. App'x 468 (6th Cir. 2012).........................................................37

*United States v. Hester*,
　No. 23-11938, 2024 WL 4100901 (11th Cir. Sept. 6, 2024) ...........................63

*United States v. Idarecis*,
　164 F.3d 620, 1998 WL 716568 (2d Cir. 1998)....................................42

*United States v. King*,
　646 F. Supp. 3d 603 (E.D. Pa. 2022)....................................................64

*United States v. King*,
　735 F.3d 1098 (9th Cir. 2013) ..............................................................37

*United States v. McNulty*,
　684 F. Supp. 3d 14 (D. Mass. 2023).....................................................64

*United States v. Murphy*,
　852 F.2d 1 (1st Cir. 1988) ....................................................................37

*United States v. Myers*,
  972 F.2d 1566 (11th Cir. 1992) ........................................................... 50

*United States v. Nadirashvili*,
  655 F.3d 114 (2d Cir. 2011) ................................................................ 37

*United States v. Rahimi*,
  602 U.S. 680 (2024) ...................................................... 62, 65, 66, 67

*United States v. Rozier*,
  598 F.3d 768 (11th Cir. 2010) ............................................................ 63

*United States v. Shipley*,
  546 F. App'x 450 (5th Cir. 2013) ....................................................... 32

*United States v. Tarr*,
  589 F.2d 55 (1st Cir. 1978) ................................................................ 37

*United States v. Texas*,
  599 U.S. 670 (2023) ........................................................................... 68

*United States v. Tilotta*,
  No. 3:19-cr-04768-GPC, 2022 WL 3924282 (S.D. Cal. Aug. 30, 2022) ........... 64

*United States v. Valdes*,
  681 F. App'x 874 (11th Cir. 2017) ..................................................... 32

*United States v. Williams*,
  553 U.S. 285 (2008) ........................................................................... 60

*United States v. Wilmoth*,
  636 F.2d 123 (5th Cir. Unit A Feb. 1981) ................................... 32, 37

*United States v. Woods*,
  684 F.3d 1045 (11th Cir. 2012) ................................................... 59, 61

*United States v. Zheng Jian Shan*,
  80 F. App'x 31 (9th Cir. 2003) ........................................................... 37

*Usmani v. United States Att'y Gen.*,
  483 F.3d 1147 (11th Cir. 2007) .......................................................... 53

*USX Corp. v. Barnhart*,
  395 F.3d 161 (3d Cir. 2004) ...................................................................47

**Statutes**

5 U.S.C. § 706(2) ..........................................................................................68

5 U.S.C. § 706(2)(A) .....................................................................................55

18 U.S.C. § 921 ..........................................................................................2, 5

18 U.S.C. § 921(a)(13) ..................................................................... 41, 52, 53

18 U.S.C. § 921(a)(21) .................................................................... *passim*

18 U.S.C. § 921(a)(22) .................................................................... *passim*

18 U.S.C. § 922(a)(1)(A) ................................................................ 3, 4, 43, 62

18 U.S.C. § 922(b)(5) ..................................................................................3, 4

18 U.S.C. § 922(c) ...........................................................................................3

18 U.S.C. § 922(d) ...........................................................................................5

18 U.S.C. § 922(g) ...........................................................................................2

18 U.S.C. § 922(t)(1) .......................................................................................3

18 U.S.C. § 923 .........................................................................................4, 36

18 U.S.C. § 926(a) .............................................................................. 8, 51, 54

Bipartisan Safer Communities Act,
  Pub. L. No. 117-159, 136 Stat. 1313 (2022) ...................................6, 34

Brady Handgun Violence Prevention Act,
  Pub. L. No. 103-159, 107 Stat. 1536 (1993) .......................................3

Firearms Owners' Protection Act,
  Pub. L. No. 99-308, 100 Stat. 449 (1986) ............................... 5, 34, 45

**Rules**

Fed. R. Evid. 301 ..........................................................................................49

## Regulations

27 C.F.R. § 478.11 ..................................................................... *passim*

27 C.F.R. § 478.13(a) ................................................................ *passim*

27 C.F.R. § 478.13(b) ................................................................ *passim*

27 C.F.R. § 478.13(c) ................................................................ *passim*

27 C.F.R. § 478.13(d) ................................................................. 11, 12, 46

27 C.F.R. § 478.13(e) ................................................................. 12, 47, 60

27 C.F.R. § 478.13(f) .................................................................. 12, 47

27 C.F.R. § 478.13(g) ................................................................. 12

27 C.F.R. § 478.13(h) ................................................................. 12, 49

27 C.F.R. § 478.57 ..................................................................... 12, 30

27 C.F.R. § 478.78 ..................................................................... 12, 30

27 C.F.R. § 478.121 ................................................................... 4

27 C.F.R. § 478.134 ................................................................... 4

Executive Order No. 14092, § 3, 88 Fed. Reg. 16527 (Mar. 14, 2023) ................... 8

Final Rule, Definition of "Engaged in the Business" as a Dealer in Firearms, 89 Fed. Reg. 28,968 (Apr. 19, 2024) .......................................................... *passim*

Notice of Proposed Rulemaking, Definition of "Engaged in the Business" as a Dealer in Firearms, 88 Fed. Reg. 61,993 (Sept. 8, 2023) ................................. 8, 52

## Other Authorities

1 Laws of the State of Maine 546 (1830) .................................................. 66

2 General Laws of Massachusetts from the Adoption of the Constitution to February, 1822, ch. 52 ................................................................... 65

3 Laws of the Commonwealth of Massachusetts, from November 28, 1780, to February 28, 1807, at 259–61 (1807) ....................................................... 66

15 The Public Records of the Colony of Connecticut, from May, 1775, to June, 1776, Inclusive 191, An Act for Encouraging the Manufactures of Salt Petre and Gun Powder (1890)..............................................................................................66

Act of May 22, 1794, 1 Stat. 369, ch. 33, § 1 ..........................................................65

An Act Providing for the Appointment of Inspectors, and Regulating the Manufactory of Gun-Powder, secs. 1, 8 (1823) ..............................................65

Acts of the General Assembly of the State of New Jersey, at a Session Begun at Princeton on the 27th Day of August 1776, and Continued by Adjournments 6, ch. 6, An Act for the Inspection of Gun-Powder, § 1 (1877) .............................66

An Act to amend title 18, United States Code, Pub. L. No. 99-360, 100 Stat. 766, 766 (1986) ................................................6, 34

ATF Form 4473, Firearms Transaction Record, https://www.atf.gov/firearms/docs/4473-part-1-firearms-transaction-record-over-counter-atf-form-53009/download...................................................................3

ATF, National Tracing Center, https://www.atf.gov/firearms/national-tracing-center .....................................................................................................................4

Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 152 (1st ed. 2011) ......................................................................................39

Colonial Laws of Massachusetts Reprinted from the Edition of 1672, Powder (1890)...............................................................................................................65

FBI, *National Instant Criminal Background Check System 2022 Operational Report*, https://www.fbi.gov/file-repository/nics-2022-operations-report.pdf/view ...................................................................................................4

Laws of the State of New Hampshire; With the Constitutions of the United States and of the State Prefixed 276-78, An Act to Provide for the Appointment of Inspectors and Regulating the Manufactory of Gunpowder, secs. 1, 8 (1830)....66

Perry Stein, *ATF traced Trump rally shooter's gun using records opposed by some in GOP*, Wash. Post (July 21, 2024) ........................................................12

William J. Krouse, Cong. Rsch. Serv., IF12197, *Firearms Dealers* ''*Engaged in the Business*'' (2022) ..............................................................................................7

Webster's Third New International Dictionary (1971) ...........................................41

## INTRODUCTION

When selling a firearm, a person may have no obvious way to distinguish a law-abiding purchaser from a potentially dangerous one. In the Gun Control Act of 1968 ("GCA"), Congress accordingly required those "engaged in the business" of dealing in firearms first to obtain a federal firearms license and then to comply with a series of verification, background-check, and recordkeeping obligations when transferring firearms. These requirements serve the "twin goals" of "keep[ing] guns out of the hands of criminals and others who should not have them, and [] assist[ing] law enforcement authorities in investigating serious crimes." *Abramski v. United States*, 573 U.S. 169, 180 (2014). Recognizing the harm to public safety caused by unlicensed firearms dealing, Congress recently amended the GCA via the Bipartisan Safer Communities Act of 2022 ("BSCA") to expand the category of conduct that constitutes being "engaged in the business" of firearms dealing and thus requires a federal license. And in the Rule at issue in this case,[1] the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") exercised its statutory authority to promulgate regulations necessary to carry out the GCA by further clarifying what it means to be "engaged in the business" of dealing, and setting forth conduct that presumptively does, or does not, so qualify.

---

[1] Final Rule, Definition of "Engaged in the Business" as a Dealer in Firearms, 89 Fed. Reg. 28,968 (Apr. 19, 2024) ("Rule").

The plaintiffs in this case—two individual gunowners and a national gun-rights organization—challenge the Rule under the Administrative Procedure Act ("APA") and on constitutional grounds. Yet none of the Plaintiffs has standing to challenge the Rule. The Court recognized at the preliminary injunction stage that Plaintiffs' showing of standing was deficient. Despite Plaintiffs having the burden to prove standing with competent evidence, they have not remedied the problem. On the merits, the Final Rule is consistent with the GCA and BSCA, is not unconstitutionally vague, and comports with the Second Amendment. Accordingly, the Court should grant summary judgment to Defendants and deny Plaintiffs' motion for summary judgment.

## BACKGROUND

### I. Statutory and Regulatory Background

### A. The Gun Control Act of 1968

Congress enacted the Gun Control Act, 18 U.S.C. § 921 *et seq.*, in 1968 to promote public safety and to curb the crime and violence caused by the misuse of firearms. The GCA prohibits various groups of people, including felons, fugitives from justice, and individuals subject to domestic violence restraining orders, from receiving or possessing firearms with a nexus to interstate commerce. *See* 18 U.S.C. § 922(g). In restricting the access of criminals and other dangerous individuals to

firearms, "the focus of the federal scheme is the federally licensed firearms dealer." *Huddleston v. United States*, 415 U.S. 814, 825 (1974).

Under the GCA, anyone "engage[d] in the business of . . . dealing in firearms" must obtain a federal license, 18 U.S.C. § 922(a)(1)(A), and federal firearms licensees ("FFLs") must fulfill various obligations imposed by federal law that are designed, among other things, "to enable" licensed dealers "to verify, at the point of sale, whether a potential buyer may lawfully own a gun." *Abramski*, 573 U.S. at 172. In most cases, a person wishing to purchase a firearm must "appear in person at the licensee's business premises." 18 U.S.C. § 922(c). The licensed dealer must obtain the transferee's "name, age, and place of residence" and "verif[y] the identity of the transferee by examining a valid identification document," *id.* §§ 922(b)(5), (t)(1)(D). Transferees must fill out a form certifying that they are not prohibited by federal law from receiving or possessing firearms.[2]  The dealer must then submit information about the transferee to the FBI's National Instant Criminal Background Check System ("NICS"), which will conduct a background check and will deny the transaction if the check reveals that the transferee is prohibited by law from receiving or possessing the firearm. 18 U.S.C. § 922(t)(1).[3]

---

[2] *See* ATF Form 4473, Firearms Transaction Record, https://www.atf.gov/firearms/docs/4473-part-1-firearms-transaction-record-over-counter-atf-form-53009/download.
[3] The NICS was established pursuant to the Brady Handgun Violence Prevention Act, Pub. L. No. 103-159, 107 Stat. 1536 (1993). Since it became operational in 1998, NICS has conducted more than 443 million background checks, and more than 2.1 million firearms transactions have been denied based on such checks. *See* FBI, *National Instant Criminal Background Check System 2022*

FFLs also maintain records of acquisitions and dispositions of firearms, which enable the tracing of firearms recovered from crime scenes. 18 U.S.C. §§ 922(b)(5), 923(g)(1)(A); 27 C.F.R. §§ 478.121-.134. When a firearm is recovered from a crime scene, law enforcement (often state or local) can submit a request to ATF's National Tracing Center,[4] and ATF will query the records maintained by FFLs to trace the firearm to its first retail purchaser. Such tracing helps all levels of law enforcement solve crimes involving firearms. *See* 89 Fed. Reg. at 28,988.[5]

Each of the requirements described above applies only to firearms transfers made by FFLs.[6]  In contrast, a person who is not "engaged in the business" of dealing in firearms does not need a federal license to transfer a firearm and may make such transfers without conducting a background check, keeping transaction records, or

---

*Operational    Report*    14-15,    https://www.fbi.gov/file-repository/nics-2022-operations-report.pdf/view.

[4] *See* ATF, National Tracing Center, https://www.atf.gov/firearms/national-tracing-center.

[5] For instance, law enforcement officials were able to identify the man who attempted to assassinate then-former President Donald Trump in July 2024 within 30 minutes of relaying the serial number on the shooter's firearm to ATF's National Tracing Center. *See* Perry Stein, *ATF traced Trump rally shooter's gun using records opposed by some in GOP*, Washington Post (July 21,    2024),    https://www.washingtonpost.com/national-security/2024/07/21/tracing-trump-rally-gun-atf-closed-business-records/.

[6] An individual can face criminal liability under the GCA for engaging in firearms dealing without a license, but only if he or she does so "willfully." 18 U.S.C. §§ 922(a)(1)(A), 924(a)(1)(D). That is, the GCA imposes criminal liability only on individuals who (1) engage in the business of firearms dealing without a license and (2) "act[] with knowledge that [their] conduct [is] unlawful." *Bryan v. United States*, 524 U.S. 184, 191-92 (1998); *see id.* at 191 (explaining that the term "willfully" differentiates between "deliberate and unwitting conduct").

complying with any of the other obligations that the GCA requires of FFLs.[7]    The GCA's standard for when a person or business must obtain a federal firearms license thus has vital public safety implications.

When Congress first enacted the GCA, it did not further define what it means to be "engaged in the business" of dealing in firearms. In 1986, as part of the Firearms Owners' Protection Act, Pub. L. No. 99-308, 100 Stat. 449 (1986) ("FOPA"), Congress added a statutory definition of engaged in the business for the first time. As applied to a dealer in firearms other than a gunsmith or pawnbroker, FOPA defined "engaged in the business" as follows:

> a person who devotes time, attention, and labor to dealing in firearms as a regular course of trade or business with the principal objective of livelihood and profit through the repetitive purchase and resale of firearms, but such term shall not include a person who makes occasional sales, exchanges, or purchases of firearms for the enhancement of a personal collection or for a hobby, or who sells all or part of his personal collection of firearms.

*Id.* § 101 (amending 18 U.S.C. § 921). Congress further defined the term "with the principal objective of livelihood and profit" to "mean[] that the intent underlying the sale or disposition of firearms is predominantly one of obtaining livelihood and pecuniary gain, as opposed to other intents, such as improving or liquidating a personal firearms collection." *Id.* Congress amended that definition several months

---

[7] Certain requirements apply even to firearms transfers by unlicensed individuals. For example, no person may transfer a firearm if that person knows or has reasonable cause to believe that the transferee is legally prohibited from receiving or possessing that firearm. *See* 18 U.S.C. § 922(d).

later to clarify that "proof of profit shall not be required as to a person who engages in the regular and repetitive purchase and disposition of firearms for criminal purposes or terrorism." An Act to amend title 18, United States Code, Pub. L. No. 99-360, § 1(b), 100 Stat. 766, 766 (1986).

## B.    The Bipartisan Safer Communities Act of 2022

In 2022, Congress amended the GCA by enacting the Bipartisan Safer Communities Act, Pub. L. No. 117-159, 136 Stat. 1313 (2022). Congress enacted the BSCA in the wake of a series of tragic mass shootings. In one of those shootings, which occurred between Midland and Odessa, Texas, an FFL refused to transfer a firearm to the perpetrator based on mental illness, but the perpetrator then unlawfully obtained the firearm used in the shooting from an unlicensed dealer who did not conduct a background check. That dealer later pleaded guilty to unlawful unlicensed firearms dealing. *See* 89 Fed. Reg. at 28,971-72 & nn.26-29.

As relevant here, the BSCA expanded the GCA's definition of being "engaged in the business" of dealing in firearms. The BSCA replaced "with the principal objective of livelihood and profit" with "to predominantly earn a profit," and defined the latter clause in a separate subsection to mean that "the intent underlying the sale or disposition of firearms is predominantly one of obtaining pecuniary gain." 136 Stat. at 1324-25, § 12002. The BSCA's sponsors intended to address potential confusion about the GCA's application to individuals who deal in firearms with the

intent to earn profit, but possibly not as a principal source of livelihood, to "clarify who should be licensed, eliminating a 'gray' area in the law, ensuring that one aspect of firearms commerce is more adequately regulated."[8]

As amended by the BSCA, the GCA thus currently defines "engaged in the business" as applied to a dealer in firearms as:

> a person who devotes time, attention, and labor to dealing in firearms as a regular course of trade or business to predominantly earn a profit through the repetitive purchase and resale of firearms, but such term shall not include a person who makes occasional sales, exchanges, or purchases of firearms for the enhancement of a personal collection or for a hobby, or who sells all or part of his personal collection of firearms.

18 U.S.C. § 921(a)(21)(C).[9]   The GCA further defines the term "to predominantly earn a profit" to

> mean[] that the intent underlying the sale or disposition of firearms is predominantly one of obtaining pecuniary gain, as opposed to other intents, such as improving or liquidating a personal firearms collection: *Provided*, That proof of profit shall not be required as to a person who engages in the regular and repetitive purchase and disposition of firearms for criminal purposes or terrorism.

---

[8] 89 Fed. Reg. at 28,972 (quoting William J. Krouse, Cong. Rsch. Serv., IF12197, *Firearms Dealers* ''*Engaged in the Business*'' 2 (2022), https://crsreports.congress.gov/product/pdf/IF/IF12197/2); *see also id.* at 28,972 n.31 (collecting statements of the BSCA's sponsors).

[9] A separate statutory provision defines "engaged in the business" as applied to a dealer in firearms as a gunsmith. 18 U.S.C. § 921(a)(21)(D). Another provision defines "dealer" to include any pawnbroker who receives any firearm as security for payment or repayment of money. *Id.* § 921(a)(11)(C). These provisions were not addressed in the Final Rule and are not at issue in this litigation.

*Id.* § 921(a)(22).[10]

### C.    The Final Rule

ATF is a bureau within the Department of Justice responsible for implementing and enforcing federal firearms laws, including the GCA. Congress has vested in the Attorney General the authority to prescribe regulations "necessary to carry out the provisions of" the GCA, 18 U.S.C. § 926(a), and Congress and the Attorney General have delegated that authority to ATF.

On September 8, 2023, ATF issued a Notice of Proposed Rulemaking for a proposed rule addressing when a person is "engaged in the business" of dealing in firearms. Notice of Proposed Rulemaking, Definition of "Engaged in the Business" as a Dealer in Firearms, 88 Fed. Reg. 61,993 (Sept. 8, 2023) ("NPRM").[11]   ATF received nearly 388,000 comments, including nearly 258,000 comments in support of the proposed rule and nearly 99,000 in opposition to it. 89 Fed. Reg. at 28,984.

After considering these comments, ATF published the Final Rule on April 19, 2024. ATF explained that the Rule "implement[s]" the BSCA's "statutory change" to the definition of "engaged in the business," and thereby furthers Congress's

---

[10] This provision further contains a detailed definition of "terrorism," *see* 18 U.S.C. § 921(a)(22), which is also not in dispute in this litigation.

[11] On March 14, 2023, President Biden issued an Executive Order directing the Attorney General to "develop and implement a plan to . . . clarify the definition of who is engaged in the business of dealing in firearms, and thus required to become Federal firearms licensees (FFLs), in order to increase compliance with the Federal background check requirement for firearm sales, including by considering a rulemaking, as appropriate and consistent with applicable law." Executive Order No. 14092, § 3, 88 Fed. Reg. 16527, 16527-28 (Mar. 14, 2023).

design "to improve public safety by helping to prevent persons who are prohibited from possessing firearms under Federal law from acquiring firearms and allowing law enforcement officers to trace firearms involved in crime." *Id.* at 28,968, 28,987.[12]   The Rule also "provide[s] clarity to persons who remain unsure of whether" they are engaged in the business of dealing in firearms. *Id.* at 28,968.

The Rule defines various subsidiary terms in the GCA's definition of "engaged in the business," consistent with statutory text and ordinary usage. For example, the term "Dealer" includes "[a]ny person engaged in the business of selling firearms at wholesale or retail . . . wherever, or through whatever medium, they are conducted," including at "a gun show," a "flea market," "by mail order," "over the internet," or "through the use of other electronic means." 27 C.F.R. § 478.11. ATF explained that this definition reflects the statutory text, because "there is no statutory exemption under the GCA for unlicensed persons to engage in the business of dealing in firearms at a gun show, or at any other venue." 89 Fed. Reg. at 28,989. The list of venues at which firearms dealing could occur is also consistent with decades of case law and ATF practice. *See id.* at 28,973-74 & nn.35-46.

---

[12] *See also* 89 Fed. Reg. at 28,993-95 (explaining that the Rule will promote compliance with the GCA, which will in turn effectuate the GCA's purpose of enhancing public safety by increasing the number of background checks performed, enabling more traces of firearms, and improving crime gun intelligence).

The Rule introduces a standalone section, 27 C.F.R. § 478.13, to define being engaged in the business of dealing. Subsection (a) defines "engaged in the business as a dealer in firearms other than a gunsmith or a pawnbroker," in relevant part, as

> A person who devotes time, attention, and labor to dealing in firearms as a regular course of trade or business to predominantly earn a profit through the repetitive purchase and resale of firearms. The term shall not include a person who makes occasional sales, exchanges, or purchases of firearms for the enhancement of a personal collection or for a hobby, or who sells all or part of the person's personal collection of firearms.

89 Fed. Reg. at 29,091 (27 C.F.R. § 478.13(a)). That definition matches the statutory definition verbatim, except that it breaks the definition into two sentences for readability. *Compare id.*, *with* 18 U.S.C. § 921(a)(21)(C).

Subsection (b) states that whether someone is "engaged in the business" of dealing "is a fact-specific inquiry," and that while "[s]elling large numbers of firearms . . . may be highly indicative of business activity, . . . there is no minimum threshold number of firearms purchased or sold that triggers the licensing requirement." *Id.* § 478.13(b). This subsection reflects ATF's sensible conclusion that defining "engaged in the business" through a bright-line threshold of number of transactions would be inconsistent with the GCA's text and would necessarily be both underinclusive and overinclusive. *See* 89 Fed. Reg. at 29,086.

To clarify the GCA's application in specific contexts, subsection (c) sets forth fact patterns that give rise to rebuttable presumptions "[i]n civil and administrative

proceedings" (but not in criminal proceedings) that "a person shall be presumed to be engaged in the business of dealing in firearms." 27 C.F.R. § 478.13(c). For example, a person is presumed to be engaged in the business of dealing firearms when the person repetitively purchases for the purpose of resale stolen firearms, or resells or offers for resale stolen firearms. *Id.* § 478.13(c)(2)(ii)(A). These presumptions "are supported by the Department's investigative, regulatory, and enforcement experience, as well as conduct that the courts have found to require a license even before the BSCA expanded the definition of 'engaged in the business.'" 89 Fed. Reg. at 28,977; *see also id.* at 28,977-79 nn.72-73, 74-77, 79-83 (citing case law and examples of federal prosecutions supporting these presumptions).

Subsection (d) clarifies the application of the statutory term "predominantly earn a profit." It provides that the phrase means that "[t]he intent underlying the sale or disposition of firearms is predominantly one of obtaining pecuniary gain," which is identical to the statutory definition found at 18 U.S.C. § 921(a)(22), and further states that "a person may have the intent to profit even if the person does not actually obtain the intended pecuniary gain from the sale or disposition of firearms." 27 C.F.R. § 478.13(d)(1). Subsection (d) then sets forth fact patterns giving rise to rebuttable presumptions in civil and administrative proceedings (but not in criminal proceedings) that a person has "the intent to predominantly earn a profit." *Id.* § 478.13(d)(2). For example, a person is presumed to have intent to predominantly

earn a profit if the person repetitively or continuously purchases or rents physical space to display firearms offered for resale. *Id.* § 478.13(d)(2)(ii). The "predominantly earn a profit" presumptions are likewise supported by decades of case law arising before the BSCA's expansion of the statutory language, as well as enforcement experience. *See* 89 Fed. Reg. at 28,981-82 & nn.97-104.

The Rule also lists categories of conduct that are not to be presumed as amounting to being "engaged in the business" of firearms dealing and can be used to rebut the Rule's presumptions, such as reselling or transferring firearms "[o]ccasionally to a licensee or to a family member for lawful purposes." 27 C.F.R. § 478.13(e), (f). Subsection (g) specifies that the activities set forth in the Rule's presumptions and its list of rebuttal evidence "are not exhaustive of the conduct or evidence that may be considered in determining whether a person is engaged in the business of dealing in firearms, or has the intent to predominantly earn a profit through the repetitive purchase and resale of firearms." *Id.* § 478.13(g). Subsection (h) expressly provides that the presumptions "shall not apply to any criminal case, although they may be useful to courts in criminal cases, for example, when instructing juries regarding permissible inferences." *Id.* § 478.13(h).[13]

---

[13] Other provisions of the Rule address the procedures that former licensees must follow when they liquidate business inventory upon license revocation or other termination of their license. *See* 27 C.F.R. §§ 478.57, 478.78. Because Plaintiffs allege, however, that they have "never held a federal firearms license," Declaration of Don Butler ("Butler Decl.") ¶ 12, ECF No. 8-1; *see* Declaration of David Glidewell ("Glidewell Decl.") ¶ 12, ECF No. 8-2, these other provisions are not at issue here.

The Rule took effect on May 20, 2024. 89 Fed. Reg. at 28,968.

### D.    Legal Challenges to the Rule

The Rule has been challenged in three other lawsuits. In *Kansas v. Garland*, No. 6:24-cv-1086 (D. Kan.), twenty-one states, three individuals, and an organization brought suit in the Eastern District of Arkansas and sought emergency relief before the Rule went into effect. Compl., *Kansas v. Garland*, No. 2:24-cv-88-JM (E.D. Ark. May 1, 2024), ECF No. 1. The Arkansas district court dismissed the State of Arkansas as a plaintiff for lack of standing and transferred the case to the District of Kansas because of a lack of venue. *See Kansas v. Garland*, No. 2:24-cv-88, 2024 WL 2384611, at *2-*3 (E.D. Ark. May 23, 2024). Following the transfer, the plaintiffs renewed their motion for a preliminary injunction, which the Kansas district court denied after concluding that the plaintiffs (1) failed to demonstrate standing "to the degree necessary for injunctive relief" and (2) likewise failed to show that they were "'substantially likely' to succeed on the merits." *Kansas v. Garland*, No. 6:24-cv-1086, 2024 WL 3360533, at *4, *6 (D. Kan. July 10, 2024), *appeal filed*, No. 24-3101 (10th Cir. July 22, 2024). The *Kansas* court's order denying a preliminary injunction is on appeal, and Defendants have since filed a motion to dismiss for lack of subject-matter jurisdiction, which remains pending.

In another case, four states, four gun-rights organizations, and an individual plaintiff filed suit in the Northern District of Texas on May 1, 2024. *See* Compl.,

13

*Texas v. ATF*, No. 2:24-cv-89-Z (N.D. Tex. May 1, 2024), ECF No. 1. There, the Texas district court granted a preliminary injunction enjoining ATF from enforcing the Rule "against all Plaintiffs pending the resolution of th[e] lawsuit." *Texas v. ATF*, -- F. Supp. 3d --, 2024 WL 2967340, at *10 (N.D. Tex. June 11, 2024), *appeal filed*, No. 24-10612 (5th Cir. July 9, 2024). The government's appeal of the preliminary injunction is pending. In that district court, the parties are briefing cross-motions for summary judgment, with the last brief due to be filed on January 7, 2025.

In the third case, the State of Florida sued, challenging the Rule solely under the APA. Compl., *Florida v. ATF*, No. 8:24-cv-1041 (M.D. Fla. May 1, 2024), ECF No. 1. Florida did not move for preliminary relief, and Defendants have filed a motion to dismiss for lack of subject-matter jurisdiction, which remains pending.

## II.    Procedural History

In this case, two individuals—Don Butler and David Glidewell—and the National Rifle Association of America ("the NRA"), brought suit on July 19, 2024. *See* Compl., ECF No. 1. In their Complaint, Plaintiffs challenge the Rule under the APA, arguing that it exceeds ATF's statutory authority (Count I) and is arbitrary and capricious (Count II). *Id.* ¶¶ 85-104. Plaintiffs also allege that the Rule is unconstitutionally vague (Count III), violates the Second Amendment (Count IV), and violates the separation of powers (Count V). *Id.* ¶¶ 105-127.

Plaintiffs filed a Motion for Preliminary Injunction on August 15, 2024, ECF No. 7. After holding a hearing, the Court denied the motion. *See* Order, ECF No. 17 ("Order"). The Court found that Plaintiffs had failed to show standing, because their factual allegations regarding their intent to engage in conduct that violates the Rule "are like the 'some day' intentions that," according to case law, "fail[s] to establish an injury in fact." *Id.* at 33. Plaintiffs similarly failed to show irreparable harm because they did not demonstrate a threat of "future injury" that "will occur between now and the end of this litigation." *Id.* at 36.

On December 6, 2024, Plaintiffs moved for summary judgment. *See* Pls.' Mot. for Summ. Judg., ECF No. 21; Brief in Supp. of Pls.' Mot. for Summ. Judg., ECF No. 22 ("Pls.' Br."). Plaintiffs' only evidence submitted with this Motion were a five-page declaration of Butler, Decl. of Don Butler, ECF No. 22-1 ("Butler Decl."), and a four-page declaration of Glidewell, Decl. of David Glidewell, ECF No. 22-2 ("Glidewell Decl.").

**RESPONSE TO PLAINTIFFS' STATEMENT OF UNDISPUTED FACTS**[14]

7.     Disputed to the extent that Plaintiff Butler's alleged fear of enforcement under the Final Rule, Butler Decl. ¶ 11, is subjective, as ATF has not brought nor indicated that it intends to bring an enforcement action against Butler specifically.

---

[14] Defendants do not dispute the facts not specifically identified in this section.

8.      Butler's statement that he would "sell or trade" certain firearms "tomorrow if the ATF's final rule did not create a credible threat of enforcement proceedings," *id.* ¶ 12, is a legal conclusion that need not be disputed or rebutted for purposes of summary judgment. *See Avirgan v. Hull*, 932 F.2d 1572, 1577 (11th Cir. 1991) (explaining that legal conclusions are not "relevant competent evidence" for purposes of summary judgment).

11.     Butler's statement that he would sell his "Kel-Tek pistol" "but for the risk of enforcement under the final rule," Butler Decl. ¶ 14, is a legal conclusion that need not be disputed or rebutted for purposes of summary judgment. *See Avirgan*, 932 F.2d at 1577.

12.     Butler does not specifically state in his declaration that he "would immediately sell or trade" other firearms "but for the Final Rule." Butler Decl. ¶ 16; *see* Pls.' Br. 8. To the extent Plaintiffs state that the conduct described in this paragraph implicates the Rule, that is a legal conclusion that need not be disputed or rebutted for purposes of summary judgment. *See Avirgan*, 932 F.2d at 1577.

14.     To the extent Plaintiffs state that the conduct described in this paragraph implicates the Rule, that is a legal conclusion that need not be disputed or rebutted for purposes of summary judgment. *See id.* at 1577.

15.    To the extent Plaintiffs state that the conduct described in this paragraph implicates the Rule, that is a legal conclusion that need not be disputed or rebutted for purposes of summary judgment. *See id.* at 1577.

17.    This statement is a legal conclusion that need not be disputed or rebutted for purposes of summary judgment. *See id.* at 1577.

24.    Disputed to the extent that Plaintiff Glidewell's alleged fear of enforcement under the Final Rule, Glidewell Decl. ¶ 10, is subjective, as ATF has not brought nor indicated that it intends to bring an enforcement action against Glidewell specifically.

28.    To the extent Plaintiffs state that the conduct described in this paragraph implicates the Rule, that is a legal conclusion that need not be disputed or rebutted for purposes of summary judgment. *See Avirgan*, 932 F.2d at 1577.

29.    To the extent Plaintiffs state that the conduct described in this paragraph implicates the Rule, that is a legal conclusion that need not be disputed or rebutted for purposes of summary judgment. *See id.* at 1577.

30.    To the extent Plaintiffs state that the conduct described in this paragraph implicates the Rule, that is a legal conclusion that need not be disputed or rebutted for purposes of summary judgment. *See id.* at 1577.

34.    This statement is a legal conclusion that need not be disputed or rebutted for purposes of summary judgment. *See id.* at 1577.

17

36.    Plaintiffs' statement that the NRA's members have suffered "injuries . . . on account of the Final Rule" is a legal conclusion that need not be disputed or rebutted for purposes of summary judgment. *See id.* at 1577.

## LEGAL STANDARD

"Summary judgment is appropriate when a movant shows that there is 'no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'"  *Signor v. Safeco Ins. Co. of Ill.*, 72 F.4th 1223, 1227 (11th Cir. 2023) (quoting Fed. R. Civ. P. 56(a)). A court considering cross-motions for summary judgment must "take each motion in turn and construe all the facts in favor of the non-movant for each." *Thai Meditation Ass'n of Ala., Inc. v. City of Mobile*, 83 F.4th 922, 926 (11th Cir. 2023). Summary judgment is a proper mechanism to resolve legal questions. *See Blanco v. Samuel*, 91 F.4th 1061, 1070 (11th Cir. 2024).

## ARGUMENT

### I.    Plaintiffs Lack Standing to Challenge the Rule

Summary judgment should be granted to Defendants at the threshold because Plaintiffs lack standing to challenge the Rule. Article III standing is "an indispensable part of [a] plaintiff's case." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). To have standing, a plaintiff must show that he has "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Muransky v.*

*Godiva Chocolatier, Inc.*, 979 F.3d 917, 924 (11th Cir. 2020) (en banc). An injury confers standing only if it is "concrete and particularized," and "actual or imminent, not conjectural or hypothetical." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (cleaned up). Threatened future injuries, moreover, constitute injuries in fact only if they are "*certainly* impending"; mere assertions of "'*possible* future injury' are not sufficient." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (citation omitted); *see FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 381 (2024) ("[T]he injury must have already occurred or be likely to occur soon.").

The plaintiff, as "[t]he party invoking federal jurisdiction," always bears the burden of establishing standing. *Common Cause/Ga. v. Billups*, 554 F.3d 1340, 1349 (11th Cir. 2009). Standing "must be 'supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." *TocMail, Inc. v. Microsoft Corp.*, 67 F.4th 1255, 1262 (11th Cir. 2023) (quoting *Lujan*, 504 U.S. at 561). To establish standing at the summary judgment stage, a plaintiff accordingly "must put forth specific facts supported by evidence" that establish each element of standing. *Ga. Republican Party v. SEC*, 888 F.3d 1198, 1202 (11th Cir. 2018). That does not mean, however, "that any evidence will do." *TocMail, Inc.*, 67 F.4th at 1263. "[S]peculation does not suffice," nor do "conclusory allegations" in a declaration. *Id.* And if a plaintiff fails to carry its standing burden, a court "ha[s] no

power to judge the merits" of the plaintiff's claims. *Corbett v. Transp. Sec. Admin.*, 930 F.3d 1225, 1232 (11th Cir. 2019).

Like at the preliminary injunction stage, the firearms-related conduct that Plaintiffs Butler and Glidewell describe in their declarations does not come close to amounting to being "engaged in the business" of dealing in firearms under the Rule's plain terms. They therefore lack standing to obtain relief from a Rule that does not injure them. Because NRA's claim to associational standing hinges solely on Butler and Glidewell's purported standing, NRA lacks standing as well.

### A.   The Individual Plaintiffs Lack Standing to Bring a Pre-Enforcement Challenge Against the Rule

Plaintiffs Butler and Glidewell base their standing to sue on their subjective belief that their firearms-related conduct—namely, "engag[ing] in occasional private firearms transactions to enhance their personal [firearm] collections"—is "arguably proscribed by" the Rule, Pls.' Br. 12-13, 14, and their attendant fear that they might someday "be subject to enforcement proceedings" as a consequence, Butler Decl. ¶ 21; *see* Glidewell Decl. ¶ 17. The Rule "has not yet been enforced" against either plaintiff, meaning that, as Plaintiffs themselves acknowledge, their standing to challenge it hinges on a purported "threat of future injury." *Dream Defs. v. Governor of the State of Fla.*, 57 F.4th 879, 887 (11th Cir. 2023); *see* Pls.' Br. 13. To have standing to bring such a pre-enforcement challenge, however, Butler and Glidewell must establish that they (1) intend "to engage in course of conduct" that is "arguably

. . . proscribed" by the Rule and (2) face "a credible threat of prosecution" as a result. *Dream Defs.*, 57 F4th at 887 (quoting *Susan B. Anthony List*, 573 U.S. at 159). Both plaintiffs fall well short of satisfying this standard.

Butler and Glidewell would potentially be subject to the Rule only if they intend to engage in conduct that amounts to being "engaged in the business" of dealing firearms. But their respective declarations make plain that their past and future firearms-related conduct does not so qualify. Both plaintiffs state that they "presently own a personal collection of firearms" that they each "maintain principally for [their] personal protection." Butler Decl. ¶¶ 7-8; Glidewell Decl. ¶¶ 6-7. They further state that they "occasionally . . . sell firearms" they "no longer want" through "unlicensed private sales" in order to "free up funds to purchase newer or more technologically advanced models as finances permit," all for the purpose of "enhanc[ing] [their] personal collection[s]." Butler Decl. ¶¶ 8-9; Glidewell Decl. ¶¶ 7-8; *see* Butler Decl. ¶ 11. And they assert that they "intend to continue occasionally buying, selling, and trading [their] firearms" for that purpose, "including in the imminent future." Butler Decl. ¶¶ 11, 16; Glidewell Decl. ¶ 10.

Yet absent from Butler's and Glidewell's declarations is any statement indicating that either plaintiff sells or intends to sell firearms with the predominant intent "to earn a profit"—an essential element of being "engaged in the business" of firearms dealing. 27 C.F.R. § 478.13(a); *see, e.g.*, Butler Decl. ¶ 18 ("[O]n any

particular day I would be willing to sell or trade one or more of my firearms *so that I can obtain a newer or different firearms*." (emphasis added)); Glidewell Decl. ¶ 14 (asserting that Glidewell intends to sell or trade firearms "around once per year, as [he] continue[s] *to enhance [his] means of self-defense*" (emphasis added)). Nor does either plaintiff state that, outside of his "occasional[] . . . unlicensed private sales," Butler Decl. ¶ 7, he otherwise "devotes time, attention, and labor to dealing in firearms as a regular course of trade or business." 27 C.F.R. § 478.13; *see, e.g.*, Butler Decl. ¶ 8 ("I have never sold firearms as part of a business or to make a livelihood."). In short, Butler and Glidewell fail to establish that they will "engage[] in conduct that could reasonably require a federal firearms license." *Klayman v. President of U.S.*, 689 F. App'x 921, 924 (11th Cir. 2017) (per curiam) (finding no standing where a plaintiff challenging ATF guidance concerning the definition of "dealer" "never alleged he would repetitively buy and sell firearms for the principal motive of making a profit"). Both plaintiffs thus fail to establish that their conduct even arguably implicates the Rule, rendering the threat of future enforcement "wholly conjectural," *Susan B. Anthony List*, 573 U.S. at 162-63 (citation omitted).[15]

Butler and Glidewell nonetheless suggest that they have standing because they both "have declared an intent to" engage in conduct that seemingly would fall within

---

[15] *See also LaCroix v. Lee Cnty.*, 819 F. App'x 839, 843-44 (11th Cir. 2020) (per curiam) (concluding that a plaintiff lacked standing because he "ha[d] not shown that he [was] 'subject to' or 'imminently will be subject to'" the ordinance he was challenging).

the scope of the Rule's first "engaged in the business" presumption, Pls.' Br. 14, which provides that, "absent reliable to the contrary," a person is presumed to be "engaged in the business" of firearms dealing if he "[r]esells or offers for resale firearms, and also represents to potential buyers or otherwise demonstrates a willingness and ability to purchase and resell additional firearms (*i.e.*, to be a source of additional firearms for resale)," 27 C.F.R. § 478.13(c)(1). Both plaintiffs assert in their declarations that, "[i]n the course of" engaging in future "private [firearms] transactions," they "intend to . . . communicate [their] willingness to be a source of other firearms, should circumstances permit." Butler Decl. ¶ 19; *see* Glidewell Decl. ¶ 14. But "demonstrat[ing] a willingness and ability to purchase and resell additional firearms," 27 C.F.R. ¶ 478.13(c)(1) (emphasis added) is not the same as merely stating that one might "be a source of other firearms" only when "*circumstances permit*," Butler Decl. ¶ 19 (emphasis added). *See also id.* ¶ 10 ("I have told the other party that I have other firearms that I *might* be willing to trade or sell if they are interested . . . ." (emphasis added)). Indeed, the latter does not amount to the sort of "*unambiguous* intention" to engage in allegedly "proscribed" conduct that is required for standing in the pre-enforcement context. *Bloedorn v. Grube*, 631 F.3d 1218, 1228 (11th Cir. 2011) (emphasis added). Even if that were not true, the presumption cited by Plaintiffs encompasses only a person who "hold[s] [himself] out as a dealer" to "potential buyers" and "thereby demonstrat[es] a present intent to

engage in *repetitive purchases and resales for profit*." 89 Fed. Reg. at 28,977, 29,028 (emphasis added). Plaintiffs' intended "occasional[]" firearms sales "for the purpose of enhancing" their firearms collections do not satisfy those factual predicates.[16]

Butler and Glidewell separately attempt to base their standing on their claim that, because the Rule allegedly "threatens prosecution for even a single (or even unconsummated) unlicensed transaction," they would be deemed being "engaged in the business" under the Rule simply by engaging in a single firearm sale. Pls.' Br. 13. The plaintiffs misstate the Rule, which plainly provides that "a single firearm transaction or offer to engage in a transaction, *when combined with other evidence*[,] . . . *may* require a license." 27 C.F.R. § 478.13(b) (emphasis added). Butler and Glidewell do not identify, moreover, any "other evidence" that might even arguably show that the firearms sales they purportedly wish to make would rise to the level of being "engaged in the business"—including, crucially, evidence that they would deal firearms with intent to earn a profit. Conversely, the Rule unequivocally states that "a single isolated firearm transaction, absent "other evidence" indicative of being "engaged in the business," would "not require a license." 27 C.F.R. § 478.13(b).

The Fifth Circuit's recent decision in *Paxton v. Dettelbach*, 105 F.4th 708 (5th Cir. 2024), although not binding here, nonetheless underscores that merely selling a

---

[16] *See* Butler Decl. ¶ 8 ("I have never sold firearms as part of a business or to make a livelihood."); *id.* ¶ 10 (asserting that Butler has traded or sold a firearm "as recently as *within the past five years*" (emphasis added)).

firearm does not give Plaintiffs standing to challenge the Rule. In *Paxton*, the Fifth Circuit considered whether individuals who wished to "personally manufacture" silencers for their "own noncommercial, personal use" had standing to bring a pre-enforcement challenge against federal statutes that criminalize the making of such items without first complying with certain regulatory requirements. 105 F.4th at 712. The individuals claimed in declarations that they each "intend[ed] to personally manufacture a firearm suppressor." *Id.* But the statutes at issue "only prohibit[ed] making a firearm suppressor *without complying with the applicable procedures and requirements, i.e.*, applying for approval, paying the requisite tax, registering the suppressor, and labeling it with a serial number." *Id.* And the plaintiffs' declarations "sa[id] nothing" about whether they intended to manufacture silencers *without also* applying for the necessary approval to do so. *Id.* The *Paxton* court accordingly concluded that because the plaintiffs "ha[d] failed to show that their intended conduct [was] within the scope of what" the challenged statutes "prohibit[ed]," they lacked standing to bring a pre-enforcement challenge. *Id.*

Here, Butler and Glidewell suggest that merely engaging in a single unlicensed firearms transaction implicates the Rule and thus gives them standing to challenge it. *See* Pls.' Br. 13. Yet much like the statutes in *Paxton*, the Rule does not provide that a license is categorically required to make any firearm sale, but rather that a license *may* be required if a firearm sale *and* "other evidence" indicate that the

seller is (1) "devot[ing] time, attention, and labor to dealing in firearms as a regular course of trade or business" (2) with the predominant intent to "earn a profit." 27 C.F.R. § 478.13(a)-(b). The mere fact that the individual plaintiffs "intend to continue occasionally . . . selling . . . [their] firearms" therefore fails to establish that their intended conduct fall "with the [Rule's] scope," meaning they lack standing to bring a pre-enforcement challenge here. *Paxton*, 105 F.4th at 712-13.

Butler and Glidewell also appear to claim that they have standing because the Rule "excludes" firearms used for "personal protection" from 18 U.S.C. § 921(a)(21)(C)'s "safe-harbor provision," meaning that, in their view, "any transaction" involving such firearms "is no longer insulated from prosecution." Pls.' Br. 13 (citing 27 C.F.R. § 478.11). That gets matters backwards. The "personal collection" exception applies to exempt some conduct that would otherwise require a license from the statutory requirement to obtain a license. But here, there is no need for Butler and Glidewell to invoke that exception because the firearms-related conduct they describe not satisfy the express elements of being "engaged in the business" of dealing in firearms in the first place. *See* 27 C.F.R. § 478.13(a).

Moreover, despite the Rule having now been in effect in 46 states—including Alabama—for over seven months,[17] Plaintiffs offer no examples of the Rule being

---

[17] A district court in Texas has preliminarily enjoined ATF from enforcing the Rule in Texas, Louisiana, Mississippi, and Utah "pending the resolution of" a separate lawsuit involving a

applied to gunowners who, like them, only occasionally sell firearms to upgrade their private collections. *See Susan B. Anthony List*, 573 U.S. at 158 (finding standing based on "a history of past enforcement," including against the plaintiff, where such enforcement was "not a rare occurrence"). The individual plaintiffs' alleged fear of future "enforcement proceedings," Butler Decl. ¶ 21, is thus based entirely on their subjective (and erroneous) interpretation of the Rule and their "subjective fear" of the Rule's enforcement against them "at some indeterminate" time in the future— all of which is "not sufficient to create standing." *Corbett*, 930 F.3d at 1239.[18]

Finally, in response to the Court's conclusion in its preliminary injunction Order that Butler and Glidewell's "initial declarations did not establish that either Plaintiff faces the threat of future injury needed to have standing to seek injunctive relief," Order at 36, Plaintiffs submitted new declarations that, in their view, "overcome any concern about" the individual plaintiffs having only "'some day' intentions" to sell firearms in the future. Pls.' Br. 14. Those new declarations assert that Butler and Glidewell intend to sell firearms occasionally "in the imminent future"; that such an intention "is present, immediate, and ongoing"; and that the

---

challenge to the Rule. *See Texas v. ATF*, -- F. Supp. 3d --, 2024 WL 2967340, at *10 (N.D. Tex. June 11, 2024), *appeal filed*, No. 24-10612 (5th Cir. July 9, 2024).

[18] *See also id.* at 1233 ("[T]he threatened future injury must pose a realistic danger and cannot be merely hypothetical or conjectural."); *Clapper*, 568 U.S. at 416 ("[A party] cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending."); *City of Los Angeles v. Lyons*, 461 U.S. 95, 107 n.8 (1983) ("It is the *reality* of the threat of repeated injury that is relevant to the standing inquiry, not the plaintiff's subjective apprehensions.").

plaintiffs would sell firearms as soon as "tomorrow" if the Rule allegedly "did not create a credible threat of enforcement proceedings." Butler Decl. ¶ 11; *see* Glidewell Decl. ¶ 10. Neither new declaration describes possible conduct that would amount to being "engaged in the business" under the Rule, and thus does nothing to address that central flaw in Plaintiffs' standing. In fact, the new assertions confirm that neither plaintiff intends to engage in conduct that falls within the Rule's ambit.

Butler, for instance, states that he "intend[s] to sell or trade" a "Kel-Tek pistol," which would "help [him] pay for" a "new" and "more reliable" pistol that better meets his "self-defense needs." Butler Decl. ¶¶ 12-13. Glidewell similarly notes his intention to "sell or trade" a "Taurus G2c pistol" and a "Derya DY9 9 millimeter pistol" in order to "help [him] afford to pay for a new and better firearm." Glidewell Decl. ¶¶ 11, 13. And both plaintiffs assert that they intend to continue occasionally selling firearms to help "offset the cost of purchasing others," Butler Decl. ¶ 16, and to "continue to enhance [their] means of self-defense," Glidewell Decl. ¶ 14. Missing entirely for these more detailed descriptions, however, is any indication that Butler and Glidewell will make such sales *with the predominant intent to earn a profit*—a prerequisite for being "engaged in the business" of dealing—or that such occasional sales would amount to "devot[ion] [of] time, attention, and labor to dealing in firearms as a regular course of trade or business." 27 C.F.R. § 478.13(a)-(b). At bottom, Plaintiffs' more specific declarations reveal

28

that, far from being "arguably . . . proscribed" by the Rule, Pls.' Br. 13 (citation omitted), Butler and Glidewell's intended conduct inarguably does not constitute being "engaged in the business" of dealing and thus in no way implicates the Rule. They therefore fail to show that the Rule harms them. *See Alliance for Hippocratic Med.*, 602 U.S. at 381 ("[T]he injury must affect 'the plaintiff in a personal and individual way' and not be a generalized grievance." (citation omitted)).

### B.    The NRA Lacks Associational Standing

The NRA separately asserts that it has standing to challenge the Rule because Butler and Glidewell, who are both members of the organization, do. *See* Pls.' Br. 17; *see also* Butler Decl. ¶ 6; Glidewell Decl. ¶ 5. This theory depends entirely on whether Butler and Glidewell "otherwise have standing to sue in their own right." *Greater Birmingham Ministries v. Sec'y of State for State of Ala.*, 992 F.3d 1299, 1316 (11th Cir. 2021); *see* Order at 22 (acknowledging that Plaintiffs' standing "turns on whether" Butler and Glidewell have standing). Neither individual plaintiff does, as explained above. The NRA therefore lacks standing here, too.

### C.    Plaintiffs Lack Standing to Challenge Rule Provisions That Do Not Affect Them

Plaintiffs assert that because their alleged injuries are caused by the Rule's "promulgation," they have standing to challenge "any part" of the Rule that could lead to its invalidation, seemingly irrespective of whether any such "part[s]" affect Plaintiffs in any way. Pls.' Br. 16.

29

But "standing is not dispensed in gross," *Murthy v. Missouri*, 603 U.S. 43, 44 (2024) (citation omitted), and a plaintiff "may challenge only" those provisions of a law "that affect it[]." *CAMP Legal Def. Fund, Inc. v. City of Atlanta*, 451 F.3d 1257, 1273 (11th Cir. 2006); *see id.* (rejecting the argument that a plaintiff's "injury under one provision is sufficient to confer standing . . . to challenge all provisions of an allegedly unconstitutional ordinance"); *Davis v. FEC*, 554 U.S. 724, 733-34 (2008) ("The fact that [the plaintiff] has standing to challenge [one provision of a federal campaign finance law] does not necessarily mean he also has standing to challenge [a separate provision]."); *Harrell v. The Fla. Bar*, 608 F.3d 1241, 1253 (11th Cir. 2010) (confirming that a lawyer needed to establish standing "with respect to each" of the "nine advertising-related provisions" of the Florida Bar rules he was challenging). Plaintiffs therefore plainly lack standing to challenge any provisions in the Rule that they do not even claim harm them—which in this case, includes a sizable portion of the Rule. *See, e.g.*, 27 C.F.R. § 478.13(c)(2)-(5), (d)(2) (describing various types of conduct that presumptively amount to being "engaged in the business" or having the predominant intent to earn a profit that Plaintiffs decidedly do not intend to engage in); *id.* §§ 478.57, 457.78 (implementing various requirements regarding the disposition of a former licensee's business inventory).[19]

---

[19] Plaintiffs cite a D.C. Circuit case to argue that standing to challenge one provision would confer standing to challenge the entire Rule. *See* Pls.' Br. 16 (citing *Ascendium Educ. Sols., Inc. v. Cardona*, 78 F.4th 470, 478 (D.C. Cir. 2023)). The plaintiffs in *Ascendium* contended that the rule

**II.    Defendants Are Entitled to Summary Judgment on the Merits**

**A.    The Rule Is Consistent with the GCA and ATF's Authority**

Plaintiffs argue that the Rule conflicts with the GCA or exceeds ATF's authority in six distinct ways. *See* Pls.' Br. 18-28. In each respect, Plaintiffs are mistaken. The Rule is consistent with the GCA and ATF's statutory authority to promulgate regulations necessary to implement the GCA.

**1.    The GCA Requires Intent to Profit, Not Actual Profit**

Plaintiffs argue that the Rule unlawfully "nullif[ies] the government's statutory burden to prove actual profit in most cases." Pls.' Br. 21. But this alleged "burden" appears nowhere in the statute.

The statute defines the phrase "to predominantly earn a profit" to refer to intent, not actual profit: "[t]he term 'to predominantly earn a profit' means that *the intent* underlying the sale or disposition of firearms is predominantly one of obtaining pecuniary gain, as opposed to *other intents*, such as improving or liquidating a personal firearms collection." 18 U.S.C. § 921(a)(22) (emphasis

---

they challenged was "unlawful in its entirety." *Ascendium*, 78 F.4th at 478. Plaintiffs here, by contrast, have not advanced any argument that many components of the Rule—such as the provisions addressing former licensee inventory, auctioneers, or definitions of terms like "purchase" and "sale"—are unlawful. And the D.C. Circuit, has recognized in comparable circumstances that a plaintiff must show standing to challenge each provision that it wishes to have invalidated. *See*, *e.g.*, *Competitive Enter. Inst. v. FCC*, 970 F.3d 372, 382-88 (D.C. Cir. 2020) (holding that the plaintiffs had standing to challenge some, but not all, conditions in any agency order). In any event, as noted above, binding Supreme Court and Eleventh Circuit precedent forecloses Plaintiffs' position.

added). And, consistent with that definition, the statute eliminates that intent requirement for particular bad actors, noting that the "proof of profit" normally required—*i.e.*, proof of intent to profit—"shall not be required as to a person who engages in the regular and repetitive purchase and disposition of firearms for criminal purposes or terrorism." *Id.*

Courts have consistently held that the government "does not need to show" that the defendant "necessarily made a profit from dealing." *United States v. Valdes*, 681 F. App'x 874, 877 (11th Cir. 2017) (per curiam) (quoting *United States v. Wilmoth*, 636 F.2d 123, 125 (5th Cir. Unit A Feb. 1981)).[20] Were it otherwise, a bad businessman who fails to earn a profit could sell unlimited firearms without a license.

Plaintiffs also do not explain how a profit requirement could sensibly be enforced. Most business enterprises require substantial start-up expenses, and many take months or years to earn a profit. On Plaintiffs' view, if a person spent $50,000 in start-up expenses to launch a gun shop, he would not need to become licensed until he did enough business to recoup those costs and turn a profit, allowing the gun shop owner to sell hundreds (or more) firearms without a background check before

---

[20] *See also United States v. Shipley*, 546 F. App'x 450, 454 (5th Cir. 2013) (per curiam) (statute "does not require that [dealer] succeed[] in that endeavor" to profit); *see also United States v. Tyson*, 653 F.3d 192, 200 (3d Cir. 2011) (statute requires that a person's "principal motivation is economic"); *United States v. Focia*, 869 F.3d 1269, 1282 (11th Cir. 2017) ("the statute focuses on the defendant's motivation in engaging in the sales"); *see generally* 89 Fed. Reg. at 28,981 & n.96 (collecting cases).

becoming licensed. If actual profit were required, even determining whether a large gun store was engaged in the business could turn on financial calculations of the store's profits and losses, which would raise a host of difficult questions.[21]

Plaintiffs do not reckon with any of the cases rejecting their claim that actual profit is required. They instead argue that the exception's provision that "proof of profit shall not be required as to a person who engages in the regular and repetitive purchase and disposition of firearms for criminal purposes or terrorism" carries the negative implication that actual profit must be required for other sales not "for criminal purposes or terrorism." Pls.' Br. 21-22; *see also* 18 U.S.C. § 921(a)(22). Yet the sentence immediately preceding this exception makes clear that "intent" to profit determines whether a person engages in conduct "to predominantly earn a profit." 18 U.S.C. § 921(a)(22). The exception thus provides that someone who deals in firearms to arm a gang or terrorist organization must obtain a license—and can be prosecuted for unlicensed dealing—even if his predominant intent is to support crime or terrorism rather than to profit.[22]   It does not add requirements to the

---

[21] For example, would profit be determined by generally accepted accounting principles or the tax code?  Is gross profit, operating profit, before-tax profit, after-tax profit, or some other measure required?  Must a firearms business return an annual profit, or is a quarterly or shorter-term profit sufficient?  If a large and thriving firearms business engineers a large one-time accounting loss (such as by disposing of a capital asset at a large loss), does that mean that the business can begin selling firearms to felons without a background check?  The statute does address these questions because its clear text does not (and has never been understood to) require actual profit.

[22] Recognizing that only intent to profit is generally required does not render "meaningless surplusage" the exclusion of any requirement of proof of profit in criminal purposes and terrorism cases, as Plaintiffs' argue. Pls.' Br. 22. Rather, the "proof of profit" that is not required where the

definition of "to predominantly earn a profit," which exclusively addresses "the intent underlying the sale or disposition of firearms." *Id.*

The temporal sequence of amendments to 18 U.S.C. § 921(a)(22) further underscores that actual profit is not required. As initially enacted in 1986, the statute unambiguously required a predominant "intent" of "obtaining livelihood and pecuniary gain," not actual profit. *See* Pub. L. No. 99-308, § 101, 100 Stat. at 450.[23] Just weeks later, Congress added the definition's proviso to clarify that criminals and terrorists were not exempt from the licensing requirement if they dealt firearms with the intent to facilitate crime rather than to turn a profit. Pub. L. No. 99-360, § 1(b), 100 Stat. at 766. It would be anomalous to conclude that in surgically amending the GCA to make it easier to apply the licensing requirement to criminals, Congress added a new hurdle of actual profit to apply the requirement to anyone else. Finally, in the BSCA, Congress further expanded § 921(a)(22) by removing the requirement of intent to obtain "livelihood," *see* Pub. L. No. 117-159, § 12002, 136 Stat. at 1324-25, a change that also cannot reasonably be read to add a requirement of actual profit.

---

purpose is crime or terrorism is the same type of proof discussed in the main definition, namely proof of predominant "intent . . . of obtaining pecuniary gain." 18 U.S.C. § 921(a)(22).

[23] In full, the definition read: "The term 'with the principal objective of livelihood and profit' means that the intent underlying the sale or disposition of firearms is predominantly one of obtaining livelihood and pecuniary gain, as opposed to other intents, such as improving or liquidating a personal firearms collection." *Id.*

### 2.    Federal Law Does Not Set A Numerical Threshold for Firearms Transactions That Require a License

Plaintiffs contend that the Rule departs from the GCA in rejecting an inflexible rule that multiple completed purchases and sales of firearms are always required to be engaged in the business of dealing. Pls.' Br. 19. But the Rule is consistent with plain text of the statute and decades of uniform case law, which do not impose such a rigid numerical threshold.

Federal law does not set a numerical threshold for the number of firearms a person must sell, or the number of firearms sales transactions a person must complete, to trigger the licensing requirement. Instead, a person is engaged in the business of dealing in firearms if the person (1) "devotes time, attention, and labor to dealing in firearms as a regular course of trade or business" (2) "'to predominantly earn a profit' through the repetitive purchase and resale of firearms." 18 U.S.C. § 921(a)(21)(C). The first phrase describes the required action: to devote time, attention, and labor. One can do so without successfully completing multiple firearms transactions. The second phrase describes the required intent to profit; as another provision clarifies, "to predominantly earn a profit means that the *intent underlying* the sale or disposition of firearms is predominantly one of obtaining pecuniary gain," *id.* § 921(a)(22) (emphasis added). The relevant question is not the number of completed transactions, but whether a person has devoted effort as a regular course of trade or business to firearms dealing with the predominant purpose

35

of profiting from repeated sales. Thus, some individuals are not required to obtain a license even though they have engaged in multiple firearms transactions, if they do not meet the statute's action or intent requirements. *See supra*, pp. 23-24.

Conversely, a person may have put forth effort to sell firearms with the requisite intent to profit—and thus require a license—even if they have not yet sold a firearm or have only completed a single firearms sales transaction. For example, a person who incorporates a gun store, rents a storefront, displays an inventory of firearms for sale, advertises the availability of guns at the store, and contracts with a payments processor to enable credit card payments is required to obtain a license before making a sale. In those circumstances, the individual undoubtedly has "devote[d] time, attention, and labor" to firearms dealing "as a regular course of trade or business" with the intent to "earn a profit through the repetitive purchase and resale of firearms," 18 U.S.C. § 921(a)(21)(C), even before he has made a sale. Crucially, dealers must be licensed before they begin selling to the public. *See* 18 U.S.C. § 923(a)(1) (providing that "[n]o person shall engage in the business of . . . dealing in firearms . . . until he has . . . received a license to do so").

As the Rule explains, many courts have rejected numerical thresholds for decades in a variety of factual contexts. *See* 89 Fed. Reg. at 28,976 & n.67 (collecting cases). Even before the provision was broadened in the BSCA, Section 921(a)(21)(C) "d[id] not require a threshold number of sales, profit, or hours spent

before a person has engaged in the business of dealing in firearms." *United States v. Baptiste*, 607 F. App'x 950, 952-53 (11th Cir. 2015).[24]  For example, an individual who ordered 19 firearms, unsuccessfully attempted to sell one of them, and repeatedly told others he could procure guns for sale was engaged in the business, as the licensing requirement "does not require an actual sale of firearms." *United States v. King*, 735 F.3d 1098, 1106-07, 1107 n.8 (9th Cir. 2013).[25]  Moreover, a single firearms transaction may be of sufficient size and complexity to indicate that a person is engaged in the business of dealing.[26]  By contrast, Plaintiffs cite no case, other than the erroneous preliminary injunction ruling in *Texas v. ATF*, supporting a rigid numerical threshold of multiple completed purchases and sales.[27]

---

[24] *See also United States v. Gray*, 470 F. App'x 468, 473 (6th Cir. 2012) (GCA "does not establish a minimum threshold for the number of guns sold" to trigger the licensing requirement); *United States v. Carter*, 801 F.2d 78, 82 (2d Cir. 1986) (no "magic number" of sales required); *Wilmoth*, 636 F.2d at 125.

[25] *See also United States v. Nadirashvili*, 655 F.3d 114, 120-21 (2d Cir. 2011) (holding that, despite defendants' knowledge of only a single completed firearms sale, there was sufficient evidence to prove they had aided and abetted unlawful unlicensed firearms dealing because they knew that their co-defendant was "holding himself out more generally as a source of firearms"); *United States v. Zheng Jian Shan*, 80 F. App'x 31, 31-32 (9th Cir. 2003) (upholding conviction where "the Government provided evidence of the sale of weapons-arguably in only one transaction" and "also submitted evidence of Shan's disposition as a person 'ready and able to procure' additional weapons").

[26] *United States v. Murphy*, 852 F.2d 1, 8 (1st Cir. 1988) (holding that a "single transaction was sufficiently large in quantity, price and length of negotiation to constitute dealing in firearms" where "[t]he deal involved 102 rifles, a missile, [and] ammunition" and "[c]onsummation occurred after over one year of telephone calls and clandestine meetings").

[27] Plaintiffs cite *United States v. Tarr*, 589 F.2d 55 (1st Cir. 1978), which recognized that even though dealers typically engage in multiple transactions, "a single transaction" of sufficient size could be sufficient "to constitute engaging in the business of dealing in firearms. *Id.* at 59. In *Tyson*, 653 F.3d 192, the court recognized that "the quantity and frequency of sales" was just one of several relevant factors, and cautioned that "the importance of any one of these considerations is subject to the idiosyncratic nature of the fact pattern presented." *Id.* at 201. *Tyson* is consistent

The Rule straightforwardly implements this understanding of the statutory framework. The Rule explains that a "single firearm transaction" may require a license *only* when "combined with other evidence (*e.g.*, where a person represents to others a willingness and ability to purchase more firearms for resale)," but that "a single isolated firearm transaction without such evidence would not require a license." 89 Fed. Reg. at 29,091 (27 C.F.R. § 478.13(b)); *see also id.* at 28,976. Plaintiffs accordingly misconstrue the Rule in arguing that it treats "the purchase or sale of a single firearm" as sufficient to require a license. Pls.' Br. 21.

Plaintiffs argue that multiple completed transactions are required because various words and phrases in the statutory definition seem to suggest repeated or ongoing activity, such as "firearms," and "regular course of trade or business." Pls.' Br. 19. But the definition must be read in context. The statute requires that a person "devotes time, attention, and labor to dealing in firearms as a regular course of trade or business." 18 U.S.C. § 921(a)(21)(C). The required action is devoting time, attention, and labor, not successfully consummating transactions. If a person devotes time, attention, and labor to selling a single firearm in an isolated transaction, that is insufficient, as the Rule clearly provides. 89 Fed. Reg. at 29,091, (27 C.F.R. § 478.13(b)). But devoting substantial effort to launching a regular firearms business

---

with the Rule's provision that "a fact-specific inquiry," rather than rigid numerical thresholds, governs whether a person is engaged in the business of dealing. 89 Fed. Reg. at 29,091 (27 C.F.R. § 478.13(b)).

(say, by opening a gun shop) triggers the licensing requirement.

Plaintiffs also point to the phrase "repetitive purchase and resale of firearms," Pls.' Br. 19, but this phrase modifies the definition's *intent* requirement, and does not refer to required *action*. The statute requires that a person devote effort to dealing in firearms "to predominantly earn a profit through the repetitive purchase and resale of firearms." 18 U.S.C. § 921(a)(21)(C). As explained above, "to predominantly earn a profit" refers to the required intent. *See supra*, pp. 31-34. Because "through the repetitive purchase and resale of firearms" occurs immediately after "to predominantly earn a profit," it modifies that phrase.[28]   Therefore, the statute does not require completion of repetitive firearms purchases and resales. Rather, a person must intend to profit *through* repetitive purchase and resale of firearms.

### 3.    The Rule Properly Defines "Personal Collection."

Plaintiffs also challenge the Rule's definition of "personal collection" as incompatible with the GCA. Pls.' Br. 23-24. But that definition aligns with the ordinary meaning of "collection" and best comports with a common-sense understanding of the GCA's and BSCA's objective of promoting public safety via federal licensing requirements for firearms dealers.

---

[28] *See* Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 152 (1st ed. 2011) ("When the syntax involves something other than a parallel series of nouns or verbs, a prepositive or postpositive modifier normally applies only to the nearest reasonable referent.").

The GCA provides that the term "engaged in the business" does not include "a person who makes occasional sales, exchanges, or purchases of firearms for the enhancement of a personal collection or for a hobby, or who sells all or part of his personal collection of firearms." 18 U.S.C. § 921(a)(21)(C). The Rule reproduces this language in its definition of "engaged in the business." *See* 27 C.F.R. § 478.13(a). It then defines "personal collection" to mean:

> Personal firearms that a person accumulates for study, comparison, exhibition (*e.g.*, collecting curios or relics, or collecting unique firearms to exhibit at gun club events), or for a hobby (*e.g.*, noncommercial, recreational activities for personal enjoyment, such as hunting, skeet, target, or competition shooting, historical re-enactment, or noncommercial firearms safety instruction). The term shall not include any firearm purchased for the purpose of resale with the predominant intent to earn a profit (*e.g.*, primarily for a commercial purpose or financial gain, as distinguished from personal firearms a person accumulates for study, comparison, exhibition, or for a hobby, but which the person may also intend to increase in value). In addition, the term shall not include firearms accumulated primarily for personal protection: *Provided*, that nothing in this definition shall be construed as precluding a person from lawfully acquiring firearms for self-protection or other lawful personal use.

*Id.* § 478.11.

This definition is drawn "from standard dictionary definitions" of "collection," which means "an accumulation of objects gathered for study, comparison, or exhibition or as a hobby." 89 Fed. Reg. at 29,038 (quoting Merriam-Webster Online Dictionary); *see id.* at n.216 (quoting a similar definition of "collection" from another dictionary); *see also id.* at 28,980 n.88 (quoting definitions

40

of "personal," "collection", and "hobby" from Webster's Third New International Dictionary (1971)). Thus, not every firearm someone owns is part of a "personal collection" of firearms, just as not everyone who owns more than one automobile has a "car collection."

That ordinary meaning is reinforced by comparison to other portions of the GCA. Under the statute, a "collector" is a "person who acquires, holds, or disposes of firearms as curios or relics." 18 U.S.C. § 921(a)(13). Congress instructed the Attorney General to define "curios or relics," *id.*, and the relevant regulations have long defined the term as including "[f]irearms which are of special interest to collectors by reason of some quality other than is associated with firearms intended . . . as offensive or defensive weapons," such as firearms manufactured more than 50 years ago or that "derive a substantial part of their monetary value from the fact that they are novel, rare, bizarre, or because of their association with some historical figure, period, or event," 27 C.F.R. § 478.11. As the Rule explains, a "'personal collection' . . . does not include firearms that have no special interest to the collector or hobbyist other than as weapons for self-defense or defense of others." 89 Fed. Reg. at 29,038.

Plaintiffs assert that the Rule's definition "arbitrarily excludes 'firearms accumulated primarily for personal protection'" from what they call the "personal collection" "safe-harbor provision" found in 18 U.S.C. § 921(a)(21)(C). Pls.' Br. 23.

41

Plaintiffs assert, without providing the actual definition, that a single dictionary instead defines "collection" as "a group of objects collected under some (i.e., any) unifying principle – such as personal protection (or other lawful purposes)." *Id.* They argue that the Court therefore "should apply the ordinary, everyday meaning of personal collection, which includes firearms accumulated for the unifying purpose of personal protection." *Id.* (cleaned up). In other words, anyone who owns firearms for self-defense (or any other purpose) has a "personal collection."

Plaintiffs struggle to reconcile that broad reading with the text of the statute. They assert that the definition of "collector" in the same section of the GCA is "irrelevant" but that is plainly incorrect. Pls.' Br. 24. In general, "similar language contained within the same section of a statute must be accorded a consistent meaning." *Douglas v. Yates*, 535 F.3d 1316, 1320-21 (11th Cir. 2008) (quoting *Nat'l Credit Union Admin. v. First Nat'l Bank & Trust Co.*, 522 U.S. 479, 501 (1998)). More specifically, Courts have rejected this particular argument "that the definition of a gun 'collection' in § 921(a)(21)(c) should be read more broadly than the definition of a gun 'collector'" because "[t]here is no case authority to suggest that there is a distinction between the definition of a collector and of a collection in the statute." *United States v. Idarecis*, 164 F.3d 620, 1998 WL 716568, at *3-4 (2d Cir. 1998) (table); *see also* 89 Fed. Reg. at 29,038 n.217 (collecting cases). And that interpretation is consistent with a common understanding of "collecting": just as a

42

"collector" of cars develops a "personal collection" of cars gathered because of their unique interest apart from their function for transportation, a firearms collector owns weapons of interest for some reason other than their ability to function as firearms.

Plaintiffs also contend that "the safe-harbor provision broadly uses 'firearms' not 'curios or relics,'" and therefore means to sweep in firearms accumulated for any purpose, including personal protection, Pls.' Br. 24. But the "safe harbor" provision addresses people who engage in particular "sales, exchanges, or purchases of firearms," not only related to a "personal collection" but also "for a hobby." 18 U.S.C. § 921(a)(21)(c). As ATF explained, the statutory exclusion thus sweeps "more broadly than just a collection of curios or relics" and includes firearms related to a "hobby" such as "hunting, skeet, target, or competition shooting, historical re-enactment, or noncommercial firearms safety instruction." 89 Fed. Reg. at 29,038. That inclusion does not alter the basic point that a "collection"—and a "collector"—refers to some unique quality of a firearm rather than every firearm capable of being used for self-defense.

Plaintiffs' broad reading of "personal collection" as encompassing essentially any firearms a person owns is incompatible with a statutory scheme under which "dealers in firearms," as a default rule, "must be licensed." 89 Fed. Reg. at 29,039; *see* 18 U.S.C. § 922(a)(1)(A). All firearms, including ones that someone purchases to resell for profit, can be used for personal protection, and under Plaintiffs' preferred

definition of "personal collection," any person who buys and sells firearms could assert that their sales involve their "personal collection." 18 U.S.C. § 921(a)(21)(C). Put another way, because "one could nearly always claim that a firearm was . . . sold to improve or liquidate the firearms one keeps for self-defense," Plaintiffs' reading of "personal collection" would "allow the limited definitional exclusions for enhancing and liquidating a personal collection to swallow the rule that dealers in firearms must be licensed." 89 Fed. Reg. at 29,039. Given that a cardinal purpose of the GCA and the BSCA is to regulate firearms sales, it should not be "lightly" assumed that Congress enacted such a "self-defeating" statutory exception. *Pugin v. Garland*, 599 U.S. 600, 607 (2023) (citation omitted).

Plaintiffs ignore these consequences in asserting that their reading of "personal collection" is the "only 'textually permissible interpretation that furthers rather than obstructs' Congress's manifest purposes behind the safe-harbor provision." Pls.' Br. 23. But the "safe harbor" does not exist independently of the general rule firearms dealers must be licensed; instead, the statute's structure makes clear that the "safe harbor" is a narrow exception in circumstances that would otherwise meet the definition of engaged in the business.

Plaintiffs contend nonetheless that their interpretation of the "safe harbor" is necessarily the correct one because FOPA was enacted "for the express purposes of upholding 'the right[] . . . to keep and bear arms' and 'reaffirms' that Congress has

no intention to obstruct '*personal protection*, or any other lawful activity.'" *Id.* at 24. Nothing in the Rule precludes the sale of personal protection firearms, even private sales, so long as the seller's conduct does not rise to the level of requiring a license. And more generally, the section to which Plaintiffs cite is the preamble of FOPA as a whole, which revised large swathes of the GCA separate from the provision at issue in this case. It does not speak specifically to the inclusion or exclusion of firearms for personal protection in the engaged in the business definition and is not part of the statute's actual requirements. *See Georgia v. President of the United States*, 46 F.4th 1283, 1298 (11th Cir. 2022).[29]  Finally, the preamble asserts only a general intent not to "place any undue or unnecessary" burdens on lawful uses of firearms. Pub. L. No. 99-308, § 1, 100 Stat. at 449. The "safe harbor" is merely an exception to the statute's licensing requirement on those engaged in the business of dealing. That statute, which is unchallenged by Plaintiffs, burdens *dealing* in firearms, and nothing in the Rule burdens *uses* of firearms.

### 4.    The Rule's Presumptions Are a Lawful Exercise of ATF's Authority

Plaintiffs argue that the Rule's presumptions are impermissible because they "do not reflect the best reading and are not 'necessary to carry out' the text." Pls.'

---

[29] *See also, e.g., Int'l Union v. MSHA*, 68 F. App'x 205, 206 (D.C. Cir. 2003) ("it is well-settled that preambles, though undoubtedly contributing to a general understanding of statutes and regulations, are not 'operative parts' of statutes and regulations.") (citation omitted).

Br. 25. However, Plaintiffs do not apply the correct test for regulatory presumptions, do not address ATF's actual authority, and do not attempt to invalidate the specific presumptions created by the Rule.

In the Rule, ATF identifies certain activities that give rise to rebuttable presumptions in civil and administrative proceedings that an individual is engaged in the business as defined in the GCA, pending consideration of additional evidence. 89 Fed. Reg. at 29,091; *see, e.g.*, 27 C.F.R. § 478.13(c) (providing that a person is "presumed" to be engaged in the business, "absent reliable evidence to the contrary," if he "[r]epetitively resells or offers for resale firearms . . . [w]ithin 30 days" of purchasing them). These presumptions help effectuate the GCA as revised and provide increased clarity, deter unlicensed dealing, and improve public safety. *See infra*, p. 52. The Rule likewise identifies certain activities that give rise to a rebuttable presumption—again, applicable only "[i]n civil and administrative proceedings"—that an individual "ha[s] the intent to predominantly earn a profit through the repetitive purchase and resale of firearms." 27 C.F.R. § 478.13(d)(2); *see, e.g.*, *id.* § 478.13(d)(2)(i) (providing that a person is "presumed to have the intent to predominantly earn a profit," "absent reliable evidence to the contrary," if he "[r]epetitively or continuously advertises, markets, or otherwise promotes a firearms business"). And the Rule also identifies categories of firearms sales and transfers that do not support a presumption that a person is "engaged in the business," such as

a transfer amounting to a "[b]ona fide gift[]," or sales made "[o]ccasionally to obtain more valuable, desirable, or useful firearms for the person's personal collection." *Id.* §478.13(e); *see id.* § 478.13(f) (providing that "[r]eliable evidence of" such sales or transfers "may be used to rebut" any of the presumptions set forth in the Rule).

The Supreme Court has made clear that agencies have authority to include presumptions in their rulemaking. *Republic Aviation Corp. v. NLRB*, 324 U.S. 793, 804-05 (1945)) (for "a statutory presumption or one established by regulation, the validity . . . depends upon the rationality between what is proved and what is inferred."). It is thus "well established that presumptions may be established by administrative agencies, as long as there is a rational nexus between the proven facts and the presumed facts." *Cole v. USDA*, 33 F.3d 1263, 1267 (11th Cir. 1994); *accord U.S. Steel Corp. v. Astrue,* 495 F.3d 1272, 1284 (11th Cir. 2007).[30] ATF, like any other federal agency, has general authority to promulgate regulations to effectuate its administration of the statutes it is charged with administering.

As these cases establish, the creation of presumptions is a component of an agency's authority to issue regulations or conduct adjudications to administer a statute. Moreover, "in challenging the validity of [a] regulatory presumption . . . [the Plaintiff] bears the heavy burden of demonstrating that there is no rational

---

[30] *See also*, *e.g.*, *USX Corp. v. Barnhart*, 395 F.3d 161, 171 (3d Cir. 2004); *Holland Livestock Ranch v. United States*, 655 F.2d 1002, 1005 (9th Cir. 1981).

connection between the fact proved and the ultimate fact to be presumed." *Cole*, 33 F.3d at 1267; *accord id.* at 1268 ("It is the party challenging the validity of the presumption who must demonstrate that it is irrational.").

Plaintiffs incorrectly contend that the presumptions are impermissible because they are not necessary to enforce the GCA, and ATF may only promulgate necessary regulations. *See* Pls.' Br. 26. First, as discussed *infra*, pp. 51-54, ATF has the authority to determine what is or is not necessary to enforce the statute it administers. *See Nat'l Rifle Ass'n v. Brady*, 914 F.2d 475, 479 (4th Cir. 1990). As noted above and explained in the NPRM and the Rule, ATF has faced substantial difficulties in enforcing the GCA over many years with frequent attempts by individuals to evade the licensure requirements of the statute. Thus, ATF's determination that including presumptions in its Rule would be necessary to best effectuate its enforcement of the GCA is consistent with ATF's statutory authority. Second, Plaintiff's bald and unsupported assertion that "there is no 'difficulty' of locating evidence that makes presumptions necessary," Pls.' Br. 26-27, fails to carry their heavy burden or invalidate ATF's reasoned explanation for the presumptions.[31] Additionally, the cases Plaintiffs cite indicate only that a difficulty in collecting evidence can be one reason to employ presumptions, not that it is a necessary to establishing

---

[31] ATF explained that the presumptions would provide clarity to regulated parties as to what conduct implicates the statute and would facilitate increased compliance with the GCA. *See* 89 Fed. Reg. at 28,991, 29,005, 29,012-13.

presumptions. *See Cole*, 33 F.3d at 1269 n.10; *U.S. Steel Corp.*, 495 F.3d at 1284.

Plaintiffs also argue that the presumptions impermissibly shift the burden of persuasion to firearms owners to prove their innocence. Pls.' Br. 25. Plaintiffs misunderstand the Rule. The presumptions apply only to civil and administrative proceedings and do not change the basic requirement that the government demonstrate violation of the statute by a preponderance of the evidence. *See* 89 Fed. Reg, at 29,091. Only the burden of production is shifted to potential violators by the presumptions, and they need not "prove innocence," but merely rebut with evidence the presumption that they are more likely than not engaged in the business of dealing in firearms. *See id.* The Rule explicitly requires consideration of the totality of the circumstances and makes all presumptions rebuttable by reliable evidence. *See* 89 Fed. Reg. at 29,092. The Rule does not eliminate any of the elements of the statute or change the ordinary preponderance standard for civil and administrative matters.[32]

Plaintiffs also argue, despite the Rule's explicit statements to the contrary, *see*, *e.g.*, 27 C.F.R. § 478.13(h), that "ATF invites courts to use the presumptions in criminal cases . . . which urges courts to violate the presumption of innocence in a way Congress cannot have intended." Pls.' Br. 25-26 (cleaned up). But while the Rule notes that its presumptions "may be useful to courts in criminal cases, for

---

[32] Indeed, the Rule's use of presumptions aligns with the standard used in the Federal Rules of Evidence. *See* Fed. R. Evid. 301 (presumption alters the "burden of producing evidence to rebut the presumption" but does not "shift the burden of persuasion").

example, when instructing juries regarding permissible inferences," *id.*, that observation is neither improper nor remarkable. *See, e.g.*, *Francis v. Franklin*, 471 U.S. 307, 314 (1985) (noting that a "permissive inference" in jury instructions "suggests to the jury a possible conclusion to be drawn if the State proves predicate facts, but does not require the jury to draw that conclusion"); *United States v. Myers*, 972 F.2d 1566, 1573 (11th Cir. 1992) (explaining that "[a] permissive inference is not burden shifting and, therefore, does not violate the due process clause"); *see also* 89 Fed. Reg. at 28,976 n.66 (collecting cases explaining that courts may use permissive inferences in criminal jury instructions).

As for the individual presumptions in the Rule, Plaintiffs do not even attempt to meet their "heavy burden of demonstrating that there is no rational connection between the fact proved and the ultimate fact to be presumed." *Cole*, 33 F.3d at 1267. Indeed, they do not address the controlling rational nexus standard at all. Instead, Plaintiffs contend generally that the presumptions cover "conduct unambiguously lawful under the statute," and are therefore impermissible. That argument simply restates Plaintiffs' mistaken statutory interpretation. Moreover, the presumptions identify circumstances in which a person likely meets the elements of the statute, but the factfinder must still conclude after considering the totality of the circumstances that the statute has been violated.

Whether the Rule's presumptions impermissibly encompass "lawful conduct" hinges entirely on Plaintiffs' assertions that the GCA requires multiple firearms transactions and proof of profit in order for someone to be "engaged in the business." *See* Pls.' Br. 27. As explained above, those antecedent arguments about the Rule's consistency with the GCA fail for several reasons, *see supra*, pp. 31-39, and to the extent Plaintiffs' challenge to the presumptions can even be considered, it accordingly fails as well.

### 5.    ATF Has Authority to Define Statutory Terms

Plaintiffs argue that the Rule impermissibly defines statutory terms both because (1) Defendants lack authority to define any statutory terms and (2) the Rule alters or expands the meanings of terms already clearly defined by the statute. Pls.' Br. 27. Plaintiffs are wrong on both counts.

First, the GCA indisputably delegates authority to the Attorney General, and through him ATF, to promulgate "rules and regulations as are necessary to carry out" the GCA. 18 U.S.C. § 926(a). "Because § 926 authorizes the [Attorney General] to promulgate those regulations which are 'necessary,' it almost inevitably confers some measure of discretion to determine what regulations are in fact 'necessary.'" *Brady*, 914 F.2d at 479. In *Brady*, the court approved as "necessary" ATF regulations defining terms in the GCA. *See id.* at 480-81 (upholding ATF regulations defining "business premises" and "gun show or event").

51

Here, ATF concluded that the Final Rule, including its definition of various terms, was necessary to provide "clarity" regarding when a federal firearms license was required and "deter[]" unlawful unlicensed dealing, Notice of Proposed Rulemaking, Definition of "Engaged in the Business" as a Dealer in Firearms, 88 Fed. Reg. 61,993, 61,996 (Sept. 8, 2023), given that "ATF observed a significant level of noncompliance with the GCA's licensing requirements even prior to the BSCA," 89 Fed. Reg. at 29,086. ATF further determined that the Rule would "improve public safety by helping to prevent persons who are prohibited from possessing firearms under Federal law from acquiring firearms and allowing law enforcement officers to trace firearms involved in crime." *Id.* at 28,987. These are unquestionably valid regulatory objectives that necessitated providing further clarity regarding the operation of statutory terms. *Brady*, 914 F.2d at 479.[33]

Plaintiffs contend that this explicit authority to make necessary regulations under § 926 "confers no authority to define statutory terms" because § 921(a)(13) "expressly delegate[es] **additional statutory authority** to 'define' specifically enumerated terms within the definition of 'collector'" which would be "impermissibly 'meaningless'" if ATF otherwise had authority to define terms. Pls.'

---

[33] *See also Gardner v. Grandolsky*, 585 F.3d 786, 793 (3d Cir. 2009) (holding that agency regulation was lawful because it furthered "legitimate" objective of "protecting the public safety"); *Licon v. Ledezma*, 638 F.3d 1303, 1311 (10th Cir. 2011) (regulation was lawful because agency reasonably explained that it promoted "public safety").

Br. 27. But Plaintiffs' premise is mistaken. Section 921(a)(13) does not itself create any authority, but rather states that ATF *must* use its rulemaking authority to define "curios or relics." 18 U.S.C. § 921(a)(13) ("curios or relics, as the Attorney General *shall* by regulation define . . . ." (emphasis added)). "[W]hen Congress has intended mandatory action, it has used the word 'shall' to convey that intent." *Usmani v. United States Att'y Gen.*, 483 F.3d 1147, 1151 (11th Cir. 2007); *accord Jewell v. United States*, 749 F.3d 1295, 1298 (10th Cir. 2014). Thus, the Rule's reliance on § 926's general authority to define terms does not violate the canon against surplusage as it relates to § 921(a)(13) because § 921(a)(13) retains an independent meaning and effect. *See, e.g., Mass. Dep't of Revenue v. Shek*, 947 F.3d 770, 777 (11th Cir. 2020) (the "surplusage canon obliges us, whenever possible, to disfavor an interpretation when that interpretation would render a clause, sentence, or word . . . superfluous, void, or insignificant." (citation omitted)). The plain text of these two GCA provisions is consistent and suggests, at most, that ATF is not required to define other terms not identified by § 921(a)(13), not that it is prohibited from exercising its authority under § 926 to do so.

Second, Plaintiffs assert without explanation that the Rule's definitions of several terms "meaningfully differ from the statutory definitions," and make the unremarkable observation that an agency cannot define a statutory term inconsistently with unambiguous statutory text. *See* Pls.' Br. 27. But, as explained

above, the Rule is consistent with the GCA's text, and Plaintiffs have failed to describe any inconsistencies with the plain text of the statute. The Rule does not assert some unfettered authority to redefine statutory terms. Instead, the Rule notes that the amended GCA "authorizes the Department to utilize its expertise gained from decades of enforcement experience to further define terms or to issue other rules that are necessary to implement the GCA." 89 Fed. Reg. at 29,011. This exercise of authority is consistent with the authority granted to ATF under 18 U.S.C. § 926(a), *see Brady*, 914 F.2d at 479-81, and Plaintiffs have not carried their burden to demonstrate otherwise.

### 6.    The Rule of Lenity Is Inapplicable

Plaintiffs argue that the Rule violates the rule of lenity. Pls.' Br. 27-28. But the rule of lenity "only applies if, after considering text, structure, history, and purpose, there remains a grievous ambiguity or uncertainty in the statute, such that the Court must simply guess as to what Congress intended." *Barber v. Thomas*, 560 U.S. 474, 488 (2010) (citations omitted). Plaintiffs invoke the rule of lenity in the abstract, but they identify no "grievous ambiguity" that the Rule construes against potential criminal Defendants. Plaintiffs assert that "the Final Rule fails unless the statutory text unambiguously compels every single one of the ATF's contorted interpretations," but the cases they cite do not support that proposition. Pls.' Br. 27-28. Instead, those cases impose the rule of lenity only when there is sufficient

ambiguity in the criminal statute being interpreted. *See id.*; *see also*, *e.g.*, *United States v. Dawson*, 64 F.4th 1227, 1229 (11th Cir. 2023) (The rule of lenity "applies only when, after seizing everything the court can from which aid can be derived to determine the meaning of a statute, the court can no more than guess as to what Congress intended.") (citation omitted). As explained above, the Rule correctly interprets the statute, *see supra*, pp. 31-54, and with no grievous ambiguity, the rule of lenity has no role to play here.

## B.    The Rule Is Not Arbitrary and Capricious

Plaintiffs also wrongly contend that the Rule "is an arbitrary and capricious departure from prior practice." Pls.' Br. 28. When reviewing a final agency action under the APA, a federal court must apply the "arbitrary and capricious" standard. 5 U.S.C. § 706(2)(A). "This standard of review is 'exceedingly deferential' and provides the reviewing court with limited discretion to reverse an agency's decision." *City of N. Miami v. FAA*, 47 F.4th 1257, 1266 (11th Cir. 2022) (citation omitted); *see Nat'l Mining Ass'n v. United Steel Workers*, 985 F.3d 1309, 1321 (11th Cir. 2021) (noting that arbitrary and capricious review "presumes the validity of agency action"). A court must "simply ensure[] that the agency has acted within a zone of reasonableness," *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021), and the court may not "substitute [its] judgment for the agency's as long as" the latter's "conclusions are rational," *Miccosukee Tribe of Indians of Fla. v. United*

*States*, 566 F.3d 1257, 1264 (2009). An agency decision accordingly must be upheld so long as it is "reasonable and reasonably explained." *FCC*, 592 U.S. at 423.

Plaintiffs argue that the Rule represents a "radical, 180-degree departure from ATF's longstanding position regarding the legality of private, non-commercial transactions." Pls.' Br. 29. They also contend that ATF has not "adequately acknowledge[d]" that it has changed its position and that the Rule's "preamble does not explain the disconnect between ATF's past policies and new position." *Id.* First, the reach of the GCA was changed by the BSCA as it related to persons engaged in the business, so even if the Rule in fact demonstrated a departure from ATF's prior interpretation of the statute it would not constitute an arbitrary revision as Plaintiffs claim. Second, to the extent ATF's position changed, any change was not to the agency's substantive view of what conduct the GCA prohibits, but only to whether the previous version of the GCA identified that prohibited conduct sufficiently clearly on its face. *See id.* at 29; *see infra*, pp. 57-58 (explaining the justification for promulgating the Rule). Third, a change in agency policy requires only that the agency "display awareness that it *is* changing position" and that "the new policy is permissible under the statute, that there are good reasons for it, and that the agency *believes* it to be better." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). ATF easily satisfied this standard when issuing the Rule.

Indeed, in the Rule's preamble, ATF explained what aspects of the Rule

differed from past practice and the reasons for those changes. For instance, ATF acknowledged that it had not previously promulgated a regulation providing a detailed definition of "engaged in the business" of dealing, and in fact decided not to do so in 1980. *See* 89 Fed. Reg. at 28,969-70. Yet ATF concluded that the Rule was necessary, in part, "[t]o implement the new statutory language in the BSCA," *id.* at 28,972, which expanded the statutory definition of being "engaged in the business." *See id.* at 29,010 (noting that the Rule "updates ATF's regulations in accordance with the BSCA's new statutory definition of when a person is considered to be 'engaged in the business' and makes other related changes"). ATF further explained that the Rule was necessary to "provide clarity" as to when a federal firearms license is required and to "deter" unlawful unlicensed dealing, given that "ATF observed a significant level of noncompliance with the GCA's licensing requirements even prior to the BSCA." 89 Fed. Reg. at 28,968, 29,086.[34]  ATF also determined that the Rule would "improve public safety by helping to prevent persons who are prohibited from possessing firearms under Federal law from acquiring [them] and allowing law enforcement officers to trace firearms involved in crime." *Id.* at 28,987. By citing to such valid regulatory objectives, ATF more than

---

[34] *See also* 89 Fed. Reg. at 28,973 ("[S]ince 1968, advancements in manufacturing (*e.g.*, 3D printing) and distribution technology (*e.g.*, internet sales) and changes in the marketplace for firearms and related products (*e.g.*, large-scale gun shows) have increased the ways in which individuals shop for firearms, and therefore have created a need for further clarity in the regulatory definition of 'dealer.'" (citing the NPRM)).

adequately justified the changes reflected in the Rule. *See FCC*, 592 U.S. at 423 ("A court simply ensures that the agency . . . has reasonably considered the relevant issues and reasonably explained the decision."); *see also Licon v. Ledezma*, 638 F.3d 1303, 1311 (10th Cir. 2011) (concluding that a regulation was not arbitrary and capricious because the agency reasonably explained that it promoted public safety).

Additionally, ATF explicitly acknowledged that the Rule would lead to an increase in the number of firearms sellers who would become licensed and an attendant decrease in the total number of private firearms sellers, as some would elect to leave the market entirely rather than obtain a license. *See* 89 Fed. Reg. at 28,998, 29,071-72. ATF explained in detail how the Rule might affect firearms "accumulated primarily for personal protection," 27 C.F.R. § 478.11. *See* 89 Fed. Reg. at 29,037-40. ATF also meticulously estimated the costs of the Rule, *id.* at 29,070-82, and concluded that those costs were outweighed by the Rule's substantial benefits, including "significant public safety benefits," *id.* at 29,082-86.

In the face of the statutory change, the Rule's modest changes, and ATF's careful consideration and explanation, Plaintiffs' unsupported assertion that ATF does not have "good reasons" for the Rule cannot possibly carry their burden to demonstrate the Rule is an arbitrary and capricious change of position.

## C.    The Rule is Not Unconstitutionally Vague

Plaintiffs fail to show that the Rule is vague, let alone unconstitutionally so.

Under the Fifth Amendment's Due Process Clause, a statute or regulation is unconstitutionally vague only if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *United States v. Woods*, 684 F.3d 1045, 1057 (11th Cir. 2012) (citation omitted). To succeed on a facial vagueness challenge—which Plaintiffs bring here—"the challenger must establish that no set of circumstances exists under which" the law being challenged "would be valid." *SisterSong Women of Color Reprod. Just. Collective v. Governor of Ga.*, 40 F.4th 1320, 1327 (11th Cir. 2022) (citation omitted). That is, "the possibility of a valid application" of the law "necessarily precludes facial invalidity." *Id.*

Plaintiffs do not even attempt to meet this "demanding standard." *Id.* The Rule, for one, defines "engaged in the business" and "predominantly earn a profit"—two terms which determine whether a person must obtain a federal license—consistently with the GCA, the clarity of which Plaintiffs do not challenge. Far from being vague, the Rule provides even more clarity than the statute by setting forth specific circumstances that give rise to presumptions that a person is "engaged in the business" of dealing in firearms or has the predominant intent to earn a profit, while also setting forth specific types of conduct that do not constitute being "engaged in the business" of dealing and can be used to rebut the Rule's presumptions.

Plaintiffs contend, only in very general terms, that the Rule is impermissibly vague because it is a "fact-specific inquiry . . . riddled with exceptions, presumptions rebuttable by undefined 'reliable' evidence to the contrary, and declarations that certain conduct 'may' (or may not) require a license." Pls.' Br. 29. The mere fact that the Rule contains exceptions, like many other statutes and regulations, does not establish unconstitutional vagueness. As explained above, Plaintiffs do not assert that any specific presumption is impermissibly vague or otherwise improper. They fail to explain how a presumption being *rebuttable* speaks to whether the facts and inferences the presumption encompasses are unconstitutionally vague. *See SisterSong*, 40 F.4th at 1327 ("The inquiry into whether a statute is vague looks only to whether the language of the law itself is vague." (cleaned up)); *cf. United States v. Williams*, 553 U.S. 285, 306 (2008) ("What renders a statute vague is not the possibility that it will sometimes be difficult to determine whether the incriminating fact it establishes has been proved; but rather the indeterminacy of precisely what that fact is."). And the categories of conduct that can be used to rebut the Rule's presumptions are also spelled out in clear detail. *See*, *e.g.*, 27 C.F.R. § 478.13(e) (listing "reselling or otherwise transferring firearms" "[a]s bona fide gifts" or "[o]ccasionally to a licensee or to a family member for lawful purposes"). Plaintiffs' suggest that they are confused about what else might constitute "reliable evidence" sufficient to rebut the presumptions, but "[t]he plain meaning of [a word] is definite

enough to give notice to ordinary citizens . . . ." *See League of Women Voters of Fla. Inc. v. Fla. Sec'y of State*, 66 F.4th 905, 946 (11th Cir. 2023).

As for whether certain conduct may or may not be conclusively identified as requiring a license or not in the Rule, "[a] statute is not unconstitutionally vague for failing to describe explicitly" the full range of ways "in which [it] can be violated." *Woods*, 684 F.3d at 1059. If certain firearms-related conduct is not explicitly described by the Rule, determining whether that conduct amounts to being "engaged in the business" would simply require referring back to the Rule's general definition of that term—namely, whether a person "devotes time, attention, and labor to dealing in firearms as a regular course of trade or business to predominantly earn a profit through the repetitive purchase and resale of firearms." 27 C.F.R. § 478.13(a). That definition is materially identical to the GCA's—which again, Plaintiffs do not challenge on vagueness grounds.

### D.    The Rule Comports with the Second Amendment

Plaintiffs Second Amendment challenge to the Rule is meritless. *See* Pls.' Br. 30-32. In *District of Columbia v. Heller*, the Supreme Court made clear that "longstanding . . . laws imposing conditions and qualifications on the commercial sale of arms" are "presumptively lawful regulatory measures." 554 U.S. 570, 626-27, 627 n.26 (2008). And the Court's decision in *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022), "did nothing to disturb that part of *Heller*." *McRorey v.*

*Garland*, 99 F.4th 831, 836 (5th Cir. 2024). More recently, the Court explained that "the Second Amendment permits more than just those regulations identical to ones that could be found in 1791," so long as a "challenged regulation is consistent with the principles that underpin our regulatory tradition." *United States v. Rahimi*, 602 U.S. 680, 692 (2024).

*Bruen* itself affirmed the constitutionality of "'shall-issue' licensing regimes," under which the right to carry weapons is conditioned on passing a "background check" and obtaining a license. *Bruen*, 597 U.S. at 38 n.9; *see also id.* at 80 (Kavanaugh, J., concurring). If it is permissible to require a license to *bear* arms—a right expressly listed in the Second Amendment—there is no reason that it would violate the Second Amendment to require a license to *deal* firearms, an activity not mentioned in the text. *See McRorey*, 99 F.4th at 836-37 ("*Bruen* continued to distinguish the treatment of prohibitions on 'keep[ing] and bear[ing]'" from "other ancillary firearm regulations such as background checks preceding sale").

Furthermore, Plaintiffs' Second Amendment claim is foreclosed by binding Eleventh Circuit precedent, which has rejected a Second Amendment challenge to federal licensing requirements. *See Focia*, 869 F.3d at 1284 (rejecting a Second Amendment challenge to 18 U.S.C. § 922(a)(5) and explaining that § 922(a)(1)(A) "qualifies as the kind of 'presumptively lawful regulatory measure[]' described in *Heller*"). Plaintiffs have previously questioned whether *Focia* remains good law

after *Bruen* and *Rahimi*. *See* ECF No. 8, Pls.' PI Brief, at 54-55. But under the Eleventh Circuit's "prior-panel-precedent rule[,] a prior panel's holding is binding on all subsequent panels unless and until it is overruled or undermined to the point of abrogation by the Supreme Court or by [the Eleventh Circuit] sitting *en banc*." *United States v. Dubois*, 94 F.4th 1284, 1293 (11th Cir. 2024) (cleaned up), *docketing petition for cert.*, No. 24-5744 (U.S. Oct. 10, 2024). Neither *Bruen* nor *Rahimi* discussed *Focia* or commented explicitly on the constitutionality of licensing requirements for firearms dealing. If anything, *Bruen*'s endorsement of background checks supports *Focia*. *See Bruen*, 597 U.S. at 38 n.9.

Nor did *Bruen* or *Rahimi* undermine the Eleventh Circuit's continued reliance on *Heller*'s instruction that certain firearms regulations are "presumptively lawful." 554 U.S. at 627 n.26. For instance, after *Heller*, the Eleventh Circuit relied on that language to uphold another category of presumptively lawful firearms regulations—namely, bans on felons possessing firearms. *United States v. Rozier*, 598 F.3d 768, 770-71 (11th Cir. 2010). The court later held that neither *Bruen* or *Rahimi* abrogated *Rozier* or undermined "*Rozier*'s reliance on" *Heller*'s "presumptively lawful" language. *Dubois*, 94 F.4th at 1293; *see also United States v. Hester*, No. 23-11938, 2024 WL 4100901, at *1 (11th Cir. Sept. 6, 2024) (per curiam).[35]  This reasoning

---

[35] Plaintiffs criticize *Dubois* and *Hester* as purportedly showing that "[t]he Eleventh Circuit has been slow to embrace *Bruen*." Pls.' Br. 30. But the Eleventh Circuit carefully explained why its

applies with equal force to *Focia*, which also relied on *Heller*'s "presumptively lawful" language and was not abrogated by *Bruen* or *Rahimi*.

Even if Plaintiffs' Second Amendment claim were not squarely foreclosed by circuit precedent, the result would be the same. Both before and after *Bruen*, courts have regularly rejected arguments that the Second Amendment precludes regulation of those engaged in the business of dealing firearms. *See, e.g.*, *Teixeira v. Cnty. of Alameda*, 873 F.3d 670 (9th Cir. 2017) (en banc); *United States v. Flores*, 652 F. Supp. 3d 796 (S.D. Tex. 2023).[36]  Plaintiffs, moreover, cite no case law supporting their contention that the Second Amendment confers an unfettered right to "sell[]" or "trad[e]" arms without a license. Pls.' Br. 30. They cite *Ezell v. City of Chicago*, 651 F.3d 684, 704 (7th Cir. 2011), but that inapposite case merely held that the Second Amendment protected a right to practice shooting at a firing range.

Plaintiffs argue that a mere "hind[rance]" on the ability to engage in firearms transactions necessarily infringes on that person's Second Amendment rights. Pls.' Br. 30-31. Yet multiple circuit courts have recently—and correctly—rejected such a contention. *See McRorey*, 99 F.4th at 839-40 (upholding federal background check

---

precedent was consistent with *Bruen*. *See Dubois*, 94 F.4th at 1292-93. In any event, regardless of Plaintiffs' criticisms, Eleventh Circuit precedent is binding here.

[36] *See also United States v. Duncan*, No. 7:20-cr-00167-M-3, 2023 WL 7346042, at *3 (E.D.N.C. Nov. 7, 2023) ("[I]mpos[ing] a condition, namely licensing, on firearms commerce . . . does not violate the Second Amendment"); *United States v. King*, 646 F. Supp. 3d 603, 607 (E.D. Pa. 2022) ("[T]he Second Amendment does not protect the *commercial* dealing of firearms"); *United States v. McNulty*, 684 F. Supp. 3d 14, 18 (D. Mass. 2023); *United States v. Tilotta*, No. 3:19-cr-04768-GPC, 2022 WL 3924282, at *5 (S.D. Cal. Aug. 30, 2022).

requirements because the "law is plain as can be that some amount of time for background checks is permissible").[37]

Moreover, the Rule's modest requirements for commercial firearms sales are "consistent with the principles that underpin our regulatory tradition." *Rahimi*, 602 U.S. at 692. As ATF explained, "there is a robust historical tradition supporting the Government's authority to require licenses and inspection of firearms sellers." 89 Fed. Reg. at 29,002. In 1794, for example, Congress temporarily made it unlawful "to export from the United States any cannon, muskets, pistols, bayonets, swords, cutlasses, musket balls, lead, bombs, grenades, gunpowder, sulpher, or saltpetre," Act of May 22, 1794, 1 Stat. 369, ch. 33, § 1, making clear that the Founding generation believed that it was permissible to regulate arms sales.

Colonies and states in the early republic also regulated firearms commerce. For instance, at different times between 1651 and 1809, Massachusetts, Connecticut, and New Jersey all required licenses or inspection to export or sell gunpowder, which was necessary to operate a firearm.[38]   An 1805 Massachusetts law and an

---

[37] *See also Md. Shall Issue, Inc. v. Moore*, 116 F.4th 211, 226-27 (4th Cir. 2024) (en banc) (upholding a state shall-issue licensing law requiring a person to pass a background check and obtain a license before purchasing a handgun and rejecting the argument that "*any* delay resulting from compliance" with the law "qualifies as [an] 'infringement'" of Second Amendment rights), *petition for cert. filed*, 24-373 (U.S. Sept. 27, 2024).

[38] *See* Colonial Laws of Massachusetts Reprinted from the Edition of 1672, at 126, Powder (1890) (1651 statute requiring a license to export gunpowder); 2 General Laws of Massachusetts from the Adoption of the Constitution to February, 1822, at 198-200, ch. 52, An Act Providing for the Appointment of Inspectors, and Regulating the Manufactory of Gun-Powder, secs. 1, 8 (1823) (1809 statute providing for the appointment of an "inspector of gunpowder for every public

1821 Maine law required pistol barrels to be "proved," meaning inspected and marked, before they could be sold.[39]   In concluding that "[t]he historical record confirms that the right to sell firearms was not within the 'historical understanding of the scope of the [Second Amendment] right,'" *Teixeira*, 873 F.3d at 683 (citations omitted), the Ninth Circuit also cited additional historical materials showing that many colonies enacted restrictions on commercial sales of firearms to Indians, and Connecticut and Virginia "controlled more generally where colonial settlers could transport or sell guns," *id.* at 685. These historical laws confirm that the government can lawfully regulate commerce in firearms and related products such as ammunition and gunpowder. The Rule's modest licensing requirements—which implement the GCA and BSCA—"fit[] comfortably within this tradition." *Rahimi*, 602 U.S. at 690.

---

powder magazine, and at every manufactory of gunpowder'' and imposing penalties for any sale or export of gunpowder ''before the same has been inspected and marked''); 15 The Public Records of the Colony of Connecticut, from May, 1775, to June, 1776, Inclusive 191, An Act for Encouraging the Manufactures of Salt Petre and Gun Powder (1890) (1775 Connecticut law establishing, among other things, that no gunpowder manufactured in the colony ''shall be exported out'' of the colony ''without [an applicable] licence''); Acts of the General Assembly of the State of New-Jersey, at a Session Begun at Princeton on the 27th Day of August 1776, and Continued by Adjournments 6, ch. 6, An Act for the Inspection of Gun-Powder, § 1 (1877) ("No person shall offer any gunpowder for sale ''without being previously inspected and marked as is herein after directed.''); *see also* Laws of the State of New Hampshire; With the Constitutions of the United States and of the State Prefixed 276-78, An Act to Provide for the Appointment of Inspectors and Regulating the Manufactory of Gunpowder, secs. 1, 8 (1830) (authorizing ''inspector of gunpowder for every public powder magazine, and at every manufactory of gunpowder in this state'' and imposing penalties for any sale or disposition of gunpowder ''before the same has been inspected and marked'').

[39] *See* 3 Laws of the Commonwealth of Massachusetts, from November 28, 1780, to February 28, 1807, at 259–61 (1807); 1 Laws of the State of Maine 546 (1830).

Plaintiffs argue that the Rule is unconstitutional because there is no historical example of precisely the same type of regulation, and each historical regulation on firearms commerce cited by ATF differs from the Rule in some way. *See* Pls.' Br. 31-32. Plaintiffs engage in the same sort of "misunderst[anding]" of "the methodology of [the Supreme Court's] recent Second Amendment cases" that the Court decried in *Rahimi*. 602 U.S. at 691. Those precedents, the Court explained, "were not meant to suggest a law trapped in amber." *Id.* Rather, "the Second Amendment permits more than just those regulations identical to ones that could be found in 1791," so long as a "challenged regulation is consistent with the principles that underpin our regulatory tradition." *Id.* at 691-92.

### E.    Plaintiffs' Separation-of-Powers Claim Lacks Merit

Plaintiff argues that the Rule has improperly invaded Congress's purview by criminalizing conduct not made illegal by the GCA. *See* Pls.' Br. 32. As explained in detail *supra*, pp. 31-54, the Rule does not change what conduct meets the definition of "engaged in the business" in the GCA. Regardless of the Rule's application, ATF, and courts, must still determine that all elements of the statute are satisfied at the applicable standard of proof to impose criminal or other liability. This claim attempts to repackage Plaintiffs' statutory claim that the Rule violates the GCA as a constitutional one and should therefore be rejected. *See Nw. Austin Mun. Util. Dist. No. One v. Holder*, 557 U.S. 193, 205 (2009).

67

### III.  Any Relief Should Be Appropriately Limited

If the Court disagrees with Defendants' arguments, any relief should be no broader than necessary to remedy the demonstrated harms of any Plaintiffs found to have standing. "A plaintiff's remedy must be tailored to redress the plaintiff's particular injury." *Gill v. Whitford*, 585 U.S. 48, 73 (2018). Much of the relief sought by Plaintiffs is impermissible or overbroad.

Plaintiffs seek universal vacatur of the Rule, citing 5 U.S.C. § 706(2). Pls.' Br. 32-33. But that provision for courts to "set aside" unlawful agency actions, 5 U.S.C. § 706(2), does not authorize universal vacatur. The "set aside" language in § 706(2) should not be read as authorizing remedies, which are governed by § 703 of the APA. Section 703 states that the APA generally authorizes "any applicable form of legal action, including actions for declaratory judgments or writs of prohibitory or mandatory injunction or habeas corpus." *Id.* § 703. Therefore, only traditional equitable relief is available. Indeed, three Justices have declared themselves "skeptical" that the APA permits universal vacatur and stated that the issue "is worth a closer look." *United States v. Texas*, 599 U.S. 670, 695 (2023) (Gorsuch, J., concurring in the judgment) (joined by Justices Thomas and Barrett). Plaintiffs cite *Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Engineers*, 781 F.3d 1271 (11th Cir. 2015), but that case considered vacatur of an order granting a permit, not universal vacatur of a regulation. The court stated that courts have

"equitable discretion" to fashion appropriate remedies short of vacatur. *Id.* at 1290. At a minimum, universal vacatur is not required by the APA.

Plaintiffs also seek a permanent injunction. Pls.' Br. 33-35. But Plaintiffs acknowledge that irreparable harm is required for injunctive relief. *Id.* at 34. For the same reasons that Plaintiffs have not shown any injury-in-fact, *see supra*, pp. 18-30, they have not shown irreparable injury. *See also* Order at 36-37 (concluding that Plaintiffs had not shown irreparable harm at the preliminary injunction stage).[40]

Further, the Court should not award nationwide or universal relief in any form, but should limit any relief to the Plaintiffs. Only in "rare" circumstances are nationwide injunctions "appropriate." *Georgia*, 46 F.4th at 1304 (quoting *Florida v. HHS*, 19 F.4th 1271, 1281-82 (11th Cir. 2021)). Nationwide injunctions "frustrate [the] end" of the "federal court system" to "allow[] courts to reach multiple answers to the same legal question," which is "helpful" to "the development of important questions of law." *Id.* (citation omitted). That concern is especially salient here, where four lawsuits have been filed challenging the Rule in different jurisdictions, two of which are in the courts of appeals. *See supra*, pp. 13-14. Furthermore, 21 states and the District of Columbia have filed an amicus brief arguing that the Rule is lawful and promotes public safety in their states.[41]  A nationwide injunction would

---

[40] Defendants do not dispute that if the Court finds that Plaintiffs have standing and rules for them on the merits, a declaratory judgment in Plaintiffs' favor would be appropriate. *See* Pls.' Br. 33.
[41] Brief for State of New York *et al.*, *Texas v. ATF*, No. 24-10612 (5th Cir. Sept. 24, 2024).

give those "States victories they do not want." *Arizona v. Biden*, 40 F.4th 375, 396 (6th Cir. 2022) (Sutton, C.J., concurring). Those concerns apply fully to universal vacatur, which would similarly preclude implementation of the Rule nationwide.

Finally, any relief in this case should apply only to those aspects of the rule that Plaintiffs have standing to challenge and that the Court holds unlawful. A regulation is severable where severance would "not impair the function of the statute as a whole, and there is no indication that the regulation would not have been passed but for its inclusion." *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 294 (1988) (invalidating only the provision of a regulation that exceeded the agency's statutory authority). The Final Rule's clear statement that the Rule is intended to be severable, 89 Fed. Reg. at 29,070, creates a presumption of severability. *Alaska Airlines, Inc. v. Brock*, 480 U.S. 678, 686 (1987). This is not mere "boilerplate," Pls.' Br. 35, but rather reflects ATF's considered judgment that the Rule can operate meaningfully even if specific provisions are invalidated. If the Court concludes that specific provisions are unlawful, the Court should limit any relief to those provisions.

## CONCLUSION

The Court should deny Plaintiffs' Motion for Summary Judgment, grant Defendants' Cross-Motion for Summary Judgment, and enter judgment in favor of Defendants.

Dated: January 3, 2025

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

LESLEY FARBY
Deputy Director, Federal Programs Branch

*/s/ Keri L. Berman*
KERI L. BERMAN
JEREMY S.B. NEWMAN
ZACHARY W. SHERWOOD
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, DC 20005
keri.l.berman@usdoj.gov
(202) 305-7538

*Counsel for Defendants*

## **CERTIFICATE OF SERVICE**

On January 3, 2024, I electronically submitted the foregoing document with the clerk of court for the U.S. District Court, Northern District of Alabama, using the electronic case filing system of the court. I hereby certify that I have served all parties electronically or by another manner authorized by Federal Rule of Civil Procedure 5(b)(2).

*/s/ Keri L. Berman*
KERI L. BERMAN
Trial Attorney
U.S. Department of Justice

72