# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## EASTERN DIVISION

**DON BUTLER, et al.,**
    Plaintiffs,

**v.**

**PAMELA BONDI,** *in her
official capacity as Attorney General
of the United States*, **et al.,**
    Defendants.

**Case No. 1:24-cv-975-CLM**

## <u>MEMORANDUM OPINION</u>

Congress makes it unlawful for anyone "except a licensed importer, licensed manufacturer, or licensed dealer, to engage in the business of importing, manufacturing, or dealing in firearms." 18 U.S.C. § 922(a)(1)(A). There are costs to being a licensed dealer, such as application and renewal fees, conducting background checks on prospective buyers, maintaining records for tracing, and ATF compliance inspections. But the cost of dealing firearms ***without*** a license are far worse: Up to five years in prison, fines of up to $250,000, and the loss of certain rights—such as the right to possess a firearm. *See* 18 U.S.C. §§ 924(a)(1)(D); 922(g)(1).

Suffice it to say, it's important that gunowners know whether they are "engaged in the business of" dealing firearms. Don Butler and David Glidewell sometimes buy, sell, and trade guns for their personal collections. They argue that Congress does not consider them to be engaged in the firearms business, but the Bureau of Alcohol, Tobacco, and Firearms ("ATF") does—if ATF follows its 2024 Final Rule interpretation of Congress's firearms statutes:



Congress' definition of "engaged in the business"

Final Rule's interpretation of "engaged in the business"

Butler and Glidewell say they fit within the expanded coverage created by the Final Rule, and their fear that the Final Rule criminalizes their dealings unless they secure a dealer's license has stymied their plans to buy, sell, and

trade with acquaintances and persons they meet at local gun shows. So Butler, Glidewell, and the National Rifle Association ("NRA") sue Attorney General Pam Bondi, ATF Director Daniel Driscoll, the ATF, and the Department of Justice and ask this court to "hold unlawful and set aside" the ATF's "engaged in the business" Final Rule on several grounds. *See* 5 U.S.C. § 706(2).

The parties have cross-moved for summary judgment. (*See* Docs. 21, 23). As explained within, the court agrees with Plaintiffs that ATF exceeded its authority when it issued the Final Rule and thus **GRANTS** Plaintiffs' motion for summary judgment on Count 1 and **DENIES** Defendants' motion on Count 1. Because the court sets aside the Final Rule under Count 1, the court **DENIES WITHOUT PREJUDICE** the parties' motions for summary judgment on all other counts and **SETS** a telephone status conference to discuss the parties' position on the remaining counts. That call will start at 10:30 AM Central on October 14, 2025.

# I.

## BACKGROUND

Congress makes laws that regulate the trading of firearms. Subject to Attorney General oversight, Congress gave ATF the authority to investigate, administer, and enforce Congress's gun laws. *See* 28 U.S.C. § 599A(b)(1), (c)(1); 28 C.F.R. § 0.130(a)(1)(2). To help administer Congress's gun laws, ATF sometimes issues Final Rules that interpret gun-related statutes.

This case hinges on whether ATF's interpretation of the phrase "engaged in the business … of dealing in firearms" in a 2024 Final Rule is broader than the definition Congress gave that phrase in statutes. If it is, the court must set aside the Final Rule's broader definition because it exceeds ATF's statutory authority and could lead to the investigation or prosecution of unlicensed dealings that Congress did not criminalize.

The court thus starts its background section by explaining how Congress defines "engaged in the business." The court then discusses the Final Rule's interpretation of Congress' definition and how Plaintiffs say that interpretation injures them.

### A.    Statutory + Regulatory Background

In 1968, Congress enacted the Gun Control Act ("GCA"), which makes it unlawful for anyone without a license "to engage in the business of . . . dealing in firearms." 18 U.S.C. § 922(a)(1)(A). Though the GCA imposed severe consequences for violating this requirement, neither the GCA nor any ATF regulation defined "engaged in the business."

Congress amended the GCA with the Firearms Owners' Protection Act of 1986 ("FOPA"). FOPA modified the GCA by defining what the term "engaged in the business" means:

> [A]s applied to a dealer in firearms, . . . a person who devotes time, attention, and labor to dealing in firearms as a regular course of trade or business with the principal objective of livelihood and profit through the repetitive purchase and resale of firearms, but such term shall not include a person who makes occasional sales, exchanges, or purchases of firearms for the enhancement of a personal collection or for a hobby, or who sells all or part of his personal collection of firearms[.]

Pub. L. 99-308, § 1(b), 100 Stat. 449, 450 (May 19, 1986) (codified at 18 U.S.C. § 921(a)(21)(C)).

FOPA also defined "with the principal objective of livelihood and profit" to mean "that the intent underlying the sale or disposition of firearms is predominantly one of obtaining livelihood and pecuniary gain, as opposed to other intents, such as improving or liquidating a personal firearms collection." *Id.* (codified at 18 U.S.C. § 921(a)(22)). A few months later, Congress amended the definition of "with the principal objective of livelihood and profit" by inserting this provision at the end of the definition:

> *Provided*, That proof of profit shall not be required as to a person who engages in the regular and repetitive purchase and disposition of firearms for criminal purposes or terrorism.

18 U.S.C. § 921(a)(22).

After FOPA's enactment, ATF issued regulations that mirrored Congress's definitions of "engaged in the business" and "principal objective of livelihood and profit." 53 Fed. Reg. 10480, 10491 (Mar. 31, 1988). But ATF did not "list examples illustrating when a license is required" because it found "the definition adequately addresses this concern by expressly delineating the activity requiring licensing from that of a firearms collector not subject to licensing." *Id.* at 10481.

In response to several deadly mass shootings, Congress passed the Bipartisan Safer Communities Act of 2022. This Act modified the definition of "engaged in the business" by replacing the phrase "with the principal objective of livelihood and profit" with "to predominately earn a profit." Pub. L. 117-159, 136 Stat. 1313, 1324 (2022). So a dealer is now "engaged in the business" of selling firearms if he is:

> [A] person who devotes time, attention, and labor to dealing in firearms as a regular course of trade or business to predominantly earn a profit through the repetitive purchase and resale of firearms, but such term shall not include a person who makes occasional sales, exchanges, or purchases of firearms for the enhancement of a personal collection or for a hobby, or who sells all or part of his personal collection of firearms.

18 U.S.C. § 921(a)(21)(C) (highlight added). Congress also altered § 921(a)(22) to say:

> The term "to predominantly earn a profit" means that the intent underlying the sale or disposition of firearms is predominately one of obtaining pecuniary gain, as opposed to other intents, such as improving or liquidating a personal firearms collection: *Provided*, That proof of profit shall not be required as to a person who engages in the regular and repetitive purchase and disposition of firearms for criminal purposes or terrorism.

18 U.S.C. § 921(a)(22) (highlights added).

**B.    "Engaged in the Business" Final Rule**

Following enactment of the Bipartisan Safer Communities Act, ATF promulgated the Final Rule at issue to "clarif[y] what it means for a person to be 'engaged in the business' of dealing in firearms and to have the intent to 'predominantly earn a profit' from the sale or disposition of firearms." 89 Fed. Reg. 28968, 28969 (Apr. 19, 2024).

Plaintiffs challenge several aspects of the Final Rule. First, Plaintiffs challenge the Final Rule's assertion that there is no minimum threshold number of firearms purchased or sold or minimum number of transactions that triggers the licensing requirements:

> (b) Fact-specific inquiry. Whether a person is engaged in the business as a dealer under paragraph (a) of this section is a fact-specific inquiry. Selling large numbers of firearms or engaging or offering to engage in frequent transactions may be highly indicative of business activity. However, there is no minimum threshold number of firearms purchased or sold that triggers the licensing requirement. Similarly, there is no minimum number of transactions that determines whether a person is "engaged in the business" of dealing in firearms. For example, even a single firearm transaction or offer to engage in a transaction, when combined with other evidence (*e.g.*, where a person represents to others a willingness and ability to purchase more firearms for resale), may require a license; whereas, a single isolated firearm transaction without such evidence would not require a license. At all times, the determination of whether a person is engaged in the business of dealing in firearms is based on the totality of the circumstances.

27 C.F.R. § 478.13(b) (highlight added).

Plaintiffs also challenge ATF's definition of predominantly earn a profit, which says that obtaining a pecuniary gain isn't required for someone to be considered a firearms' dealer:

(d) Predominantly earn a profit—

(1) Definition. The intent underlying the sale or disposition of firearms is predominantly one of obtaining pecuniary gain, as opposed to other intents, such as improving or liquidating a personal firearms collection: *Provided,* that proof of profit, including the intent to profit, shall not be required as to a person who engages in the regular and repetitive purchase and disposition of firearms for criminal purposes or terrorism. For purposes of this section, a person may have the intent to profit even if the person does not actually obtain the intended pecuniary gain from the sale or disposition of firearms.

27 C.F.R. § 478.13(d)(1) (highlight added).

And Plaintiffs say that ATF's definition of "personal collection" eradicates the safe harbor for personal collections of firearms found in 18 U.S.C. § 921(a)(21)(C) by excluding firearms accumulated primarily for personal protection from this definition:

Personal collection (or personal collection of firearms, or personal firearms collection)—

(1) General definition. Personal firearms that a person accumulates for study, comparison, exhibition (*e.g.*, collecting curios or relics, or collecting unique firearms to exhibit at gun club events), or for a hobby (*e.g.*, noncommercial, recreational activities for personal enjoyment, such as hunting, skeet, target, or competition shooting, historical re-enactment, or noncommercial firearms safety instruction). The term shall not include any firearm purchased for the purpose of resale with the predominant intent to earn a profit (*e.g.*, primarily for a commercial purpose or financial gain, as distinguished from personal firearms a person accumulates for study, comparison, exhibition, or for a hobby, but which the person may also intend to increase in value). In addition, the term shall not include firearms accumulated primarily for personal protection: *Provided*, that nothing in this definition shall be construed as

> precluding a person from lawfully acquiring firearms for self-protection or other lawful personal use.

27 C.F.R. § 478.11 (highlights added).

Finally, Plaintiffs say that three sets of presumptions for civil and administrative proceedings created by the Final Rule are atextual. First, Plaintiffs challenge the Final Rule's presumption that "absent reliable evidence to the contrary," a person is "presumed to be engaged in the business of dealing in firearms" when it is shown that the person:

> (1) Resells or offers for resale firearms, and also represents to potential buyers or otherwise demonstrates a willingness and ability to purchase and resell additional firearms (*i.e.*, to be a source of additional firearms for resale);
>
> (2) Repetitively purchases for the purpose of resale, or repetitively resells or offers for resale, firearms—
>
> (i) Though straw or sham businesses, or individual straw purchasers or sellers; or
>
> (ii) That cannot lawfully be purchased, received, or possessed under Federal, State, local or Tribal law, including:
>
> > (A) Stolen firearms (*e.g.*, 18 U.S.C. § 922(j));
> >
> > (B) Firearms with the licensee's serial number removed, obliterated, or altered, or not identified as required by law (*e.g.*, 18 U.S.C. 922(k) or 26 U.S.C. 5861(i));
> >
> > (C) Firearms imported in violation of law (*e.g.*, 18 U.S.C. 922(l), 22 U.S.C. 2278, or 26 U.S.C. 5844, 5861(k)); or
> >
> > (D) Machineguns or other weapons defined as firearms under 26 U.S.C. 5845(b) that cannot lawfully be possessed (*e.g.*, 18 U.S.C. 922(o); 26 U.S.C. 5861(d));
>
> (3) Repetitively resells or offers for resale firearms—
>
> (i) Within 30 days after the person purchased the firearms; or

> (ii) Within one year after the person purchased the firearms if they are—
>
>> (A) New, or like new in their original packaging; or
>>
>> (B) The same make and model, or variants thereof;
>
> (4) As a former licensee (or responsible person acting on behalf of the former licensee), resells or offers for resale to a person (other than a licensee in accordance with § 478.57 or § 478.78) firearms that were in the business inventory of the former licensee at the time the license was terminated (*i.e.*, license revocation, denial of license renewal, license expiration, or surrender of license), whether or not such firearms were transferred to a responsible person of the former licensee after the license was terminated in accordance with § 478.57(b)(2) or § 478.78(b)(2); or
>
> (5) As a former licensee (or responsible person acting on behalf of the former licensee), resells or offers for resale firearms that were transferred to the licensee's personal collection or otherwise as personal firearms in accordance with 18 U.S.C. 923(c) and 27 CFR 478.125a(a) prior to the time the license was terminated, unless:
>
> (i) The firearms were received and transferred without any intent to willfully evade the restrictions placed on licensees by 18 U.S.C. chapter 44; and
>
> (ii) One year has passed from the date of transfer to the licensee's personal collection or otherwise as personal firearms.

27 C.F.R. § 478.13(c).

Next, Plaintiffs challenge the Final Rule's presumption that "absent reliable evidence to the contrary," a person is presumed "to have the intent to predominantly earn a profit through the repetitive purchase and resale of firearms" when it is shown that the person:

(i) Repetitively or continuously advertises, markets, or otherwise promotes a firearms business (*e.g.*, advertises or posts firearms for resale, including through the internet or other digital means, establishes a website to offer their firearms for resale, makes available business cards, or tags firearms with sales prices), regardless of whether the person incurs expenses or only promotes the business informally;

(ii) Repetitively or continuously purchases, rents, or otherwise exchanges (directly or indirectly) something of value to secure permanent or temporary physical space to display firearms they offer for resale, including part or all of a business premises, a table or space at a gun show, or a display case;

(iii) Makes and maintains records to document, track, or calculate profits and losses from firearms repetitively purchased for resale;

(iv) Purchases or otherwise secures merchant services as a business (***e.g.***, credit card transaction services, digital wallet for business) through which the person intends to repetitively accept payments for firearm transactions;

(v) Formally or informally purchases, hires, or otherwise secures business security services (***e.g.***, a central station-monitored security system registered to a business, or guards for security) to protect firearm assets and repetitive firearms transactions;

(vi) Formally or informally establishes a business entity, trade name, or online business account, including an account using a business name on a social media or other website, through which the person makes, or offers to make, repetitive firearms transactions; or

> (vii) Secures or applies for a State or local business license to purchase for resale or to resell merchandise that includes firearms.

27 C.F.R. § 478.13(d)(2).

Finally, Plaintiffs challenge the Final Rule's presumption that a person shouldn't "be presumed to be engaged in the business of dealing in firearms when reliable evidence shows that the person is only reselling or otherwise transferring firearms":

> (1) As bona fide gifts;
> (2) Occasionally to obtain more valuable, desirable, or useful firearms for the person's personal collection;
> (3) Occasionally to a licensee or to a family member for lawful purposes;
> (4) To liquidate (without restocking) all or part of the person's personal collection; or
> (5) To liquidate firearms—
> (i) That are inherited; or
> (ii) Pursuant to a court order; or
> (6) To assist in liquidating firearms as an auctioneer when providing auction services on commission at an estate-type auction.

27 C.F.R. § 478.13(e).

## C.    Plaintiffs

1. *Don Butler*: Plaintiff Don Butler is a retired engineer who lives in Talladega, Alabama. (Doc. 22-1, ¶¶ 2–3). Butler is an avid gun owner, hunter, and sportsman who is a member of the NRA. (*Id.*, ¶¶ 5–6). Butler also owns a personal collection of firearms that he maintains for his personal protection. (*Id.*, ¶¶ 7–8).

Butler does not hold a federal firearms license because he has never sold firearms as part of a business or to make a livelihood. (*Id.*, ¶ 8). But Butler does occasionally buy, trade, and sell firearms through unlicensed private transactions to enhance his personal collection. (*Id.*). Butler privately sells

firearms to free up funds to purchase newer or more advanced firearms and sometimes trades firearms. (*Id.*, ¶ 9). Through these private transactions, Butler has sold pistols, rifles, and shotguns, including within the past five years. (*Id.*, ¶ 10). And in at least one transaction, Butler informally communicated his willingness to be a source of additional firearms should circumstances permit. (*Id.*).

According to Butler, he currently owns a few firearms that he would sell or trade "tomorrow" if he wasn't afraid of enforcement proceedings under the Final Rule. (*Id.*, ¶ 11). For example, Butler owns a Kel-Tek .22 magnum pistol that he wishes to sell or trade because he's determined that it isn't suited for his self-defense needs. (*Id.*, ¶ 12). Butler has several friends who would be interested in buying or trading for the Kel-Tek, including a friend who offered to trade an Austrian-made 9mm for the Kel-Tek. (*Id.*, ¶¶ 14–15). In addition to buyers within his friend group, Butler says he could attend a local gun show to sell or trade the Kel-Tek. (*Id.*, ¶ 15). Butler estimates that it would only take him a few weeks, at most, to find someone willing to buy one of his firearms. (*Id.*, ¶ 17).

Butler says that enhancing his means of self-defense "is a constant and sometimes impulsive practice" of his. (*Id.*, ¶ 18). So if it weren't for the Final Rule, "on any particular day [Butler] would be willing to sell or trade one or more of [his] firearms so that [he could] obtain a newer or different firearm, should the opportunity arise." (*Id.*). During these transactions, Butler would communicate his willingness to be a source of other firearms should circumstances permit. (*Id.*, ¶ 19). And Butler lacks the resources and ability to obtain a federal firearms license and comply with the regulations that apply to federal firearms licensees. (*Id.*, ¶ 20).

2. *David Glidewell*: Plaintiff David Glidewell is retired from a career in residential construction and lives in Ragland, Alabama. (Doc. 22-2, ¶¶ 2–3). Glidewell is a member of the NRA who owns a personal collection of firearms that he has accumulated over his decades of gun ownership. (*Id.*, ¶¶ 5–6). Glidewell has never held a federal firearms license because he has never sold firearms as part of a business or to make a livelihood. (*Id.*, ¶ 7). Glidewell, however, occasionally buys, trades, and sells firearms through unlicensed private sales to enhance his personal collection. (*Id.*). For example, within the

past two and a half years, Glidewell has traded a Hi-Point carbine rifle to one friend and a 9mm pistol to another friend. (*Id.*, ¶ 8).

During at least one private transaction, Glidewell informally communicated his willingness to be a source of additional firearms should circumstances permit. (*Id.*, ¶ 9). And Glidewell owns a few firearms that he would sell or trade "tomorrow" if he wasn't afraid of enforcement proceedings under the Final Rule. (*Id.*, ¶ 10). For example, Glidewell owns a Taurus G2c pistol that he would like to sell or trade to offset the cost of an upgraded Taurus G3 9mm pistol that he recently purchased. (*Id.*, ¶ 11). To sell his old G2c, Glidewell would work through his friend list until one of them agreed to buy it from him. (*Id.*, ¶ 12).

Glidewell's G2c is not the only firearm that he would like to immediately sell or trade in a private transaction without obtaining a federal firearms license. (*Id.*, ¶ 13). Glidewell also owns a Derya DY9 9mm pistol that he'd be willing to sell under the right circumstances. (*Id.*). And Glidewell intends to engage in private transactions to enhance his means of self-defense around once per year. (*Id.*, ¶ 14). During these transactions, Glidewell would communicate his willingness to be a source of other firearms should circumstances permit. (*Id.*). But like Butler, Glidewell lacks the resources and ability to obtain a federal firearms license and comply with the regulations that apply to federal firearms licensees. (*Id.*, ¶ 16).

3. *The NRA*: The NRA is an organization dedicated to defending Second Amendment rights. (Doc. 1, ¶ 25). The NRA has around 4 million members, including Butler and Glidewell, who rely on the organization to protect their Second Amendment rights through litigation. (*Id.*, ¶ 26). The NRA says that its members will be affected by the "Engaged in the Business" Final Rule because they wish to engage in occasional sales, exchanges, or purchases of firearms to enhance their personal collections of firearms that they accumulated for their personal protection and also sell all or part of their personal collections. *(Id.*, ¶ 28).

## D.   This Lawsuit

The Final Rule took effect on April 19, 2024. Three months later, Butler, Glidewell, and the NRA sued the Biden administration raising several

statutory and constitutional challenges to the Final Rule. Count 1 alleges that the Final Rule exceeds ATF's statutory and jurisdictional authority because it conflicts with the plain language of the GCA as amended by FOPA and the Bipartisan Safer Communities Act. (Doc. 1, ¶¶ 85–94). Count 2 asserts that the Final Rule violates the APA because it is arbitrary and capricious. (*Id.*, ¶¶ 95–104). Count 3 says the Final Rule violates the Fifth Amendment's Due Process Clause because it is unconstitutionally vague. (*Id.*, ¶¶ 105–112). Count 4 contends that the Final Rule violates the Second Amendment. (*Id.*, ¶¶ 113–119). Finally, Count 5 alleges that the Final Rule violates the Separation of Powers, Non-Delegation, and Take Care Clauses of the U.S. Constitution. (*Id.*, ¶¶ 120–127).

On November 5, 2024, Donald Trump was elected President. Soon after his inauguration in January, President Trump directed the DOJ and ATF to comprehensively review the "engaged in the business" Final Rule. That review is ongoing. But the Final Rule remains in effect, and Defendants continue to ask the court to grant them summary judgment on each of Plaintiffs' claims for both standing and merits-based reasons. (*See* Doc. 78, p. 12).

—

Now that the table is set, the court focuses on Plaintiffs' primary argument, which they plead in Count I: ATF exceeded its statutory authority by broadening Congress's definition of "engage in the business of … dealing in firearms" to include dealings that a plain reading of 18 U.S.C. § 922(a)(1)(A) would not cover:



§ 922(a)(1)(A)'s definition of "engaged in the business"

Final Rule's interpretation of "engaged in the business"

To be entitled to judgment on Count 1, Plaintiffs must show both that (a) the Final Rule expands § 922(a) to criminalize otherwise uncovered firearms transaction (*i.e.*, the merits) and (b) their intended transactions fit inside this statutorily uncovered category (*i.e.*, standing). Because standing is jurisdictional, the court must start there.

## II.

## STANDING

To have Article III standing, a plaintiff must show three things: (1) he has suffered an injury in fact; (2) the injury is fairly traceable to conduct of the defendant; and (3) a favorable decision would redress the injury. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). Organizations like the NRA have "associational standing to enforce the rights of their members when (a) their members would otherwise have standing to sue in their own right; (b) the interests the lawsuit seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Dream Defs. v. Gov. of the State of Fla.*, 57 F.4th 879, 886 (11th Cir. 2023) (cleaned up). The parties agree that the court's standing analysis for all three plaintiffs turns on whether Butler and Glidewell have suffered an injury in fact that is fairly traceable to Defendants and redressable by this court.[1]

### A.    Have Plaintiffs suffered an injury in fact?

"A threat of future injury is sufficient to establish standing when the threatened injury is certainly impending or there is a substantial risk that the harm will occur." *Dream Defs.*, 57 F.4th at 887 (quotations omitted). And "[w]hen an individual is subject to such a threat, an actual arrest, prosecution or other enforcement action is not a prerequisite to challenging the law." *Id.* Instead, a three-part test applies to determine whether plaintiffs have standing to bring a pre-enforcement challenge to a statute or regulation. A "plaintiff must show (1) that he has an intention to engage in a course of conduct arguably affected with a constitutional interest, (2) that his conduct is arguably proscribed, and (3) that he is subject to a credible threat of enforcement." *Speech First, Inc. v. Cartwright*, 32 F.4th 1110, 1119–20 (11th Cir. 2022) (quotations omitted).

---

[1] The NRA satisfies the second and third elements of associational standing. Protecting the statutory and constitutional firearm rights of its members is germane to the NRA's organizational purpose. And a pre-enforcement challenge to ATF regulations that seeks declaratory and injunctive relief doesn't require the participation of the NRA's members. *See Baughcum v. Jackson*, 92 F.4th 1024, 1031 (11th Cir. 2024).

### 1.    What is Plaintiffs' intended course of conduct?

The first part of this test requires Plaintiffs to show that they have "an unambiguous intention at a reasonably foreseeable time to engage in a course of conduct arguably affected with a constitutional interest." *See Bloedorn v. Grube*, 631 F.3d 1218, 1228 (11th Cir. 2011); *see also Zimmerman v. City of Austin*, 881 F.3d 378, 389 (5th Cir. 2018) (requiring a "serious intention" to engage in the conduct at issue). Plaintiffs have made this showing. Both Butler and Glidewell assert that they intend to continue to occasionally buy, sell, and trade firearms to enhance the personal collections of firearms that they maintain for self-defense purposes. (Doc. 22-1, ¶ 11; Doc. 22-2, ¶ 10). For example, Butler would sell or trade his Kel-Tek .22 "as soon as tomorrow" because he has determined that it isn't reliable enough for his self-defense needs. (Doc. 22-1, ¶ 12–13). And Butler has options: Butler has several friends who would be interested in buying or trading for the Kel-Tek, including a friend who offered to exchange an Austrian-made 9mm for the Kel-Tek. (*Id.*, ¶¶ 14–15). Butler is also confident he could sell or trade it at a local gun show. (*Id.*, ¶ 15). Despite these options, Butler hasn't sold or traded the Kel-Tek because of the Final Rule. (*Id.*, ¶¶ 14–15).

Glidewell also owns some firearms that he would sell or trade "tomorrow" if it weren't for his fear of enforcement proceedings under the Final Rule. (Doc. 22-2, ¶ 10). For example, Glidewell owns a Taurus G2c pistol that he would like to sell or trade to offset the cost of an upgraded Taurus G3 9mm pistol that he recently purchased. (*Id.*, ¶ 11). To sell his old pistol, Glidewell would only have to work through his list of friends until one of them agreed to buy it from him. (*Id.*, ¶ 12). Glidewell intends to engage in similar private transactions to enhance his means of self-defense around once per year. (*Id.*, ¶ 14). As a result, both Butler and Glidewell have expressed an "unambiguous intent" to sell or trade firearms in their personal collections and provided the court with "a reasonably foreseeable time" in which they would engage in this conduct. *See Bloedorn*, 631 F.3d at 1228.[2]

---

[2] Butler and Glidewell's declarations in support of their motion for summary judgment cure the court's concerns at the preliminary injunction stage that they had only "some day" intentions to sell or trade firearms within their personal collections. (*See* Doc. 17).

Butler and Glidewell's intended conduct is also arguably affected with statutory and constitutional interests. Butler and Glidewell are required to hold a federal firearms license only if they are "engage[d] in the business of . . . dealing in firearms." 18 U.S.C. § 922(a)(1)(A); *see also* 18 U.S.C. § 923(a). And Congress has specifically exempted from the definition of "engaged in the business" someone "who makes occasional sales, exchanges, or purchases of firearms for the enhancement of a personal collection or for a hobby, or who sells all or part of his personal collection of firearms." 18 U.S.C. § 921(21)(C). So those who fall outside the definition of a person "engaged in the business" of dealing in firearms or who fit within this safe harbor have a right to not have the GCA enforced against them. Plus, Butler and Glidewell's desire to not obtain a federal firearms license before selling firearms that they have acquired for the purpose of personal protection at least arguably implicates Second Amendment interests. *See N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 38 n.9 (2022) (refusing to rule out constitutional challenges to shall-issue licensing regimes even though "they do not necessarily prevent 'law-abiding, responsible citizens' from exercising their Second Amendment right to public carry"). So the court must decide whether Butler and Glidewell's intended conduct is arguably proscribed by the Final Rule.

## 2.    Is Plaintiffs' conduct arguably proscribed?

As explained in the Background section, Plaintiffs challenge four aspects of the Final Rule: (a) the Final Rule's assertion that there is no minimum threshold number of firearms purchased or sold or minimum number of transactions that triggers the licensing requirements; (b) the lack of a proof of profit requirement in the Final Rule's definition of "to predominantly earn a profit"; (c) the exclusion of firearms accumulated primarily for personal protection from the Final Rule's definition of "personal collection"; and (d) the Final Rule's three sets of rebuttable presumptions. In deciding whether Plaintiffs' intended conduct is arguably proscribed by these provisions, the court "must be careful not to decide the questions on the merits for or against the plaintiff[s], and must therefore assume that on the merits the plaintiffs would be successful in their claims." *West Virginia ex rel. Morrisey v. U.S. Dep't of the Treasury*, 59 F.4th 1124, 1137 (11th Cir. 2023).

A. *Definitions*: Both Butler and Glidewell's intended conduct is arguably proscribed by the Final Rule's general definition of "engaged in the business." Butler and Glidewell "occasionally" buy, trade, and sell firearms. But the Final Rule has no minimum transactions requirement; even a single firearms transaction may require a license when, for example, the seller expresses a willingness and ability to buy more firearms for resale. 27 C.F.R. § 478.13(b). Both Butler and Glidewell have communicated to another party during a private transaction that they could be the source of other firearms as circumstances permit, and they say that they intend to make similar communications again. So as Plaintiffs point out, it's at least arguable that ATF could find that their conduct—*i.e.*, the sale or trade of a single gun accompanied by talk of possible future sales or trades—fits within the Final Rule's example of when a gun owner needs a dealer's license.

Butler and Glidewell also say that they sell firearms they no longer want to "free up funds to purchase newer or more technologically advanced models as finances permit." It's arguable that the Final Rule proscribes this conduct because Butler and Glidewell intend to sell their firearms to make money (*i.e.*, predominantly earn a profit or obtain pecuniary gain). *See* 27 C.F.R. § 478.13(d)(1). And the firearms that Butler and Glidewell maintain for their personal protection fall outside the Final Rule's definition of personal collection. *See* 27 C.F.R. § 478.11. So Butler and Glidewell argue that the Final Rule blocks their reliance on the intent to collect guns for personal protection as proof that they are not engaged in the business of dealing firearms. *See* 27 C.F.R. §§ 478.11, 478.13(a), 478.13(d)(1). In short, Butler and Glidewell (a) intend to occasionally sell firearms, (b) to free up funds, (c) to enhance the collections of firearms that they maintain for their personal protection. So it's arguable that the Final Rule's no minimum transactions requirement combined with its definitions of "predominantly earn a profit" and "personal collection" proscribe their intended conduct.

B. *Presumptions for "engaged in the business"*: It's also arguable that the first rebuttable presumption that a gun owner is "engaged in the business" of dealing firearms proscribes Butler and Glidewell's intended conduct. That presumption says that "absent reliable evidence to the contrary," someone is presumed to be engaged in the business as a dealer when he "[r]esells or offers for resale firearms, and also represents to potential buyers or otherwise

demonstrates a willingness and ability to purchase and resell additional firearms (*i.e.*, to be a source of additional firearms for resale)." 27 C.F.R. § 478.13(c)(1). Butler and Glidewell intend to communicate during private firearms transactions their "willingness to be a source of other firearms should circumstances permit." So it's arguable that ATF would use this regulatory presumption to support a finding that Butler and Glidewell must obtain a federal firearms license to sell their firearms.

But Butler and Glidewell's intended conduct is not arguably affected or proscribed by the other "engaged in the business" rebuttable presumptions, 27 C.F.R. § 478.13(c)(2)-(5). Nothing in the record suggests Butler and Glidewell are buying or reselling firearms through straw or sham businesses. *See* 27 C.F.R. § 478.13(c)(2)(i). Nor are Butler and Glidewell purchasing or reselling firearms that cannot lawfully be purchased, received, or possessed. *See* 27 C.F.R. § 478.13(c)(2)(ii). Plus, there's no evidence that Butler and Glidewell are repetitively reselling firearms within 30 days or even a year of purchasing them. *See* 27 C.F.R. § 478.13(c)(3). Finally, the rebuttable presumptions related to former licensees do not apply to Butler and Glidewell because they have never held a federal firearms license. *See* 27 C.F.R. § 478.13(c)(4)-(5). So Plaintiffs haven't shown that enforcement of these presumptions would likely harm them.

C. *Presumptions for the "intent to predominantly earn a profit"*: Plaintiffs have shown that the first rebuttable presumption—and only the first presumption—for "intent to predominantly earn a profit" arguably affects or proscribes their intended conduct. *See* 27 C.F.R. § 478.13(d)(2). That rebuttable presumption says that "absent reliable evidence to the contrary" someone is presumed to have the intent to predominately earn a profit if he:

> Repetitively or continuously advertises, markets, or otherwise promotes a firearms business (*e.g.*, advertises or posts firearms for resale, including through the internet or other digital means, establishes a website to offer their firearms for resale, makes available business cards, or tags firearms with sales prices), regardless of whether the person incurs expenses or only promotes the business informally[.]

*See id.* True, Butler and Glidewell haven't said that they plan to advertise, market, or otherwise promote a firearms business by establishing a website to offer their firearms for resale. *See* 27 C.F.R. § 478.13(d)(2)(i). But they do say that they intend to find interested buyers through either word of mouth or by bringing their firearms to gun shows in Alabama. (Doc. 22-1, ¶ 15; Doc. 22-2, ¶ 12). And it is arguable that under § 478.13(d)(2)(i) repeated attempts to sell a firearm to friends by making phone calls or sending texts messages and to strangers by attending monthly gun shows would be considered the repetitive or continuous informal promotion of a firearms business. Indeed, under § 478.13(b), even a single firearms transaction can be considered engaging in a firearms business, so Butler and Glidewell's intent to find buyers one gun at a time doesn't necessarily mean ATF would find their conduct falls outside the Final Rule's rebuttable presumption. Thus, it's arguable that ATF would use the rebuttable presumption to presume that Butler and Glidewell intend to predominantly earn a profit when they sell a firearm.

None of the other "intent to predominately earn a profit" rebuttable presumptions apply to Butler and Glidewell's intended conduct. For example, there's no evidence that Butler or Glidewell have hired business security services to protect their firearms or applied for a business license to resell merchandise that includes firearms. *See* 27 C.F.R. § 478.13(d)(2)(v), (vii). Nor does Butler and Glidewell's intent to informally sell their firearms to friends or at Birmingham-area gun and trade shows—without evidence of any plans to pay for a table or space to display the firearms—arguably fall within any of the other rebuttable presumptions for "intent to predominantly earn a profit." *See* 27 C.F.R. § 478.13(d)(2)(ii)-(iv), (vi). So Plaintiffs haven't shown that they will be injured by any predominantly earn a profit rebuttable presumption other than the presumption related to the repetitive or continuous informal promotion of a firearms business.

D. *Presumptions against being "engaged in the business"*: The final set of rebuttable presumptions lists conduct that ATF presumes falls outside the definition of being engaged in the business of dealing in firearms. *See* 27 C.F.R. § 478.13(e). Enforcement of these presumptions does not injure Plaintiffs because the presumptions are used to establish that someone does *not* need a

federal firearms license. And the only one of these presumptions that potentially relates to Butler and Glidewell's intended conduct is the presumption that someone doesn't need a license when he only resells firearms "[o]ccasionally to obtain more valuable, desirable, or useful firearms for [his] personal collection." *See* 27 C.F.R. § 478.13(e)(2). Butler and Glidewell cannot benefit from this presumption because the Final Rule excludes firearms accumulated primarily for personal protection from the definition of personal collection. *See* 27 C.F.R. § 478.11. But it is the definition of personal collection and not the rebuttable presumption that injures Plaintiffs. So Plaintiffs haven't established that any of the rebuttable presumptions listed in 27 C.F.R. § 478.13(e) injure them.

—

To sum up, both Butler and Glidewell's intended course of conduct could be affected and proscribed by the Final Rule's general definition of "engaged in the business." Their intended conduct is also arguably affected and proscribed by the first "engaged in the business" rebuttable presumption found in 27 C.F.R. § 478.13(c)(1) and the first "intent to predominantly earn a profit" rebuttable presumption found in 27 C.F.R. § 478.13(d)(2)(i). But none of the other rebuttable presumptions in 27 C.F.R. §§ 478.13(c), (d)(2), or (e) arguably affect or proscribe Butler or Glidewell's intended course of conduct. So the court will not consider these presumptions in deciding whether Plaintiffs are subject to a credible threat of enforcement, whether Plaintiffs' injuries are traceable to Defendants, and whether the court can redress Plaintiffs' injuries.

### 3.    Are Plaintiffs subject to threat of enforcement?

The final thing Plaintiffs must show to establish an injury in fact is that there is a credible threat of enforcement. *See Wollschlaeger v. Gov., Fla.*, 848 F.3d 1293, 1305 (11th Cir. 2017) (en banc). This standard is "quite forgiving," and the court can infer a credible threat of enforcement when a plaintiff challenges a law soon after its enactment and the government has "vigorously defended" the law in court. *Id.*

Plaintiffs filed this lawsuit within a few months of the Final Rule taking effect. And the federal government has defended the Final Rule in at least four different district court proceedings. (*See* Doc. 24, pp. 27–28). Though ATF is

conducting an "in-depth review" of the Final Rule, the court cannot know how that review will end. Plus, Defendants have asked the court to grant them summary judgment on each of Plaintiffs' claims. While Defendants' reply brief says, "given the ongoing review of the Rule by DOJ and ATF, aspects of the government's motion [for summary judgment] may no longer align with the government's position," (doc. 78, p. 3), Defendants have not disavowed any argument made in support of their summary judgment motion or explained how the government's position has changed. Thus, the court finds that the mere change in administrations does not eliminate the credible threat that Plaintiffs' intended conduct would be prosecuted under the Final Rule.

Nor is the court convinced by Defendants' argument that Plaintiffs' claims are moot because of an agreement between Defendants and several plaintiff-states, including Alabama, not to enforce the Final Rule against those plaintiffs during a stay in litigation in the District of Kansas. "[W]hen a defendant contends that a plaintiff's claim has become moot as a result of the defendant's own independent decision to cease some disputed action, it usually bears the burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur." *Keohane v. Fla. Dep't of Corrs. Sec'y*, 952 F.3d 1257, 1267 (11th Cir. 2020) (cleaned up). Defendants have failed to make this showing. The Final Rule hasn't been rescinded, and neither DOJ nor ATF has announced what the result of their review of the Final Rule will be. Plus, Defendants haven't promised that they ***will never*** enforce the Final Rule in Alabama or explained how they will apply the agreement in the Kansas litigation to Alabama citizens. Defendants have instead simply "agreed not to enforce the Rule against the Plaintiffs during the pendency of the stay." (*See* Doc. 234, p. 5 in *Kansas v. Bondi*, 6:24-cv-1086 (D. Kan. June 3, 2025)). So it is not "absolutely clear" that Defendants won't enforce the Final Rule against Plaintiffs. *See Keohane*, 952 F.3d at 1268 (noting that relevant factors to consider include whether government's termination of challenged conduct is unambiguous and whether government has consistently maintained its commitment to the new policy).

In sum, it is objectively reasonable for Butler and Glidewell to fear that they face an enforcement threat because the Final Rule remains on the books, arguably proscribes their intended conduct, and has been defended by the Government. So the court finds Plaintiffs' injuries are "sufficiently imminent

to permit pre-enforcement review." *See Dream Defs.*, 57 F.4th at 888. The court will now address whether Plaintiffs have met the traceability and redressability requirements of standing.

## B.    Are the traceability and redressability requirements met?

"To establish traceability and redressability in a lawsuit seeking to enjoin a government official from enforcing the law, a plaintiff must show that the official has the authority to enforce the particular provision being challenged, such that the injunction prohibiting enforcement would be effectual." *Id.* at 888–89 (cleaned up). The Attorney General and ATF promulgated the Final Rule and are responsible for enforcing it. *See* 18 U.S.C. § 926(a); 28 U.S.C. § 599A; 28 CFR § 0.130(a)(1)-(2). So the Final Rule is traceable to Defendants. And the court can redress Plaintiffs' injuries by enjoining Defendants from enforcing the Final Rule against them.

Plaintiffs thus have standing to challenge the provisions of the Final Rule that arguably affect and proscribe Plaintiffs' conduct. As a result, the court can address the merits of Plaintiffs' claims related to (a) the no minimum firearms/no minimum transactions requirement of 27 C.F.R. § 478.13(b); (b) the Final Rule's definition of "to predominantly earn a profit"; (c) the Final Rule's definition of "personal collection"; (d) the first "engaged in the business" rebuttable presumption found in 27 C.F.R. § 478.13(c)(1); and (e) the first "intent to predominantly earn a profit" rebuttable presumption found in 27 C.F.R. § 478.13(d)(2)(i).

## C.    Can Plaintiffs challenge aspects of the Final Rule that don't arguably affect them?

But before the court addresses the merits of these provisions, the court must address Plaintiffs' argument that they can also challenge components of the Final Rule that aren't directly linked to their alleged injuries. As explained below, the court rejects Plaintiffs' argument for two reasons.

First, Plaintiffs' argument conflicts with binding Supreme Court and Eleventh Circuit precedent. "[S]tanding is not dispensed in gross." *Murthy v. Missouri*, 603 U.S. 43, 61 (2024). Thus, "plaintiffs must demonstrate standing for each claim that they press against each defendant and for each form of

relief that they seek." *Id.* (quotations omitted). And "injury under one provision is" not "sufficient to confer standing on a plaintiff to challenge all provisions of an allegedly unconstitutional" rule, regulation, or ordinance. *CAMP Legal Def. Fund, Inc. v. City of Atlanta*, 451 F.3d 1257, 1273 (11th Cir. 2006). So the Eleventh Circuit has required plaintiffs "to establish injury in fact as to each provision" of the law that they challenge. *Id.*; *see also Harrell v. The Fla. Bar*, 608 F.3d 1241, 1253–57 (11th Cir. 2010). (requiring the plaintiff to establish injury-in-fact "with respect to each Bar rule that he challenges" and holding that the plaintiff lacked standing to challenge 4 of the 9 rules because they weren't arguably vague).

Second, the D.C. Circuit cases that Plaintiffs rely on state that a plaintiff who "alleges concrete injury from promulgation of an agency rule . . . has standing to challenge **essential components** of that rule, invoked by the agency to justify the ultimate action, even if they are not directly linked to [the plaintiff's] injuries." *Mozilla Corp. v. FCC*, 940 F.3d 1, 46–47 (D.C. Cir. 2019) (emphasis added); *see also Ascendium Educ. Sols., Inc. v. Cardona*, 78 F.4th 470, 478 (D.C. Cir. 2023) ("Ascendium thus has standing to bring any claims that could lead to the Rule's vacatur, like the one it raises here."). That's because if the plaintiff's "objections carry the day, the rule will be struck down and their injury redressed." *Mozilla Corp.*, 940 F.3d at 47. So a plaintiff may only challenge a provision that isn't directly linked to his injuries if ruling in plaintiff's favor would require vacating the entire rule.

Plaintiffs have failed to show that the court ruling in Plaintiffs' favor on their challenges to the rebuttable presumptions would require setting aside the entire Final Rule. "[R]egulations—like statutes—are presumptively severable." *Bd. of Cnty. Comm'rs of Weld Cnty. v. EPA*, 72 F.4th 284, 296 (D.C. Cir. 2023). So severance is appropriate as long as invalidating the challenged provision "will not impair the function of the [regulation] as a whole, and there is no indication that the regulation would not have been passed but for its inclusion." *See K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 294 (1988).

The Final Rule includes a severability clause that says "[i]t is the intent of the Department that each and every provision of this regulation be severable from each other provision to the maximum extent allowed by law." 89 Fed. Reg. at 29070. And the court has no reason to think that ATF wouldn't have passed

the Final Rule without the inclusion of the rebuttable presumptions. Plus, Plaintiffs haven't explained why invalidating the rebuttable presumptions would render the Final Rule's other provisions inoperable. Instead, it appears that the Final Rule doesn't need any of the rebuttable presumptions to function. For example, one presumption is that someone intends to predominantly earn a profit when he "makes and maintains records to document, track, or calculate profits and losses from firearms repetitively purchased for resale." 27 C.F.R. § 478.13(d)(2)(iii). Even if the court invalidated this presumption, the general definition of "predominantly earn a profit" found in 27 C.F.R. § 478.13(d)(1) would be independently effective. So Plaintiffs haven't established that the court ruling in their favor on the rebuttable presumptions not directly linked to their alleged injuries would redress any injury caused by the portions of the Final Rule that arguably affect or proscribe their intended conduct.

The court thus finds that the only "engaged in the business" rebuttable presumption Plaintiffs can challenge is the presumption that someone is "engaged in the business of dealing in firearms" when he "[r]esells or offers for resale firearms, and also represents to potential buyers or otherwise demonstrates a willingness and ability to purchase and resell additional firearms (*i.e.*, to be a source of additional firearms for resale)." *See* 27 C.F.R. § 478.13(c)(1). And the only "intent to predominantly earn a profit" rebuttable presumption that they can challenge is the presumption that someone intends "to predominately earn a profit through the repetitive purchase and resale of firearms" if he "[r]epetitively or continuously advertises, markets, or otherwise promotes a firearms business . . . regardless of whether the person incurs expenses or only promotes the business informally." *See* 27 C.F.R. § 478.13(d)(2)(i). The court now turns to address the merits of Plaintiffs' challenge to these presumptions, as well as their challenges to several of the definitions found within the "engaged in the business" Final Rule.

# III.

# DISCUSSION

Plaintiffs attack the Final Rule in five ways. First, Plaintiffs say ATF exceeded its statutory authority in issuing the Final Rule. Second, Plaintiffs allege that the Final Rule is arbitrary and capricious. Third, Plaintiffs assert that the Final Rule is unconstitutionally vague. Fourth, Plaintiffs contend that the Final Rule violates the Second Amendment. Fifth, Plaintiffs argue that the Final Rule violates the Separation of Powers, Non-Delegation, and Take Care Clauses of the U.S. Constitution.

Below, the court starts by explaining why Plaintiffs' "exceeds statutory authority" theory requires the court to enjoin the Final Rule. The court then briefly discusses whether it can or should analyze Plaintiffs' remaining four theories—a question the court ultimately pushes to another day.

## <u>Count 1</u>: The Final Rule Exceeds Statutory Authority

### A. The Merits

Congress sets the boundaries of ATF's authority. *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988)("[A]n administrative agency's power to promulgate legislative regulations is limited to the authority delegated by Congress."). Congress gave ATF authority to "prescribe only such rules and regulations as are necessary to carry out the provisions" in the GCA. *See* 18 U.S.C. § 926(a). That means, under the APA, this court can "hold unlawful and set aside agency action" that is found to be "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C). The court is therefore tasked with deciding whether any challenged part of the Final Rule is unnecessary to carry out the GCA, which includes any part of the Final Rule that expands the GCA's licensing requirement beyond the scope Congress gave it and thereby captures one or more of the Plaintiffs.

Plaintiffs point to four aspects of the Final Rule that they say go beyond ATF's delegated authority. The court tackles them in order below. Before it does, though, the court notes the simplest way to see that the Final Rule goes too far. Congress added this safe harbor provision to the GCA:

> The term 'engaged in the business' . . . shall not include a person who makes occasional sales, exchanges, or purchases of firearms for the enhancement of a personal collection or for a hobby, or who sells all or part of his personal collection of firearms[.]

18 U.S.C. § 921(a)(21)(C). Plaintiffs' firearms dealings fall squarely within the safe harbor. Like many gun owners, Plaintiffs wish to barter from their own personal gun collection to enhance that personal collection. Profit is not the point, at least not the "predominant" point. 18 U.S.C. § 921(a)(21)(C). The point is to end each round of buying, selling, and trading with a collection that better suits the owners' needs or desires, particularly when it comes to personal protection. If the Final Rule's interpretation of the GCA criminalizes this category of unlicensed dealing—a category that Congress expressly excluded from its licensing requirement—then the Final Rule goes too far.

### 1. "No minimum threshold number" of buys or sales

First, Plaintiffs argue that Congress requires a person buy or sell multiple firearms before he can be deemed to be engaged the firearms' business, and ATF exceeded its authority by roping in persons who sell or offer to sell only one firearm. The court highlights the relevant phrases:

| GCA (Congress) | Final Rule (ATF) |
|---|---|
| [A] person who devotes time, attention, and labor to dealing in firearms as a regular course of trade or business to predominantly earn a profit through the repetitive purchase and resale of firearms, but such term shall not include a person who makes occasional sales, exchanges, or purchases of firearms for the enhancement of a personal collection or for a hobby, or who sells all or part of his personal collection of firearms. | Whether a person is engaged in the business as a dealer under paragraph (a) of this section is a fact-specific inquiry. Selling large numbers of firearms or engaging or offering to engage in frequent transactions may be highly indicative of business activity. However, there is no minimum threshold number of firearms purchased or sold that triggers the licensing requirement. Similarly, there is no minimum number of transactions that determines whether a person is "engaged in the |

| | |
|---|---|
| | business" of dealing in firearms. For ==example, even a single firearm transaction or offer to engage in a transaction,== when combined with other evidence (*e.g.*, where a person represents to others a willingness and ability to purchase more firearms for resale), ==may require a license;== whereas a single isolated firearm transaction without such evidence would not require a license. |

*See* 18 U.S.C. § 921(a)(21)C); 27 C.F.R. § 478.13(b) (highlights added).

a. *Plain language*: "As always," the court starts "with the statutory text." *See Garland v. Cargill*, 602 U.S. 406, 415 (2024). That requires the court to look first to the criminal provision, then its relevant definitions:

| | |
|---|---|
| Criminal Provision §922(a)(1)(A) | It shall be unlawful for any person except a licensed importer, licensed manufacturer, or licensed dealer, to engage in the business of importing, manufacturing, or dealing in firearms[.] |
| Definition §921(a)(11) | The term "dealer" means (A) any person engaged in the business of selling firearms at wholesale or retail, (B) any person engaged in the business of repairing firearms or of making or fitting special barrels, stocks, or trigger mechanisms to firearms, or (C) any person who is a pawnbroker. The term "licensed dealer" means any dealer who is licensed under the provisions of this chapter. |
| Definition §921(a)(21)(C) | The term "engaged in the business" as applied to a dealer in firearms, as defined in section 921(a)(11)(A), a person who devotes time, attention, and labor to dealing in firearms as a regular course of trade or business to predominantly earn a profit through the repetitive purchase and resale of firearms, but such term shall not include a person who makes occasional sales, |

| | |
|---|---|
| | exchanges, or purchases of firearms for the enhancement of a personal collection or for a hobby, or who sells all or part of his personal collection of firearms. |
| Definition §921(a)(22) | The term "to predominantly earn a profit" means that the intent underlying the sale or disposition of firearms is predominately one of obtaining pecuniary gain, as opposed to other intents, such as improving or liquidating a personal firearms collection: *Provided*, That proof of profit shall not be required as to a person who engages in the regular and repetitive purchase and disposition of firearms for criminal purposes or terrorism. |

Placing the definitions into the criminal provision renders this statutory rule:

> It shall be unlawful for any person except a person licensed to engage in the business of selling firearms at wholesale or retail, to devote time, attention, and labor to dealing in firearms as a regular course of trade or business with the predominant intent to obtain pecuniary gain through the repetitive purchase and resale of firearms, as opposed to other intents such as improving or liquidating a personal firearms collection.

Read plainly, the criminalized act is "devoting time, attention, and labor to dealing in firearms as a regular course of business" without a license. But that act comes with a caveat: The actor's "predominant" intent for devoting his time, attention, and labor must be to earn a profit "through the repetitive purchase and resale of firearms." His intent cannot be something else, such as improving or liquidating his personal collection—a point reiterated in the safe harbor.

So among the many ways a person's acts could fall outside the criminal provision, two are relevant here. First, no matter how much time, attention, or labor the actor spends on firearms, the actor is not covered unless he makes dealing firearms a "regular course of business." "Regular" business means repeated, recurring, or continual business. *See Regular*, Oxford English Dictionary Online, https://www.oed.com/dictionary/regular _adj?tab =meaning

_and_use#26227636 (Sept. 30, 2025) ("3.g Recurring or taking place frequently (although not at fixed times or uniform intervals); characterized by a recurrence of this sort."); *Regular*, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/regular (Sept. 30, 2025) ("2a recurring, attending, or functioning at fixed, uniform, or normal intervals"). As a result, if the actor's firearms sales do not recur on a continuing basis, he is not "engaged in the business … of dealing firearms."

Second, assuming the actor's firearms deals recur on a continuing basis, he still falls outside the criminal prohibition if his "predominant" intent is anything other than "to earn a profit through the repetitive purchase and resale of firearms." Repetitive purchases and sales are ones that are repeated—*i.e.*, dealings that are "renewed or recurring over and over again." *Repeated*, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/ dictionary/repeated (Sept. 30, 2025).

Note that both the action clause and the intent clause require acts that recur over and over again. Devoting the time and effort to make one sale or buy is not enough to occur as part of a "***regular*** course of business." Selling one gun for a profit is not enough to profit "through the ***repetitive*** purchase and resale of firearms," plural. Under Congress's rule, one is not enough.

The Final Rule, however, embraces the concept that a single sale of a single firearm can constitute proof that someone is engaged in the business of dealing firearms: "there is no minimum number of firearms purchased or sold that triggers the licensing requirement." 27 C.F.R. § 478.13(b). The Final Rule then goes further; it says that a license could be required even if ***no*** gun trades hands as long as there is an "offer to engage in a transaction, when combined with other evidence (*e.g.*, where a person represents to others a willingness and ability to purchase more firearms for resale)[.]"

Defendants support the Final Rule's conclusion that a single sale or single offer could constitute "a regular course of business" by dividing the GCA's definition in half, the same way the court did above:

| Phrase 1: Action | Phrase 2: Intent |
|---|---|
| [A] person who devotes time, attention, and labor to dealing in firearms as a regular course of trade or business . . . | to predominantly earn a profit through the repetitive purchase and resale of firearms[.] |

Defendants then focus solely on the intent clause, claiming "a person may have put forth effort to sell firearms with the requisite intent to profit—and thus require a license—even if they have not yet sold a firearm or have only completed a single firearms sales transaction." (Doc. 24, p. 50). The court rejects this reading for two reasons.

First, the court agrees that the "repetitive purchase and resale" qualifier applies only to the actor's intent—*i.e.*, to predominantly earn a profit. *See* Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 152 (2012) (under the nearest-reasonable-referent canon, "a prepositive or postpositive modifier normally applies to the nearest reasonable referent"). But quarantining the "repetitive purchase and resale" qualifier to proof of the actor's profit motive gets Defendants nowhere. As explained, even if the Government could prove that a person intended to make money by offering to buy one gun today, with the promise of buying two more guns tomorrow, the Government must ***also*** show that the person is devoting "his time, attention, and labor" to making these proposed firearms deals "a ***regular*** course of trade or business." A one-time purchase of one gun with the promise to buy other guns does not establish that the buyer is devoting his time, attention, and labor to regularly dealing firearms as a business.

Second, Defendants' belief that they can prove actors' profit motive "even if they have not yet sold a firearm or have only completed a single firearms sales transaction," (doc. 24, p. 50), ignores § 921(a)(22)(C)'s caveat:

The term "to predominantly earn a profit" means that the intent underlying the sale or disposition of firearms is predominately one of obtaining pecuniary gain, as opposed to other intents, such as improving or liquidating a personal firearms collection: *Provided,* That proof of profit shall not be required as to a person who

> engages in the regular and repetitive purchase and disposition of
> firearms for criminal purposes or terrorism.

18 U.S.C. § 921(a)(22)(C) (highlight added). As elaborated on in Part 2, that Congress had to exclude "proof of profit" in cases involving gun sales to criminals and terrorists necessarily shows that "proof of profit" is baked into proving intent for all other firearms transactions. If the Government must obtain proof of an actor's profit, then the actor necessarily must sell firearms to make that profit. The Final Rule's assumption that the Government can prove intent without profitable sales is therefore flawed.

For these reasons, the court agrees with Plaintiffs that ATF exceeded its authority when it interpreted the GCA to possibly prohibit a single purchase or sale or a single offer to purchase or sell a firearm. *See* 5 U.S.C. § 706(2)(C).

b. *Caselaw*: Defendants contend this reading of the GCA contradicts decades of caselaw interpreting the "engaged in the business" definition. But none of the cases Defendants cite bind the court.[3] In fact, many of these cases were interpreting the pre-FOPA GCA that didn't define "engaged in the business." *See United States v. Murphy*, 852 F.2d 1 (1st Cir. 1988); *United States v. Carter*, 801 F.2d 78 (2d. Cir. 1986); *United States v. Wilmoth*, 636 F.2d 123 (5th Cir. 1981). So these cases do not grapple with the question presented here: Can a single transaction involving a single firearm ever require a license under the GCA's definition of "engaged in the business?"

Nor do any of these cases stem from a single transaction involving a single firearm, which the Final Rule says, "may require a license" if "combined with other evidence." *See* 27 C.F.R. § 478. 13(b). Instead, these cases involved far more activity and tend to support the court's finding that one transaction involving a single firearm would never be enough to trigger the "engaged in the business" licensing requirement. *See, e.g.*, *United States v. King*, 735 F.3d 1098, 1106 (9th Cir. 2013) (To prove defendant "engaged in the business of firearms dealing[,] . . . the government had to establish . . . a greater degree of activity than the occasional sale of a hobbyist or collector."); *Murphy*, 852 F.2d

---

[3] *United States v. Wilmoth*, 636 F.2d 123 (5th Cir. 1981), is a pre-split case from the former Fifth Circuit. *Wilmoth*, however, predates FOPA, which is what added the "engaged in the business" definition to the GCA. So *Wilmoth*'s interpretation of what was required to sustain a conviction under the pre-FOPA version of the GCA isn't determinative.

at 8 (("[W]hile we can conceive of a transaction sufficiently large enough in number of guns and the price paid to constitute engaging in the business of dealing in firearms, ordinarily one sale will not be sufficient to meet the statutory requirement.").

Take the unpublished Eleventh Circuit case that Defendants cite, for example. There, the circuit court stated that "§ 921(a)(21)(C) does not require a threshold number of sales, profit, or hours spent before a person has engaged in the business of dealing in firearms." *See United States v. Baptiste*, 607 F. App'x 950, 952–53 (11th Cir. 2015). But the evidence established that the defendant purchased multiple firearms and then shipped the guns to Haiti for a third party to sell. *See id.* Thus, the circuit needn't (and didn't) decide whether a single firearm transaction involving a single firearm could ever require a license. *See Ramos v. Louisiana*, 590 U.S. 83, 104 (2020) ("It is usually a judicial decision's reasoning—its *ratio decidendi*—that allows it to have life and effect in the disposition of future cases."); Lawrence B. Solum, *Originalist Theory and Precedent: A Public Meaning Approach*, 33 Const. Comment. 451, 459 (2018) (describing a decision's holding under *ratio decidendi* as "the rule that is logically entailed by the reasoning that was necessary to reach the outcome on the basis of the legally salient facts and the arguments of the parties").

—

To sum up, Congress decided that a person is not engaged in the business of dealing in firearms unless he deals firearms "as a regular course of trade or business." *See* 18 U.S.C. § 921(a)(21)(C). Regular means repeated or often. So regular business requires more than one firearm transaction involving a single firearm. Because the Final Rule says single transactions involving one firearm may be prohibited in some cases, it exceeds ATF's statutory authority.

### 2.    Defining "Predominately earn a profit"

Plaintiffs next assert that the portion of the Final Rule's definition of "predominately earn a profit" in red letters below conflicts with the GCA:

| GCA (Congress) | Final Rule (ATF) |
|---|---|
| The term "to predominantly earn a profit" means that the intent underlying the sale or disposition of firearms is predominately one of obtaining pecuniary gain, as opposed to other intents, such as improving or liquidating a personal firearms collection: *Provided*, That proof of profit shall not be required as to a person who engages in the regular and repetitive purchase and disposition of firearms for criminal purposes or terrorism. | (d) Predominantly earn a profit— <br><br> (1) Definition. The intent underlying the sale or disposition of firearms is predominantly one of obtaining pecuniary gain, as opposed to other intents, such as improving or liquidating a personal firearms collection: *Provided*, that proof of profit, including the intent to profit, shall not be required as to a person who engages in the regular and repetitive purchase and disposition of firearms for criminal purposes or terrorism. For purposes of this section, a person may have the intent to profit even if the person does not actually obtain the intended pecuniary gain from the sale or disposition of firearms. |

*See* 18 U.S.C. § 921(a)(22); 27 C.F.R. § 478.13(d)(1) (highlights, color added).

As discussed, Congress requires the actor's predominant intent be to make a profit. *See* 18 U.S.C. § 921(a)(22). As a caveat to that definition, Congress then said that "proof of profit" isn't "required as to a person who engages in the regular and repetitive purchase and disposition of firearms for criminal purposes or terrorism." Plaintiffs argue that because Congress went out of its way to say that the Government needn't prove a profit when the actor buys or sells firearms for criminal or terroristic purposes, then Congress necessarily requires proof of profit for non-criminal and non-terrorist dealings.

By saying that the Government doesn't need proof of profit to prove intent in non-criminal, non-terroristic deals, Plaintiffs say that ATF exceeded its authority under the GCA.

The court agrees. Under the negative implication canon, "[t]he expression of one thing implies the exclusion of others." Scalia & Garner, *supra*, at 107. By not requiring proof of profit for those who deal firearms for criminal purposes or terrorism, Congress implied that proof of profit is required for everyone else. Put another way, Congress baked "proof of profit" into proof of a profit motive, hence the need to expressly remove proof of profit for transactions with criminals or terrorists who have motives other than profit. Plus, "[i]f possible, every word and every provision" in a statute "is to be given effect." *Id.* at 174. So "[n]one should needlessly be given an interpretation that cause it . . . to have no consequence." *Id.* If proof of profit is never required, as the Final Rule would have it, then Congress's specific exclusion of a proof of profit requirement in cases involving criminal purposes or terrorism would be nothing more than meaningless surplusage.

The Final Rule itself acknowledges that "proof of profit" is something different than "the intent to profit." That's why the Final Rule alters the criminal purposes/terrorism carveout from "[t]hat proof of profit shall not be required" to "[t]hat proof of profit, ***including the intent to profit***, shall not be required." *Compare* 18 U.S.C. § 921(a)(22) *with* 27 C.F.R. § 478.13(d)(1) (emphasis added). If "proof of profit" can include "the intent to profit," then "proof of profit" requires something more than proof of an intent to profit. And neither this court nor ATF can "add or subtract words from a statute." *See Friends of the Everglades v. S. Fla. Water Mgmt. Dist.*, 570 F.3d 1210, 1224 (11th Cir. 2009); *Util. Air. Regul. Grp. v. EPA*, 573 U.S. 302, 328 (2014) ("Agencies are not free to adopt unreasonable interpretations of statutory provisions and then edit other statutory provisions to mitigate the unreasonableness." (cleaned up)). But that's what ATF has done with the Final Rule's definition of "predominately earn a profit." So ATF's interpretation of the "predominately earn a profit" definition exceeded ATF's statutory authority.

Defendants' counterarguments are unconvincing. First, Defendants say that when Congress wrote "proof of profit" in the criminal purposes/terrorism

carveout, Congress really meant "proof of intent to profit." (*See* Doc. 24, p. 46). Perhaps, but that's not what Congress **wrote**. And neither ATF nor this court can rewrite what Congress wrote. Plus, the mere fact that § 921(a)(22) earlier explains that an intent to profit is required doesn't imply that there cannot also be a proof of profit requirement. Instead, "the Section's usage of 'intent' serves to distinguish the *type* of intent contemplated." *Texas v. ATF*, 737 F. Supp. 3d 426, 441 (N.D. Tex. 2024).

Second, the cases Defendants cite are either unpersuasive or unhelpful. *United States v. Valdes*, 681 F. App'x 874, 877 (11th Cir. 2017), is an unpublished Eleventh Circuit case that states that a conviction for engaging in the business of dealing firearms without a license doesn't require a showing that the defendant "necessarily made a profit from dealing." Because *Valdes* is an unpublished opinion, the court must determine whether *Valdes* is persuasive before relying on it. *See McNamara v. Gov't Employees Ins. Co.*, 30 F.4th 1055, 1061 (11th Cir. 2022). The court finds *Valdes* unpersuasive for two reasons: (1) it relied on a 1981 decision that predated Congress's addition of the "proof of profit language," and (2) it contradicts § 921(a)(22)'s plain meaning. For these same reasons, *United States v. Shipley*, 546 F. App'x 450, 454 (5th Cir. 2013), is also unpersuasive. And neither *United States v. Focia*, 869 F.3d 1269, 1282 (11th Cir. 2017), nor *United States v. Tyson*, 653 F.3d 192, 200–01 (3d Cir. 2011), addressed whether § 921(a)(22) requires proof of profit. So they do not help Defendants.

Third, Defendants say a proof of profit requirement would be unworkable and couldn't be sensibly enforced. But as Plaintiffs point out, "common sense makes clear that an individual who sells a firearm for more money than it cost to obtain has made a profit." (Doc. 31, p. 34). So the government wouldn't need to engage in complicated financial calculations to prove that someone engaged in the business of dealing in firearms.

Finally, Defendants assert that "the temporal sequence of amendments to 18 U.S.C. § 921(a)(22) further underscores that actual profit is not required." (Doc. 24, p. 48). As Defendants note, FOPA was originally enacted without the criminal purpose/terrorism carveout and then amended a few weeks later to include the carveout. But that the carveout wasn't originally part of FOPA doesn't compel the conclusion that § 921(a)(22) doesn't include a proof of profit

requirement in most instances. Instead, it just as strongly suggests that the original version of the statute, which referenced "the sale or disposition of firearms," also required proof of profit.

—

To sum up, Congress can choose whether to require proof of profit or not. By removing the proof of profit requirement for criminal or terrorist-related transactions, Congress showed that the GCA does require proof of profit for other firearms transactions. ATF cannot remove that requirement, only Congress can. The court thus finds that by eliminating a proof of profit requirement for all cases except those involving criminal purposes or terrorism, ATF exceeded its statutory authority.

### 3.    Personal collection

Plaintiffs next challenge the Final Rule's interpretation of § 921(a)(21)(C)'s safe harbor provision:

| GCA | Final Rule |
|---|---|
| [A] person who devotes time, attention, and labor to dealing in firearms as a regular course of trade or business to predominantly earn a profit through the repetitive purchase and resale of firearms, but such term shall not include a person who makes occasional sales, exchanges, or purchases of firearms for the enhancement of a personal collection or for a hobby, or who sells all or part of his personal collection of firearms. | Personal collection (or personal collection of firearms, or personal firearms collection)—<br><br>(1) General definition. Personal firearms that a person accumulates for study, comparison, exhibition (*e.g.*, collecting curios or relics, or collecting unique firearms to exhibit at gun club events), or for a hobby (*e.g.*, noncommercial recreational activities for personal enjoyment, such as hunting, skeet, target, or competition shooting, historical re-enactment, or noncommercial firearms safety instruction). The term shall not include any firearm purchased for the purpose of resale with the predominant intent to earn a profit (*e.g.*, primarily for a commercial purpose or financial gain, |

| | as distinguished from personal firearms a person accumulates for study, comparison, exhibition, or for a hobby, but which the person may also intend to increase in value). <mark>In addition, the term shall not include firearms accumulated primarily for personal protection: *Provided*, that nothing in this definition shall be construed as precluding a person from lawfully acquiring firearms for self-protection or other lawful personal use.</mark> |
| --- | --- |

18 U.S.C. § 921(a)(21)(C); 27 C.F.R. § 478.11 (highlights added).

According to Plaintiffs, ATF exceeded its statutory authority by exempting "firearms accumulated primarily for personal protection" from the definition of personal collection. Everyone agrees that "personal" means "of or relating to a particular person." 89 Fed. Reg. at 28980 n.88. As for "collection," the court finds that it is best defined as "[a] group of things . . . collected or gathered together." *See Collection*, Oxford English Dictionary Online, https: //www.oed.com/dictionary/collection_n?tab=meaning_and_use#8889224 (last visited September 30, 2025); *Collection*, Merriam-Webster's Unabridged Dictionary Online, https: //unabridged.merriam-webster.com/unabridged/ collection (last visited September 30, 2025) ("2: a number of objects . . . that has been collected or has collected often according to some unifying principle or orderly arrangement"); *Collection*, Cambridge English Dictionary Online, https:// dictionary.cambridge.org/dictionary/english/collection (last visited September 30, 2025) ("a group of objects of one type that have been collected by one person or in one place"). While some dictionaries list an example of a collection as "an accumulation of objects gathered for study, comparison, or exhibition," the common, ordinary understanding of the term "collection" isn't limited to these examples. *See, e.g.*, *Collection*, Merriam-Webster Online Dictionary, https: //www.merriam- webster.com/dictionary/col lection (last visited Sept. 30, 2025).

Nor do other portions of the GCA support ATF's decision to exclude "firearms accumulated primarily for personal protection" from the definition of "personal collection." Defendants say that their reading of "personal collection" is supported by Congress's definition of a "collector" as "any person who acquires, holds, or disposes of firearms as curios or relics." *See* 18 U.S.C. § 921(a)(13). But a collector is a different category of regulated person than a dealer. And had Congress intended for the safe harbor to apply only to the specialized subset of firearms owned by collectors, it would have used the language found in § 921(a)(13) to say so. In fact, even the Final Rule recognizes that the safe harbor's reference to a "personal collection of firearms" must encompass more than the curios and relics owned by a firearms collector. *See* 27 C.F.R. § 478.11. (listing examples of a personal collection as "collecting curios or relics, ***or collecting unique firearms to exhibit at gun club events***" (emphasis added)).

Plus, the GCA includes different record-keeping requirements for the disposition of (a) firearms in the business inventory of a licensed dealer, (b) firearms in the personal collection of a licensed dealer, and (c) firearms in the inventory of a licensed collector. *See* 18 U.S.C. § 923(c), (g)(1)(A), (g)(2). These different record-keeping requirements strongly suggest that a personal collection of firearms means something other than the specialty firearms owned by collectors. Instead, within the context of the GCA as a whole, the phrase "personal collection of firearms" is best understood as simply distinguishing the firearms that a gun owner keeps for his personal use from those firearms that are part of a firearms dealer's business inventory. *See NRA v. Brady*, 914 F.2d 475, 481–84 (4th Cir. 1990) (discussing differences between record-keeping requirements for transfers of a licensee's personal firearms and those firearms in his business inventory).

Plaintiffs' interpretation of "personal collection" also furthers the purpose of FOPA, which is the statute that added the safe harbor to the GCA. *See* Scalia & Garner, *supra*, at 63 ("A textually permissible interpretation that furthers rather than obstructs the document's purpose should be favored."). FOPA was enacted to "reaffirm the intent of . . . Congress" to not "place any undue or unnecessary . . . burdens . . . with respect to the acquisition, possession, or use of firearms [for] personal protection." 100 Stat. at 449. If Congress meant not to burden the collection of guns for personal protection,

then ATF's interpretation that Congress excluded firearms accumulated primarily for personal protection from § 921(a)(21)(C)'s safe harbor makes little sense. Nor is the court's reading of the safe harbor incompatible with the primary rule that firearms dealers must be licensed. The safe harbor protects "occasional sales . . . of firearms for the enhancement of a personal collection." 18 U.S.C. § 921(a)(21)(C). If a person accumulated numerous firearms for his personal protection, then sold those guns over a course of deals to make a profit, he would need a license.

The court thus finds that ATF exceeded its statutory authority when it excluded "firearms accumulated primarily for personal protection" from its definition of "personal collection."

### 4.    Rebuttable presumptions

Plaintiffs' fourth and final challenge under 5 U.S.C. § 706(2)(C) is to the Final Rule's presumptions. As explained, Plaintiffs have standing to challenge one presumption for the Final Rule's interpretation of "engaged in business" and one presumption for the Final Rule's interpretation of "to predominately earn a profit." The court starts with the former.

Plaintiffs challenge the Final Rule's presumption that someone is "engaged in the business of dealing in firearms" when he "[r]esells or offers for resale firearms, and also represents to potential buyers or otherwise demonstrates a willingness and ability to purchase and resell additional firearms (*i.e.*, to be a source of additional firearms for resale)." *See* 27 C.F.R. § 478.13(c)(1). The court agrees with Plaintiffs that this presumption exceeds ATF's statutory authority because it presumes unlawful a single firearms transaction in which a seller merely represents that he could be a source of other firearms. As discussed, the GCA requires more activity to trigger the licensing requirement.

Plaintiffs challenge the Final Rule's presumption that someone intends "to predominately earn a profit through the repetitive purchase and resale of firearms" if he "repetitively or continuously advertises, markets, or otherwise promotes a firearms business . . . regardless of whether the person incurs expenses or only promotes the business informally." *See* 27 C.F.R. § 478.13(d)(2)(i). The court agrees with Plaintiffs that this presumption

exceeds ATF's statutory authority because it allows the Government to presume that it meets the "predominantly earn a profit" intent requirement without showing proof of profit. As discussed, Congress requires proof of profit in all cases except those involving the "repetitive purchase and disposition of firearms for criminal purposes or terrorism." *See* 18 U.S.C. § 921(22).

The court thus finds that the two rebuttable presumptions that Plaintiffs have standing to challenge exceeded ATF's statutory authority.

—

For these reasons, the court **GRANTS** Plaintiffs' motion for summary judgment on Count 1 for all provisions of the Final Rule that the court has found Plaintiffs have standing to challenge, and **DENIES** Defendants' motion for summary judgment on this count.[4]

### B. Remedy

The court must now decide the proper remedy for its finding that the Final Rule exceeded ATF's statutory authority. Plaintiffs ask for three things: (1) vacatur of the Final Rule, (2) issuance of a permanent injunction, and (3) issuance of a declaratory judgment.

### 1.    Vacatur

Under the APA, reviewing courts are to "hold unlawful and set aside agency action . . . found to be . . . in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(C). Courts have interpreted this provision as allowing them to vacate agency action. In fact, vacatur has been described as "the ordinary APA remedy." *See Black Warrior Riverkeeper, Inc. v. U.S. Army Corps. of Eng'rs*, 781 F.3d 1271, 1290 (11th Cir. 2015); *Data Mktg. P'ship, LP v. U.S. Dep't of Lab.*, 45 F.4th 846, 859 (5th Cir. 2022) ("The default rule is that vacatur is the appropriate remedy.").

---

[4] Based on this ruling, the court finds that it needn't address Plaintiffs' arguments that ATF lacks statutory authority to define statutory terms and that the rule of lenity supports ruling in Plaintiffs' favor on Count 1. (*See* Doc. 22, pp. 37–38). Nor does the court need to address other arguments Plaintiffs levy against the rebuttable presumptions.

But vacatur here would result in nullification of the Final Rule, meaning that the Final Rule couldn't be enforced against anyone, even those who aren't parties here. That's a broad remedy that has been met with criticism. And three justices have recently questioned whether the APA empowers courts to vacate agency action. *See United States v. Texas*, 599 U.S. 670, 695–99 (2023) (Gorsuch, J., concurring in the judgment) (joined by Justices Thomas and Barrett). As these justices point out, the term "set aside appears in § 706 of the APA," which discusses the scope of a court's review of agency action. *See id.* at 696 (quotations omitted). Vacatur is not discussed in § 703 of the APA, which "is where the APA most clearly discusses remedies." *Id.* at 698. Instead, that section allows aggrieved persons to bring "any applicable form of legal action, including actions for declaratory judgments or writs of prohibitory or mandatory injunction or habeas corpus, in a court of competent jurisdiction." 5 U.S.C. § 703. If Congress intended for vacatur to be the ordinary APA remedy, it would have been passing strange for it not to list vacatur alongside the other remedies described in § 703. *See Texas*, 599 U.S. at 698. That's especially true as vacatur would be an exception to the traditional rule that courts cannot grant "requests for relief that extend[ ] beyond the parties." *See Trump v. CASA, Inc.*, 145 S.Ct. 2540, 2552 (2025).

The court is thus skeptical that the APA authorizes vacatur. But even if vacatur is authorized, it isn't mandated. *See Black Warrior Riverkeeper*, 781 F.3d at 1290 ("The decision whether to vacate agency action falls within our broad equitable discretion."). And because vacatur provides such sweeping relief courts should "think twice—and perhaps twice again—" before vacating agency action. *See Arizona v. Biden*, 40 F.4th 375, 396 (6th Cir. 2022) (Sutton, C.J., concurring). Having considered the equities, the court finds that vacatur isn't warranted here. Equitable relief "should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979). And the court has other tools in its equitable toolbox that it can use to remedy Plaintiffs' injuries. For example, enjoining Defendants from enforcing the Final Rule against Plaintiffs will adequately protect Plaintiffs' interests and ensure that they are allowed to exercise their statutory rights under the GCA.

Plus, principles of comity weigh in favor of providing only party specific relief. "Comity dictates that courts should avoid rulings which may trench upon the authority of sister courts." *Florida v. HHS*, 19 F.4th 1271, 1285 (11th Cir. 2021). And the Final Rule is being challenged by four sets of plaintiffs in different jurisdictions, with two of those challenges pending before the Fifth and Tenth Circuits. While vacating the Final Rule may not necessarily moot this parallel litigation, it likely would interfere with those proceedings. So the court finds that even if it's permissible, granting the equitable remedy of vacatur isn't appropriate here.

### 2.    Permanent Injunction

The court does, however, find that it's appropriate to issue a permanent injunction.

### a.    Factors

"To obtain a permanent injunction, the moving party must show that (1) it has suffered irreparable harm; (2) remedies at law will not provide adequate compensation for the injury; (3) on balance, an equitable remedy is warranted; and (4) a permanent injunction will not disserve the public interest." *West Virginia*, 59 F.4th at 1148.

Plaintiffs have established irreparable harm because they are faced with a threat of prosecution under the Final Rule for conduct that the GCA considers lawful. *See Ga. Latino All. for Human Rights v. Gov. of Ga.*, 691 F.3d 1250, 1269 (11th Cir. 2012); *Farmworkers Ass'n of Fla., Inc. v. Moody*, 734 F. Supp. 3d 1311, 1338 (S.D. Fla. 2024). And there is no adequate remedy at law "because the federal government generally enjoys immunity from suit" for monetary damages. *West Virginia*, 59 F.4th at 1149. Finally, the balance of equities and public interest factors support granting injunctive relief because "neither the government nor the public has any legitimate interest" in enforcement of a regulation that is unlawful. *See Otto v. City of Boca Raton*, 981 F.3d 854, 870 (11th Cir. 2020). The court thus finds that issuing a permanent injunction is warranted.

### b.    Scope of Relief

"Injunctive relief should be limited in scope to the extent necessary to protect the interests of the parties." *Keener v. Convergys Corp.*, 342 F.3d 1264, 1269 (11th Cir. 2003). Here, the plaintiffs are Don Butler, David Glidewell, and the NRA. So the court finds that to protect the interests of the parties the injunction must cover Butler, Glidewell, and any member of the NRA. *See Georgia v. President of the U.S.*, 46 F.4th 1283, 1307 (11th Cir. 2022) ("The injunction permissibly blocks federal agencies from enforcing the mandate in contracts with any plaintiff State or member of Associated Builders and Contractors."). But it cannot and will not apply to enforcement of the Final Rule against non-parties. *See Casa, Inc.*, 145 S. Ct. at 2548.

The court also finds it appropriate to limit the injunction to enforcement of those provisions of the Final Rule that Plaintiffs have established that they have standing to challenge and have shown exceeded ATF's authority. As explained when discussing standing, severance is appropriate as long as invalidating the challenged provision "will not impair the function of the [regulation] as a whole, and there is no indication that the regulation would not have been passed but for its inclusion." *See K Mart Corp.*, 486 U.S. at 294. The Final Rule includes a severability clause that manifests ATF's intent that each provision of the Final Rule be severable. *See* 89 Fed. Reg. at 29070. And the court finds that the aspects of the Final Rule that the court hasn't addressed can meaningfully function apart from the aspects of the Final Rule that the court has found unlawful. The court will thus limit its injunction to those sections of the Final Rule that the court found exceeded ATF's statutory authority.

—

To sum up, the court will enter a separate order that **PERMANENTLY ENJOINS** the Department of Justice, ATF, Acting ATF Director Daniel Driscoll, and Attorney General Pamela Bondi from enforcing these aspects of the "Engaged in the Business" Final Rule against Plaintiffs Don Butler, David Glidewell, and any member of the NRA:

- 27 C.F.R. § 478.13(b), which says that no minimum threshold number of firearms or transactions is required to be "engaged in the business as a dealer in firearms";

- 27 C.F.R. § 478.13(d)(1), which defines "predominantly earn a profit" to mean that even persons not selling firearms for criminal purposes or terrorism "may have the intent to profit" if they do "not actually obtain the intended pecuniary gain from the sale or disposition of firearms";

- 27 C.F.R. § 478.11's definition of personal collection, which excludes firearms accumulated primarily for personal protection from the definition of personal collection;

- 27 C.F.R. § 478.13(c)(1), which presumes that a person is engaged in the business as a dealer if he "[r]esells or offers for resale firearms, and also represents to potential buyers or otherwise demonstrates a willingness and ability to purchase and resell additional firearms (*i.e.*, to be a source of additional firearms for resale)";

- 27 C.F.R. § 478.13(d)(2)(i), which presumes that someone "has the intent to predominantly earn a profit" if he "[r]epetitively or continuously advertises, markets, or otherwise promotes a firearms business . . . regardless of whether the person incurs expenses or only promotes the business informally."

### 3. Declaratory Judgment

Finally, Plaintiffs ask the court to declare that the Final Rule exceeded ATF's statutory authority. "Defendants do not dispute that if the Court finds that Plaintiffs have standing and rules for them on the merits, a declaratory judgment in Plaintiffs' favor would be appropriate." (Doc. 24, p. 83 n.40). So

the court will enter a declaratory judgment in Plaintiffs' favor and against Defendants on Count 1.

## <u>Count 2</u>: Final Rule is Arbitrary and Capricious

Plaintiffs next say that the Final Rule should be "held unlawful and set aside" because it is arbitrary and capricious in violation of 5 U.S.C. § 706(2)(A). This is the same relief Plaintiffs seek for their claims in Count 1. Because the court is enjoining the aspects of the Final Rule that Plaintiffs have standing to challenge for exceeding ATF's statutory authority, a finding that the Final Rule is also arbitrary and capricious does not appear to provide Plaintiffs with any meaningful relief. And several courts have found that once an agency action is found unlawful and set aside under one subsection of 5 U.S.C. § 706(2), the court needn't address whether the agency's action also violated a different subsection of § 706(2). *See Green Rock, LLC v. Internal Revenue Serv.*, 654 F. Supp. 3d 1249, 1252 (N.D. Ala. 2023); *see also VanDerStok v. Garland*, 680 F. Supp. 3d 741, 771 (N.D. Tex. 2023), *overruled on other grounds by Bondi v. VanDerStok*, 145 S. Ct. 857 (2025).

That said, the parties have not briefed whether a ruling in Plaintiffs' favor on Count 1 eliminates the need for the court to address Count 2. The court will thus **DENY WITHOUT PREJUDICE** both cross motions for summary judgment on Count 2. The court will discuss with the parties whether a ruling on the merits of Count 2 is now necessary during the October 14, 2025, telephone conference.

## <u>Counts 3–5</u>: Constitutional Challenges to Final Rule

Plaintiffs' final three counts raise constitutional challenges to the Final Rule. Count 3 alleges that the Final Rule violates the Fifth Amendment because it is unconstitutionally vague. Count 4 asserts that the Final Rule violates the Second Amendment, which protects "the right of the people to keep and bear arms." U.S. CONST. amend. II. And Count 5 contends that the Final Rule violates Separation of Powers principles because it "renders conduct unlawful that under governing statutory text, is unambiguously protected and legal." (Doc. 22, p. 42).

Under the constitutional avoidance doctrine, a federal court "should not pass on federal constitutional issues unless necessary to its decision." *Brown v. United States*, 748 F.3d 1045, 1049 (11th Cir. 2014); *Ashwander v. TVA*, 297 U.S. 288, 347 (1936) (Brandeis, J., concurring) ("The Court will not pass upon a constitutional question although properly presented by the record, if there is also present some other ground upon which the case may be disposed of.")). Indeed, "[i]f there is one doctrine more deeply rooted than any other in the process of constitutional adjudication, it is that we ought not to pass on questions of constitutionality . . . unless such adjudication is unavoidable." *Spector v. Motor Serv., Inc. v. McLaughlin*, 323 U.S. 101, 105 (1944).

The court has enjoined enforcement of the Final Rule against Plaintiffs on statutory grounds. So enjoining enforcement of the Final Rule against Plaintiffs on constitutional grounds would not provide Plaintiffs with any meaningful relief. But "[t]he existence of another adequate remedy does not preclude a declaratory judgment that is otherwise appropriate." *See* Fed. R. Civ. P. 57. And as part of their requested relief, Plaintiffs ask the court to (a) declare that the Final Rule violates the Fifth Amendment, (b) declare that the Final Rule violates the Second Amendment, and (c) declare that the Final Rule violates Articles I and II of the U.S. Constitution. (*See* Doc. 1, p. 35). While the parties have briefed the constitutional avoidance doctrine as to Count 5, they have not addressed that doctrine's application to Plaintiffs' claims that the Final Rule is unconstitutionally vague and violates the Second Amendment. Nor have they addressed whether that doctrine allows the court to pretermit a ruling on the requested declaratory relief.

The court thus finds it prudent to **DENY WITHOUT PREJUDICE** the parties' cross motions for summary judgment on Counts 3–5 and to discuss application of the constitutional avoidance doctrine to those counts during the October 14, 2025, telephone status conference. After the telephone conference, the court will likely order supplemental briefing or oral argument on this issue.

## IV.

## CONCLUSION

For these reasons, the court **GRANTS** Plaintiffs' motion for summary judgment (doc. 21) on Count 1 and **DENIES** Defendants' motion (doc. 23) as to that count. The court **DENIES WITHOUT PREJUDICE** the parties' motions for summary judgment on all other counts. The court will enter a separate order that permanently enjoins enforcement of several aspects of the Final Rule against Plaintiffs and sets a telephone status conference to discuss the remaining counts on **October 14, 2025, at 10:30 AM Central.**

**Done** and **Ordered** on September 30, 2025.

_____
**COREY L. MAZE**
UNITED STATES DISTRICT JUDGE